### IN THE UNITED STATES DISTRICT COURT FOR THE
### SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| **UNITED STATES OF AMERICA** <br><br> **EX REL. STEVEN ADLER,** <br><br>      **PLAINTIFF-RELATOR** <br><br>      **v.** <br><br> **THE SPORN COMPANY, INC. &** <br><br> **BIXLER'S, INC.,** <br><br>      **DEFENDANTS.** | **CIVIL ACTION** <br><br> **No. 1:20-cv-8194-AKH** <br><br>    **----------------------------** <br><br> **FOR VIOLATIONS OF THE FEDERAL FALSE CLAIMS ACT, 31 U.S.C. § 3729, ET SEQ.** <br><br> **AMENDED COMPLAINT** |

### AMENDED COMPLAINT

Plaintiff and *qui tam* Relator Steven Adler ("Relator"), through his attorneys, Sanford Heisler Sharp, LLP, alleges as follows, for his Amended Complaint against the Defendants The Sporn Company, Inc. ("TSC") and Bixler's, Inc. ("Bixler's Jewelers" or "Bixler's") (together hereinafter "Defendants"):

## I. <u>INTRODUCTION</u>

1.      This is an action to recover damages and civil penalties on behalf of the United States of America arising from false and/or fraudulent statements, records, and the concealment or avoidance of obligations to remit money to the United States in violation of the Federal False Claims Act, 31 U.S.C. § 3729 *et seq*., (hereinafter "the FCA").

2.      Under 19 U.S.C. § 1304(a), an importer must "legibly, indelibly, and permanently" mark each article imported into the United States with its country of origin. The purpose of the country of origin marking requirement is to inform purchasers where the good was produced, thereby allowing them to make informed buying decisions. *See United States v. Friedlander & Co.*, 27 C.C.P.A. 297, 302 (1940). For each article imported into the United States that is not marked with its country of origin and not destroyed, exported, or marked thereafter under Customs' supervision, an importer owes the U.S. government a 10% "marking" duty. *See* 19 U.S.C. § 1304(i) (captioned "Additional Duties for Failure to Mark"); 19 C.F.R. § 134.2.

3.      Beginning in June 2016, Defendants TSC and/or Bixler's imported jewelry manufactured in Montreal, Canada into the United States, without any markings showing its Canadian country of origin. Defendants did so, in part, to deceive consumers into believing that the jewelry was American made. Relator repeatedly advised the Defendants of the marking requirements, and even recommended using string tags that indicated the country of origin as a

good faith attempt to comply with the marking requirement until the jewelry could be permanently marked. Defendants, however, deliberately ignored his advice and continued importing jewelry without any indication to the ultimate consumer that the jewelry was manufactured in Canada. Only after the filing of this lawsuit did Defendants begin to permanently mark their jewelry with its country of origin.

4.    Defendants have nonetheless, to date, failed to pay or remit the 10% marking duty they owe on unmarked jewelry imported from Canada into the United States. Defendants' ongoing avoidance of this duty has defrauded the Government of millions of dollars and violates the FCA. This action seeks payment of this duty.

## II. <u>JURISDICTION AND VENUE</u>

5.    This Court has subject-matter jurisdiction over the claims brought under the False Claims Act pursuant to 31 U.S.C. § 3732(a) and 28 U.S.C. § 1331.

6.    Venue is proper in the Southern District of New York under 31 U.S.C. § 3732(a), which instructs that "[a]ny action under section 3730 [the False Claims Act] may be brought in any judicial district in which the defendant or, in the case of multiple defendants, any one defendant can be found, resides, transacts business, or in which any act proscribed by section 3729 occurred."

7.    Venue is also proper under 28 U.S.C. § 1391(b)(1)-(2), which says that "[a] civil action may be brought in—(1) a judicial district in which any defendant resides, if all defendants are residents of the State in which the district is located; [or] (2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated."

8.    Defendant TSC is incorporated in New York and is therefore subject to personal jurisdiction in New York.

9.    Personal jurisdiction and venue are also proper in this district as to both TSC and Bixler's, because both Defendants have regularly conducted business within this District. First, both Defendants have purchased diamonds, gemstones, and precious metal components for jewelry manufacturing from vendors located in New York City. Second, Defendants purposefully availed themselves of New York, and the Southern District of New York in particular: Defendants have advertised New York City-specific products on which they avoided obligations to pay customs duties. Defendants placed these New York City-specific products into the stream of commerce with the apparent intention that the products would reach New York City and be sold in New York City. And Defendants knew that their products were reaching New York City and in fact advertised this fact—presumably with the aim of generating yet further business in New York City.

10.    For example, TSC, through its wholly-owned subsidiary Bixler's Jewelers, sold a range of jewelry products bearing popular New York trademarks such as the New York Rangers, the New York Islanders, the New York Yankees, and New York University. These goods included Women's New York Yankees Bixler's Silver Engraved Triple Station Necklace; New York Yankees Bixler's Pinstripe Sterling Silver Dog Tag Necklace; New York Yankees Bixler's Women's Logo Engraved Multiband Cuff Ring; Women's Bixler's New York Yankees Logo Engraved Signet Ring; Women's New York Islanders Bixler's Diamond Logo Engraved Sterling Silver Multiband Ring; Bixler's New York Yankees Women's Diamond Bar Sterling Silver Bracelet; and a PANDORA charm inspired by the Radio City Rockettes. *See* Exs. 1-8.



*Figure 1: A ring sold by Bixler's Jewelers under the "Bixler" line with the New York Rangers trademark hallmarked into it. The ring was on sale for $134.99 as of July 2023. See Women's New York Rangers Bixler's Sterling Silver Ring, NHL Shop, https://shop.nhl.com/new-york-rangers/womens-new-york-rangers-bixlers-sterling-silver-ring/t-69263004+p-814225293505+z-8-1276332613 (last visited: July 14, 2023).*



*Figure 2: A bracelet sold by Bixler's Jewelers under the "Bixler" line with the New York Yankees trademark hallmarked into it. The ring was on sale for $159.99 as of July 2023. See New York Yankees Bixler's Women's Engraved White Sapphire Cuff Bracelet, MLB Shop, https://www.mlbshop.com/new-york-yankees/new-york-yankees-bixlers-womens-engraved-white-sapphire-cuff-bracelet/t-36441087+p-5871957013167+z-9-2116361981 (last visited: July 14, 2023).*

11.    Defendant Bixler's has advertised its location as "New York, New York" on its official social media page on Instagram with the apparent intention of generating interest in its products in New York City and/or promoting its presence in New York, New York. Ex. 9.

12.    Defendants transacted business with counterparties located in New York, NY.

13.    And Defendants sold products wholesale to retail stores in New York and via Amazon.com, including, upon information and belief, to consumers in New York.

14.    Defendants also knew that their products would reach and were reaching New York City. For example, on December 28, 2017, Defendant Bixler's, Inc. issued a social media posting on Instagram, congratulating a couple "on their recent engagement . . .  on the steps of [the American Museum of Natural History] . . . with a @devotiondiamonds ring," accompanied by a photograph of the couple and the product. Ex. 10.[1]

15.    In addition, at the time of the filing of this matter, both Defendants operated retail outlets in the state of New York: TSC operated a Perrywinkle's Fine Jewelry retail store in Plattsburg, New York and the Thousand Island Diamond Center in Watertown, New York, and Bixler's Jewelers operated its flagship store in Garden City, New York.

16.    Defendants also knew that injuries from the avoidance of customs duties would be felt in New York. These injuries include, but are not limited to, the deception of ultimate purchasers who could not make informed buying decisions as to the origin of the products they were purchasing and the sale of imported merchandise in New York at prices lower than those of competitor merchandise on which importers properly reported applicable customs duties, as well as merchandise made in the United States.

17.    In sum, TSC is a resident of New York and both Defendants have purposefully availed themselves of the Southern District of New York. They have advertised in this district, transacted business in this district, and violated the FCA in this district, including through the actions set forth in this Amended Complaint. Personal jurisdiction and venue are therefore proper in the Southern District of New York.

---

[1] The American Museum of Natural History has been located in New York City's Upper West Side for over a century.

### III.  **PARTIES**

18.    Relator Steven Adler is a citizen of Florida and worked for TSC in a variety of roles from January 2016 to December 2019. TSC first engaged Relator as an independent consultant from January 2016 to May 2016; then, from May 2016 to February 2018, Relator served as Vice President ("VP") of Manufacturing for TSC. In that role, Relator was responsible for leasing TSC's manufacturing plants in Montreal, creating operating policies and procedures, and overseeing manufacturing operations at those plants. In February 2018, TSC appointed Relator as Chief Technology Officer and Chief Operating Officer of a non-jewelry business unit, roles in which Relator served until he separated from TSC in December 2019.

19.    Defendant The Sporn Company, Inc., which sometimes does business as Perrywinkle's Fine Jewelry, is incorporated in New York and has its principal place of business in Vermont. TSC manufactures fine jewelry and licensed jewelry products—including rings, necklaces, broaches, and bracelets—in Montreal, Canada, and imports the jewelry into the United States for sale.[2] TSC sells products to the end consumer via e-commerce and its retail stores, including Perrywinkle's Fine Jewelry, Thousand Island Diamond Center, and Bixler's Jewelers. TSC also wholesales its fine jewelry to retailers like Fink's Jewelers and Fox Jewelers, which have locations in Virginia and North Carolina, and New York, respectively. TSC—through acquisitions, partnerships, trademarks, franchises, and licenses—significantly expanded its operations during the 2016 to 2019 period. For example, in 2016, TSC partnered with De Beers Group to procure diamonds to manufacture jewelry under its "Devotion" line. Upon information and belief, in 2019,

---

[2] TSC controls its Canadian operations through Sporn du Canada, Inc., also known as The Sporn Company of Canada, Inc. Through Sporn du Canada, TSC owns and operates manufacturing plants in Montreal, Canada, and exports jewelry from Canada to Defendant TSC in the United States. Defendant TSC is the majority and/or exclusive shareholder of Sporn du Canada, Inc.

TSC, through sales of Devotion, Perrywinkle's Fine Jewelry, Bixler's Jewelers, and other jewelry merchandise, generated revenues in excess of $20 million, the vast majority of which originated at its Canadian manufacturing facilities.

20.     Defendant Bixler's, Inc. was acquired by Defendant TSC in April 2016 and remains a wholly owned subsidiary of TSC.[3] Bixler's, Inc. (which sometimes does business as Bixler's Jewelers) is incorporated in Delaware and shares a corporate headquarters in Vermont with TSC. Through this acquisition, Defendant TSC acquired the "America's Oldest Jeweler" trademark and promoted its Bixler's Jewelers products as American-made. Defendant Bixler's Jewelers sold products under two brand names: "Bixler's 1785" and "Bixler." Under the "Bixler's 1785" brand, Bixler's Jewelers, operating out of an Allentown, Pennsylvania store, sold "exceptional American jewelry" including engagement rings, wedding rings, and watches. *See* BIXLER'S EST. 1785, https://bixlers1785.com (last visited: September 22, 2020). Under the "Bixler" line, Bixler's Jewelers sold "official licensed jewelry"—jewelry marked with hundreds of popular American trademarks, including the Marines, UFC, Major League Baseball, Ghostbusters, and Star Trek. *See* BIXLER, https://www.bixlers.com/ (last visited: July 14, 2023). Bixler's Jewelers sold and sells jewelry through its e-commerce platform, and through its retail stores, including, at the time of the filing of the Complaint in this matter, at its flagship store located at 630 Old Country Rd, Suite 1103B, Garden City, New York.

21.     TSC and Bixler's Inc. have operated as alter egos since TSC's acquisition of Bixler's Jewelers. TSC and Bixler's, Inc. share the same management team, policies, Montreal manufacturing facilities, Vermont corporate address, and distribution network, and both are

---

[3] Defendant TSC has admitted that Bixler's Jewelers is a wholly owned subsidiary of TSC in its Corporate Disclosure Statement. Dkt. 24.

overseen by Perry Sporn.

22.    Few if any meaningful corporate formalities exist between TSC and Bixler's. Mr. Sporn controls both entities: He is the owner of Defendant TSC, as well as its President, CEO, Director, and Secretary and also controls the operations and strategy of Bixler's Jewelers. Both TSC and Bixler's, Inc. are represented by the same counsel in this action who refer to both entities as a single "client." And TSC was, at all times relevant to this case, the owner of all inventory for both TSC and Bixler's, Inc. and operated as the importer of record for said inventory, including through its Canadian counterpart, Sporn du Canada. Indeed, the website of Bixler's, Bixlers.com, states, "The Sporn Company dba Bixlers" in its Terms of Service. Ex. 11. Moreover, a purchase made on the Bixler's website identified its sender as "The Sporn Company" on the packaging of the product. Ex. 12.

23.    As of the filing of the Amended Complaint, it is unclear whether Bixler's, Inc. continues to exist in any meaningful way. The Delaware Department of State, Division of Corporations reflects just two filings by Bixler's, Inc. since 2016, the latter of which is a "Renewal for Void" in May 2020, suggesting that Bixler's, Inc. failed to file annual reports in the preceding period and may have ceased operations. Ex. 13.

## IV.    REGULATORY STRUCTURE

### A.    General Regulations for Importing Products into the United States.

24.    All merchandise imported into the United States must be "entered," unless specifically exempted.  19 C.F.R. § 141.4(a); 19 U.S.C. § 1484.  "Entry" means, among other things, that an importer or its agent must file appropriate documents with an officer of United States Customs and Border Protection ("CBP") that allows CBP to assess the customs duties due on the merchandise being imported into the United States.  19 C.F.R. § 141.0a(a).

25.     At the time of entry into the United States, the importer must present to CBP: (1) a bill of lading or air waybill; (2) a commercial invoice; and (3) an entry summary, also known as CBP Form 7501. *See, e.g.*, 19 C.F.R. §§ 141.11, 141.19(a), 141.81, 141.86(a), 142.3(a), 142.6(a).

26.     The importer is also required to deposit estimated duties with CBP at the time of entry into the United States. 19 U.S.C. § 1505; 19 C.F.R. § 141.101. The amount of customs duty owed is equal to the value of the imported merchandise multiplied by its applicable duty rate. *See generally* 19 C.F.R. §§ 152.11, 152.12, 1304(i).

27.     Accordingly, the value or approximate value of the imported merchandise must be declared in the commercial invoice and entry summary.  Federal law provides that every importer must file a declaration stating that the values set forth on these documents are accurate. 19 U.S.C. § 1485.

28.     The entry summary, CBP Form 7501, also requires the importer to specify the applicable tariff rates. With respect to marking duties, the form specifically requires importers to record "any other fee, charge or exaction that applies" and any "estimated duty . . . and any other fees or charges" owed to the Government. *See* CBP Form 7501.

29.     CBP Form 7501 further specifically requires a declaration from the person entering the merchandise that "the statements in the documents herein filed fully disclose to the best of my knowledge and belief the true prices, values, quantities . . . and are true and correct . . . I will immediately furnish to the appropriate CBP officer any information showing a different statement of facts." *See* CBP Form 7501.

30.     Applicable regulations also require that "any record required to be made, kept, and rendered for examination and inspection by Customs . . . shall be kept for 5 years from the date of entry, if the record relates to an entry, or 5 years from the date of the activity which required

creation of the record." 19 C.F.R. § 163.4(a).

31.    Duty is owed each time merchandise enters the United States.  19 C.F.R. § 141.2.

B.    **Marking Requirements.**

32.    Under the Tariff Act, "[E]very article of foreign origin . . . imported into the United States shall be marked in a conspicuous place as legibly, indelibly, and permanently as the nature of the article (or container) will permit in such manner as to indicate to an ultimate purchaser in the United States the English name of the country of origin of the article." 19 U.S.C. § 1304(a); *See also* 19 C.F.R. § 134.11.

33.    The marking requirements inform the "ultimate purchaser" of the country of origin of the product that has been purchased. 19 U.S.C. § 1304(a). The ultimate purchaser is the "last person in the United States who purchases the good in the form in which it was imported." 19 C.F.R. § 134.1(d).

34.    As CBP Opinion No. N259851 sets forth:

Congressional intent in enacting 19 U.S.C. § 1304 was "that the ultimate purchaser should be able to know by an inspection of the marking on the imported goods the country of which the goods is the product. The evident purpose is to mark the goods so that at the time of purchase the ultimate purchaser may, by knowing where the goods were produced, be able to buy or refuse to buy them, if such marking should influence his will." *See United States v. Friedlander & Co.*, 27 C.C.P.A. 297, 302 (1940).

CBP, N259851 (Dec. 24, 2014), https://rulings.cbp.gov/ruling/N259851.

35.    The country of origin of jewelry affects the value of the jewelry and is thus of particular importance to the ultimate purchaser. *See e.g.*, Gabe Rubin, *Consumers Prefer 'Made in America' Label Over Local or Foreign-Made*, MORNING CONSULT (July 5, 2015), https://morningconsult.com/2015/07/05/consumers-prefer-made-in-america-label-over-local-or-foreign-made/ (finding that Americans prefer to buy U.S.-made products over foreign products);

*Norcal/Crosetti Foods, Inc. v. U.S. Customs Serv.*, 758 F. Supp. 729, 737 (Ct. Int'l Trade 1991) (stating that one purpose of the marking regulation was to protect consumers from misvaluing merchandise by misidentifying the country of origin (reversed on other grounds)); *Marking of Country of Origin on U.S. Imports*, U.S. Customs and Border Protection, https://www.cbp.gov/trade/rulings/informed-compliance-publications/marking-country-origin-us-imports (last visited April 3, 2023) (CBP stating that the marking regulations are meant to "inform the ultimate purchaser in the United States of the country in which the imported article was made").

36.    If a good is not marked in accordance with the above provisions, it "shall be subject to additional duties of 10 percent of the final appraised value." 19 C.F.R. § 134.2. The additional duty is not considered a penalty, but "is assessable for failure either to mark the article (or container) to indicate the English name of the country of origin of the article or to include words or symbols required to prevent deception or mistake." *Id*; *see also* 19 U.S.C. § 1304(i); *cf. United States ex rel. Customs Fraud Investigations, LLC. v. Victaulic Co*., 839 F.3d 242, 258 (3d Cir. 2016) ("In sum, failure to pay marking duties may give rise to reverse false claims liability.").

37.    Marking duty must be paid by the importer regardless of whether the good is exempt from the payment of other customs duties. *See generally* 19 U.S.C. § 1304(i).

### C.    The North American Free Trade Agreement.

38.    The North American Free Trade Agreement ("NAFTA") is a treaty that was entered into by the United States, Canada, and Mexico and became effective on January 1, 1994.

39.    NAFTA allowed the United States, Canada, and Mexico to establish rules to determine the country of origin of goods traded between the three countries, including for marking purposes.

40.    The United States established that "[t]he country of origin of a good is the country in which: (1) the good is wholly obtained or produced; (2) the good is produced exclusively from domestic materials; or (3) each foreign material incorporated in that good undergoes an applicable change in tariff classification set out in § 102.20 and satisfies any other applicable requirements of that section, and all other applicable requirements of these rules are satisfied." 19 C.F.R. § 102.11(a).

41.    Typically, the country of origin is the country in which a good is manufactured. This is true even when materials are exported from the United States into Canada for processing and, subsequently, imported back into the United States. Under such circumstances, there may be a change in the alteration of the applicable tariff category that makes Canada the country of origin. *See Bestfoods v. United States*, 260 F.3d 1320, 1322 (Fed. Cir. 2001).

42.    For example, according to the Harmonized Tariff Schedule of the United States (2020), precious gemstones have a different tariff classification than jewelry that incorporates those precious gemstones. Separate individual precious gemstones, such as diamonds, or cultured pearls that are "only temporarily strung for the convenience of transport" generally fall under a tariff classification between headings 7101 and 7105. *See* Harmonized Tariff Schedule of the United States. Washington: International Trade Commission: U.S. G.P.O., Section 14, 2020. Jewelry made of gold, silver, diamonds, and other precious materials, however, generally fall under a tariff classification heading between 7113 and 7117. *See id*. Thus, by transforming precious gemstones (HTS headings 7101 through 7105) into jewelry (HTS headings 7113 through 7117) the product undergoes a tariff shift. Therefore, precious gemstones exported from the United States into Canada for manufacture into jewelry and, subsequently, imported back into the United States would be considered to be made in Canada.

12

43. Accordingly, when raw materials for jewelry are exported from the United States to Canada, and then reimported into the United States as finished jewelry, the resulting jewelry is considered a product of Canada and must be so marked in accordance with 19 U.S.C. § 1304(i).

**D.    The False Claims Act.**

44. Under the "reverse" provision of the FCA, 31 U.S.C. § 3729(a)(1)(G), "any person who— knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government, is liable to the United States Government for a civil penalty of not less than [$11,665] and not more than [$23,331], as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 (28 U.S.C. 2461 note; Public Law 104–410), plus 3 times the amount of damages which the Government sustains because of the act of that person."

45. The FCA permits suits by a private person based on such violations. 31 U.S.C. § 3730(b).

46. Avoidance of the obligation to pay 10% duty for failure to mark goods with their country of origin is a violation of the FCA. *See United States ex rel. Customs Fraud Investigations, LLC. v. Victaulic Co.*, 839 F.3d 242, 256 (3d Cir. 2016); Stipulation and Order of Settlement and release Between the United States and Relator, *United States ex rel. Olarte v. Temple St. Clair, Inc.*, (S.D.N.Y. 2018), (No. 15 Civ. 5015). In revising the reverse false claims provision of the FCA as part of the Fraud Enforcement and Recovery Act of 2009 ("FERA"), the Senate Report explicitly stated that "customs duties clearly fall within the new definition of the term 'obligation' absent an express reference and any such specific language would be unnecessary." S. Rep. No. 111-10, at 14 n.10 (2009).

## V.  DEFENDANTS' FRAUDULENT SCHEME

47.    Beginning in June 2016, and, upon information and belief, continuing through at least the filing of the Complaint in this matter, TSC, and Bixler's Jewelers intentionally failed to legibly, indelibly, and permanently mark the country of origin on jewelry that they imported into the United States from Canada. At the same time and to date, they have intentionally and fraudulently avoided their obligation to pay or remit 10% marking duty for their failure to mark the jewelry. On numerous occasions, Relator informed TSC and Bixler's Jewelers executives, including Mr. Sporn, that U.S. law required TSC and Bixler's Jewelers to indelibly mark their jewelry as made in Canada. Instead of complying, however, Defendants deliberately ignored the statutes and regulations and acted to conceal their non-compliance. Defendants then failed to remit applicable marking duties to the United States. In total, Relator believes Defendants fraudulently evaded and continue to evade obligations to pay millions of dollars in marking duty in violation the FCA.

### A.    Defendant TSC Manufactured Jewelry in Canada But Did Not Mark It as Made in Canada and Instead Marketed It as Made by "America's Oldest Jeweler."

48.    Since June 2016, TSC has manufactured jewelry in Quebec, Canada. From May 2016[4] until May 2017, TSC owned a factory at 1240 Phillips Square, Montreal, Quebec H3B 3H4 (the "Phillips" plant). From May 2017 until present, TSC has operated a factory at 9494 Boulevard Saint Laurent, Montreal Quebec, H2N 1P4 (the "Saint Laurent" plant) (collectively, both plants are referred to as the "Montreal Plants").[5] Between 2016 and 2020, TSC manufactured in excess

---

[4] As explained below, TSC acquired the manufacturing plant in May 2016 and began production in June 2016.

[5] Both Montreal Plants were internally known as "Devotion Atelier," but are defined as the Phillips plant and the Saint Laurent plant for ease of reference in this Complaint.

of $16 million[6] worth of jewelry at these plants, which it then imported[7] to the United States for sale through a range of distribution channels, including through the Bixler's Jewelers licensed brands.

49.     At both Montreal Plants, TSC manufactured jewelry that was exported to the United States to be sold to consumers. This manufacturing (involving the transformation of raw materials, including gemstones, into finished jewelry) rendered Canada the country of origin for jewelry manufactured at the Montreal Plants. In fact, TSC certified on the cross-border commercial invoices that were presented to CBP officers that the jewelry was made in Canada.

50.     But TSC did not mark its jewelry to allow the ultimate consumer to identify that the jewelry was made in Canada. Specifically, Defendants did not legibly, indelibly, and permanently mark this jewelry as "made in Canada" as required by law, nor did they even mark the jewelry's packaging provided to the ultimate consumer.

51.     More egregiously, TSC manufactured and imported jewelry for Bixler's Jewelers at its Montreal Plants and marketed this jewelry under the "Bixler's 1785" and "Bixler" brands as made by "America's oldest jeweler." *See Why Bixler's*, BIXLER'S EST. 1785, https://bixlers1785.com/pages/why-bixlers (last visited: September 22, 2020). **According to a June 2016 article announcing TSC's acquisition of Bixler's Jewelers in April 2016, Mr. Sporn stated: "We [TSC] are the only American-made jewelry left, and we wanted to marry the**

---

[6] This figure represents the total value of the cross-border commercial invoices in Relator's possession for jewelry produced at the Phillips and Saint Laurent plants. Relator believes that additional jewelry, beyond that for which he possesses invoices, was manufactured in Canada and shipped to the United States, making Defendants' potential liability even greater. For example, Relator does not possess invoices from May 2016 to October 2017.

[7] From 2016 to 2018, TSC shipped the products by FedEx from the Montreal Plants to the Burlington facility. In April 2018, TSC began transporting the jewelry itself by courier between Montreal and Burlington for security purposes. It contracted with Livingston International to provide customs brokerage services.

**two" companies, meaning TSC and Bixler's Jewelers.** Rob Bates, *Sporn Acquires Bixler's, America's Oldest Jeweler*, JCK (June 4, 2016), https://www.jckonline.com/editorial-article/sporn-acquires-bixlers-americas-oldest-jeweler/.

52.     Defendants engaged in this bait and switch intentionally, in order to trade on Bixler's Jewelers' reputation as an American company. *See FTC Responds to Industry Request Regarding "Made in USA" Claims*, MJSA, https://mjsa.org/about_mjsa/mjsa_news/detail/ ftc_responds_to_industry_request_regarding_made_in_usa_claims_258 (last visited: September 22, 2020) (citing consumer research that showed "almost 3 in 5 Americans believe that "Made in America" means that all parts of a product, including any natural resources it contains, originated in the U.S.").

53.     For example, TSC marketed Bixler's Jewelers' jewelry under the "Bixler's 1785" brand as high-end jewelry from "America's Oldest Jeweler" sold for the same prices as "common rings at chain stores." *Why Bixler's*, BIXLER'S EST. 1785, https://bixlers1785.com (last visited: September 22, 2020). TSC even promoted a video titled "Made in America: Watch How We Make Jewelry" on the bixlers1785.com home page. BIXLER'S EST. 1785, https://bixlers1785.com (last visited: September 22, 2020). But "Bixler's 1785" jewelry, was not made in the United States; it was made in Canada. Bixler's Jewelers and TSC, thus deceived the ultimate purchasers of the country of origin of the jewelry.

54.     Being "Made in America" was integral to Defendants' branding. Under the "Bixler" line, TSC, through Bixler's Jewelers, sold licensed jewelry products, including jewelry affixed with the registered trademarks of American institutions, such as American colleges, NASCAR, and the United States Army. Again, Bixler's Jewelers promoted itself as "America's First Jeweler" in its representations to consumers. *See X Marks the Spot*, BIXLER,

https://www.bixlers.com/about-us (last visited: September 22, 2020). But this jewelry, too, was made in Canada and not indelibly marked with its Canadian origin.[8]



*Figure 3: A ring sold by Bixler's Jewelers under the "Bixler" line with the U.S. Army trademark hallmarked into it. The ring was on sale for $199. See US Army Sterling Silver Enamel Ring In Black & Yellow, BIXLER, https://www.bixlers.com/us-army-sterling-silver-enamel-ring-in-black-yellow (last visited: September 22, 2020).*

55.     Other jewelry that TSC manufactured and imported, including for Perrywinkle's Fine Jewelry retail locations and for Thousand Island Diamond Center, similarly lacked any markings for the ultimate consumer.

56.     Likewise, TSC manufactured "Devotion Diamonds" jewelry licensed by the De Beers Group "Forevermark" brand at the Montreal Plants. It then imported the Devotion Diamonds jewelry into the United States for sale to De Beers Group "Forevermark" licensed retailers, and individual consumers, without indelibly marking it with its Canadian origin.[9]

57.     Defendants persisted in this practice even though Relator informed Mr. Sporn and other TSC executives, on at least four occasions, that failing to mark jewelry with its Canadian origin violated marking requirements.

---

[8] When products are marked with a trademark that references the United States—such as Bixler jewelry marked with the trademark "United States Army"—it is particularly important to "legibly, conspicuously, and permanently" mark the country of origin "in close proximity" to the trademark or in another "conspicuous location" to ensure consumers are not confused about the origin of the product. *See* 19 C.F.R. § 134.47.

[9] Forevermark Jewelry is widely sold in Manhattan, with DeBeers identifying four retailers selling the products. Ex. 14.

58.    At no time did Defendants remit to the United States the 10% marking duty owed for failing to mark their jewelry as made in Canada. And at no time did Defendants ever inform the United States that such duty was owed.

59.    Motivated in part by TSC's repeated violations, Relator ultimately left TSC and ceased working with Mr. Sporn in December 2019.

**B.    Between 2016 and 2019, Relator Repeatedly Informed Mr. Sporn and TSC Executives of the Requirement to Mark Jewelry with Its Country of Origin for the Ultimate Consumer and Repeatedly Discovered that TSC and Mr. Sporn Did Not Comply with the Marking Requirements.**

*i.    TSC and Bixler's Jewelers Were Capable of Indelibly Marking Jewelry with its Country of Origin But Refused to Do So.*

60.    In May 2016, TSC hired Relator as VP of Manufacturing to oversee the manufacturing of jewelry at the Phillips plant in Montreal, Canada.

61.    Also in May 2016, TSC, through its subsidiary Sporn du Canada, Inc., leased the Phillips plant. TSC contemporaneously purchased a laser engraving machine from the Birks Group, which had previously owned and operated the plant. The laser engraving machine was capable of marking jewelry with its country of origin and would eventually be used to mark jewelry with other branding information. TSC, however, did not hire or even attempt to hire anyone who could operate the laser engraving machine at the Phillips plant at that time.

62.    In June 2016, Relator, Mr. Sporn, VP of Marketing Jevan Fox, and Birks Group Consultant Alain Marcel developed the policies and procedures for the Phillips plant. During their discussions, Relator informed Mr. Sporn and the other policy makers that U.S. law required that jewelry manufactured in Canada and then imported in the United Sates must be marked with its country of origin. VP Fox and Consultant Marcel concurred. It was agreed that because no one at the Phillips plant could operate the laser engraving machine, as an interim measure, TSC would have the plant's finished jewelry shipped to TSC's Burlington, Vermont facility, where it would

18

be engraved before being delivered to its ultimate purchaser.

63.    Relator further suggested that in order to facilitate the cross-border transfer for permanent marking, Defendants should at minimum tag or mark the jewelry in some way as a good-faith attempt to comply with the spirit (although not the letter) of the marking requirement. It was therefore agreed in the June 2016 meeting to attach string tags with the country of origin for jewelry being manufactured in Canada.

64.    But, contrary to Mr. Sporn's representation, TSC did not provide a string tag following manufacture in Canada, nor did it permanently mark its jewelry with its country of origin at the Burlington facility—although TSC did permanently mark the jewelry with other information that it apparently believed would be helpful to the product's sale valuation.

65.    For example, at the Burlington facility, TSC marked Devotion jewelry with the manufacturer's hallmark (i.e., "Devotion"), along with the precious metal type and content. But VP of Marketing Fox and Mr. Sporn refused to include the country of origin in the engraving standards despite Mr. Sporn's agreement to do so in June 2016.

66.    This failure was not unwitting. VP Fox, Engraver Jamie Kramer, and Director of Product Development Malyn Dziurzynski all inspected Devotion jewelry products at the Burlington facility to ensure quality standards for the engraving. Mr. Sporn thereafter performed regular quality inspections and provided the final approval for delivery to the consumer.



*Figure 4:*

*A ring marketed by TSC at Perrywinkle's Fine Jewelry without the country of origin indelibly marked, but prominently displaying the Devotion trademark.*

67.    As a result of this practice, Defendants imported jewelry into the United States that was not marked with its country of origin when sold to the ultimate consumer.

68.    For example, a FedEx invoice from April 17, 2017, shows that jewelry valued at $3,157.15 was shipped from the Phillips plant in Montreal to TSC's headquarters in Burlington, Vermont. *See* Ex. 15. On the invoice, TSC identified the jewelry's country of origin as Canada, and Director of Manufacturing Francois Limoges certified that the "information on this document is true and accurate," including the applicable tariff rates, and that it complied "with the origin requirements specified for those goods in [NAFTA]." *Id*. Relator believes that the jewelry in this order was not indelibly marked with the country of origin, nor was there any packaging sent to consumers with the correct country of origin, because TSC's standard operating procedure was not to mark either its jewelry or the jewelry's packaging with a product's country of origin.

69.    Accordingly, Defendants fraudulently avoided their obligation to report to the U.S. Government, including on Form 7501, that they owed 10% marking duties under 19 U.S.C. § 1304 *et seq*. on the foregoing transaction, as well as many others during this period.

    *ii. In September 2017, TSC Ignored PricewaterhouseCoopers's Advice that Jewelry Must Be Marked with Its Country of Origin.*

70. In early 2017, TSC hired Francois Limoges as Director of Manufacturing. Director Limoges reported to Mr. Sporn and was responsible for operations at the Phillips plant. At approximately the same time, TSC also moved the engraving process from Burlington to the Phillips plant in Canada. Still, TSC did not mark its jewelry with its Canadian country of origin.

71. Also in early 2017, TSC tasked Relator with securing, designing, and building out a new factory in Montreal as well as investigating methods to transition its jewelry-repair and Rolex-watch-repair operations to Canada.[10] Under the proposed new arrangement, TSC would hire a courier to transport broken jewelry and watches from the United States to Canada, repair the broken jewelry at its Montreal Plants, and then return the finished goods to the United States.

72. Relator hired PricewaterhouseCoopers ("PwC") to advise on tariffs and country of origin marking regulations applicable to the repair of customer-owned jewelry and Rolex watches. It was understood that marking of customer-owned jewelry as "Made in Canada" following a repair would be a non-starter for any transition plan, and the goal of PwC's engagement was therefore to ascertain whether marking would be required under such circumstances.

73. In September 2017, Relator, Mr. Sporn, and Director of Finance Terry Lavoie met with two PwC consultants, Kristin M. Bohl and Jaimie Seiden, to discuss PwC's findings. In the meeting, PwC informed Relator, Mr. Sporn, and Director Lavoie that repairs may be exempted from customs duties as temporary export/imports, and accordingly a country-of-origin marking would not be required. Nonetheless, PwC reaffirmed that any of TSC's other commercial products manufactured in Canada must be permanently marked with Canada as the country of origin before

---

[10] TSC eventually moved its repair operations to Canada beginning in December 2017.

being imported into the United States.

74.     Defendants ignored PwC's warnings about the marking regulations. Instead, they continued to deliberately conceal that their jewelry was made in Canada by failing to engrave it with its country of origin, even though Defendants were capable of doing so, as explained above.

75.     For example, an invoice from importer Livingston dated November 14, 2018, shows that jewelry valued at $96,342.20 was transported by courier and imported under bond by Livingston International from the Saint Laurent plant in Montreal to TSC headquarters in Burlington. *See* Ex. 16. On the invoice, TSC identified the jewelry as "made in Canada," and Director of Manufacturing Majid Rashtchian certified that the "information on this document is true and accurate," including the applicable tariff classifications, and that it complied "with the origin requirements specified for those goods in [NAFTA]." *Id*. But Relator believes that the jewelry in this order was not marked with the country of origin, nor was there any packaging identifying to the consumer that the jewelry was made in Canada, because TSC had a practice of not marking its jewelry and stripping country-of-origin information from consumer packaging. Defendants also did not remit any marking duty to the United States.

76.     Accordingly, Defendants fraudulently omitted to report to the U.S. Government, including on Form 7501, that they owed 10% marking duties under 19 U.S.C. § 1304 *et seq*. on the foregoing transaction, as well as many others during this period.

> iii.    *In Mid-2018, Relator Informed Mr. Sporn that TSC may be Subject to FCA Liability.*

77.     In June 2018, Relator read on the website *National Jeweler* about *United States ex. rel. Olarte v. Temple St. Clair*, a case in which another jewelry company agreed to settle claims that it violated the False Claims Act by failing to mark its jewelry with its country of origin, along with other violations of U.S. customs regulations. He thereafter sought to bring Defendants into

compliance with increasing urgency. But Defendants refused to act.

78.     On June 28, 2018, Relator e-mailed Mr. Sporn a link to the *National Jeweler* article and wrote that the article "references the lack of mark indicating country of origin as another violation outlined in Title 19 Section 103." *See* Ex. 17.

79.     Mr. Sporn was unpersuaded. He dismissed the article and, on June 28, 2018, responded that The Sporn Company was "not doing" the practices identified in *United States ex. rel. Olarte v. Temple St. Clair*. *Id.*

80.     In response, Relator specifically pointed Mr. Sporn to the article's statement that Temple St. Clair "failed to affix permanent markings to jewelry manufactured in Sri Lanka or Thailand identifying the jewelry's country of origin when it entered the U.S., then sold the jewelry to retailers without any markings indicating country of origin." *Id.* (emphasis and internal quotation omitted). He received no response.

81.     On July 4, 2018, Relator again wrote to Mr. Sporn, this time as follows: "I reviewed the Title 19 regulations and guidelines, we are NOT in compliance. . . . There are only a few unique exceptions to this regulation, none of which is directly applicable. . . . Thus far none of the border agents have asked or inspected but, [sic] they will at some point seize one of our commercial shipments for this reason. . . . I think we need to be proactive on this." *Id.* (capitalization original). Relator further recommended that TSC "immediately . . . for the customer deliveries . . . provide a 'Made in Canada' label in or on the box" to show a good-faith intent to comply with the regulations and perhaps to avoid an action to enforce marking duties. *Id.*

> iv.    *Defendants Feigned Compliance with the Marking Regulations.*

82.     On July 6, 2018, Mr. Sporn appeared to acquiesce. He wrote, "Ok . . . we'll get a label for the polybag," referring to the plastic bags that typically contain TSC's jewelry during

shipment from its manufacture site in Canada, to TSC's facility in Burlington, and in turn to the ultimate consumer. He further committed to discuss the labeling standards with Director of Manufacturing Administration Majid Rashtchian and Logistics Manager Brian Kavanagh. *Id*.

83.     On July 8, 2018, Relator again spoke with Mr. Sporn regarding TSC's failure to mark its jewelry, this time in person. Relator again expressed that TSC's failure to mark its jewelry was a major issue and that TSC needed to begin permanently marking its jewelry. Mr. Sporn responded to Relator, "Thank you, I'll look into it."

84.     Subsequently, Relator periodically followed up with Logistics Manager Kavanagh to determine whether TSC had begun to mark its jewelry or the consumer packaging at the time of shipment to the customer. In September 2018, Mr. Kavanagh informed Relator that although TSC now applied a "Made in Canada" label to the polybags used to transport the products from Montreal to Vermont, at the Burlington facility, the jewelry was then removed from the labeled polybag and re-packaged for shipment to the consumer without any marking indicating that the product was manufactured in Canada.

85.     This practice served to feign compliance with the marking requirement: Defendants included tags on the containers of the jewelry that stated "Made in Canada" for purposes of transporting the jewelry across the U.S. border *only*. If CBP inspected TSC merchandise at the border, it would appear to be marked (although still not indelibly or permanently). Defendants ensured, however, that these tags would never be seen by the ultimate consumer: They were promptly removed when the jewelry arrived at TSC's Burlington, Vermont facility. There, the unmarked jewelry was repackaged into new consumer packaging where all indications of the country of origin were removed—thus signaling to consumers that it was made in America. As far as Relator is aware, Defendants' jewelry was never marked or labeled for the ultimate consumer

(despite his repeated warnings) until after the filing of this lawsuit.

86. TSC's deceptive packaging for purposes of transporting merchandise across the border thus served to deceive CBP agents, who would believe that TSC was attempting to comply with marking regulations, when, in fact, it was not.

87. Relator also witnessed Defendants' failure to mark products firsthand: He personally witnessed Director Dziurzynski assemble licensed United Fighting Championship ("UFC") products to be sold by Bixler's Jewelers under the "Bixler" line that were not marked with the country of origin for shipment to the ultimate consumers.

88. What Relator witnessed was but one of many transactions comprising substantial amounts of jewelry. For example, a Livingston invoice from December 17, 2018, shows that TSC transported by courier, and imported under bond by Livingston International, jewelry valued at $79,221.96, with the jewelry traveling from the Saint Laurent plant in Montreal to TSC's headquarters in Burlington, Vermont. *See* Ex. 18. On the invoice, TSC identified that the jewelry as "made in Canada," and Director Rashtchian certified that the "information on this document is true and accurate" and that it complied "with the origin requirements specified for those goods in [NAFTA]." *Id*. But, again, Relator believes that the jewelry in this order was not marked with the country of origin, nor was there any packaging sent to consumers with the correct country of origin, because TSC's standard operating procedure was not to mark either its jewelry or the jewelry's polybag for the ultimate consumer.

89. And, in no case, did TSC report to the U.S. Government, including on accompanying Forms 7501, that it owed marking duty, nor did TSC remit such marking duty to the U.S. Government.

*v. In March 2019, Relator Informed TSC that TSC and Bixler's Jewelers Were Still Noncompliant.*

90.     In February 2019, Relator visited the Saint Laurent plant to consult on the installation of manufacturing equipment and to assess compliance issues for daily operations.[11] There, he observed that the country of origin was still not being indelibly marked on any Canadian-manufactured TSC or Bixler's Jewelers jewelry.

91.     On March 18, 2019, at an in-person meeting with Mr. Sporn held at TSC's Burlington, Vermont headquarters, Relator again confronted Mr. Sporn about Defendants' failure to mark their jewelry with its country of origin. *See* Ex. 19 (stating that a topic for the meeting with Mr. Sporn was the "U.S. Import Product Labeling Violation"). Mr. Sporn again reassured Relator he would bring the Defendants' practices into compliance.

92.     But, yet again, Mr. Sporn failed to follow through. And Defendants continued to import Canadian-manufactured jewelry that was not legibly, indelibly, and permanently marked with its Canadian country of origin into the United States.

93.     For example, on August 26, 2019, TSC transported by courier, and imported under bond by Livingston International, $44,000.99 worth of jewelry, with the jewelry traveling from the Saint Laurent plant to its headquarters in Burlington. *See* Ex. 20. On the invoice submitted to CBP, TSC identified the jewelry as "made in Canada." Office Administration Manager Joanne Seguin certified that the "information on this document is true and accurate" and that it complied "with the origin requirements specified for those goods in [NAFTA]." *Id*. But, upon information and belief, the jewelry in this order was not marked with the country of origin, nor was there any packaging sent to consumers with the correct country of origin, because it was Defendants'

---

[11] TSC began leasing the Saint Laurent plant after the lease for the Phillips plant ended in May 2017.

standard operating procedure not to include country of origin information on merchandise shipped to consumers.

94. By way of further example, on November 22, 2019 and/or November 25, 2019, TSC transported by courier, and imported under bond by Livingston International, $238,545.80 worth of jewelry, with the jewelry traveling from the Saint Laurent plant in Montreal to its headquarters in Burlington. *See* Ex. 21. On the invoice, TSC identified the jewelry as "made in Canada," and Manager Seguin certified that the "information on this document is true and accurate" and that it complied "with the origin requirements specified for those goods in [NAFTA]." *Id.* But, upon information and belief, the jewelry in this order was not marked with the country of origin, nor was there any packaging sent to consumers with the correct country of origin, because it was Defendants' standard operating procedure not to include country of origin information on merchandise shipped to consumers.

95. Again, in no case, did TSC report to the U.S. Government, including on accompanying Forms 7501, that it owed marking duty, nor did it remit such marking duty to the U.S. Government.

> vi. *Relator Confirmed Firsthand that TSC Continued to Fail to Mark Bixler's Jewelers' Products Despite His Warnings.*

96. Based on his communications with Defendants, Relator continued to suspect that TSC was not marking its or Bixler's Jewelers jewelry with its country of origin—not legibly, indelibly, and permanently on the jewelry itself, and not even in the containers sold to ultimate consumers. He therefore sought to document and confirm as much.

97. Relator knew that Bixler's Jewelers products were manufactured and shipped according to the same processes and policies as other TSC products and were not marked with the country of origin, for the reasons described above.

98.    On September 26, 2019, Relator ordered two Bixler's Jewelers products sold under the "Bixler" line—a Major League Baseball ring engraved with one black and one orange stripe, colors of the Baltimore Orioles, and a pin prominently marked with the UFC logo and outlined with jewels—to be shipped directly to a trusted friend in Pennsylvania.

99.    The Bixler's Jewelry products were manufactured by TSC at its Saint Laurent plant in Montreal, Canada, then shipped to TSC's headquarters in Burlington, Vermont, where they were then repackaged and forwarded on to the ultimate consumer.

100.    When the products arrived at the ultimate consumer's home in Pennsylvania, neither product nor the containers holding them identified that they were made in Canada. *See* Ex. 22. The package in fact indicated that the product was sent by The Sporn Company from the Burlington, Vermont address it shared with Bixler's. *See* Ex. 12.

101.    On June 24, 2020, Relator ordered from Bixler's Jewelers a ring with the United States Coast Guard licensed trademark to be shipped directly to a trusted friend in Florida. When the product arrived in the ultimate consumer's home in Florida, neither the product nor the containers holding it identified that it was made in Canada. *See* Ex. 23.

102.    On October 10, 2020, Relator ordered for a third time from Bixler's Jewelers. This time he ordered a ring with an Arizona State University licensed trademark to be shipped directly to a trusted friend in Florida. When the product arrived in the ultimate consumer's home in Florida, neither the product not the containers holding it identified that the product had been made in Canada. *See* Ex. 24.

**C.    Defendants Are Liable for Millions of Dollars in Damages.**

103.    Since June 2016, Defendants' fraudulent omissions have robbed the United States of millions of dollars in marking customs duties. In addition, each Form 7501 that failed to include

Defendants' obligation to pay marking duty is a false statement, containing a fraudulent omission, material to a false claim. Defendants are therefore liable for millions more in civil penalties under the False Claims Act's civil penalty provisions.

104.    Invoices dated between April 2017 and January 2020 for jewelry that TSC and Bixler's imported into the United States from its manufacturing facility in Canada identify at least 289 separate importations[12] totaling $14 million of jewelry imported into the United States during this period.[13] Relator therefore estimates that Defendants avoided obligations to pay in excess of $1.4 million to the United States Government in marking duty for failing to indelibly mark jewelry as made in Canada.

105.    In addition, Defendants submitted at least approximately 289 false Form 7501s that intentionally understated the applicable duty by failing to identify marking duty owed to the United States. As a result, Defendants are liable for at least 289 false statements and, consequently, for millions more in civil penalties.

## VI.  CLAIM FOR RELIEF

## COUNT I

## VIOLATIONS OF THE FALSE CLAIMS ACT—AVOIDING OBLIGATION TO PAY

## 31 U.S.C. § 3729(a)(1)(G)

106.    Relator Adler incorporates by reference each of the preceding paragraphs as if fully set forth in this paragraph.

107.    Relator, on behalf of himself and the United States, seeks relief against Defendants under Section 3729(a)(1)(G) of the False Claims Act, 31 U.S.C. § 3729(a)(1)(G).

---

[12] Many of these invoices included jewelry that was sold by Bixler's Jewelers.

[13] The total number of separate importations and value of the jewelry are approximations because Relator possesses only a portion of the invoices through January 10, 2020. *See supra* n. 4.

2:24-cv-00617-cr    Document 30    Filed 07/20/23    Page 31 of 33

108.   As set forth above, Defendants knowingly, deliberately, and/or with reckless disregard, concealed or improperly avoided or decreased an obligation to pay or transmit money or property, in the form of customs duties, to the United States.

109.   The Government incurred losses relating to customs duties wrongfully underpaid or unpaid by Defendants because of their wrongful and fraudulent conduct.  By virtue of the avoidance of the obligation to pay, the Government suffered damages and therefore is entitled to treble damages under the False Claims Act to be determined at trial, and a civil penalty of not less than $11,665 and not more than $23,331, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 (28 U.S.C. 2461 note; Public Law 104-410), plus 3 times the amount of damages that the Government sustains because of the act of that person.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff/Relator prays for judgment against Defendants as follows:

    a.   That Defendants cease and desist from violating 31 U.S.C. § 3729 *et seq*.

    b.   That this Court enter judgment against Defendants in an amount equal to three times the amount of damages the United States Government has sustained because of Defendants' actions, plus a civil penalty of not less than $11,665 and not more than $23,331, for each violation of 31 U.S.C. § 3729 *et seq.*, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 (28 U.S.C. § 2461 note; Public Law 104-410)*;*

    c.   That Plaintiff/Relator be awarded the maximum amount allowed pursuant to Section 3730(d) of the False Claims Act;

d. That Plaintiff/Relator be awarded all costs and expenses of this action, including attorney's fees;

e. Such other and further relief as the Court deems just.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff-Relator hereby demands a trial by jury.

Dated: July 19, 2023

Respectfully submitted:

_____
Russell L. Kornblith (RK-1950)
**SANFORD HEISLER SHARP, LLP**
1350 Avenue of the Americas, 31st Fl.
New York, New York 10019
Telephone: (646) 402-5650
Facsimile: (646) 402-5651
Email: rkornblith@sanfordheisler.com

Frank Tong Xu (5655238)
**SANFORD HEISLER SHARP, LLP**
700 Pennsylvania Ave, SE
Washington, D.C. 20003
Telephone: (202) 499-5215
Email: fxu@sanfordheisler.com

*Attorneys for the Plaintiff-Relator Steven Adler*