UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

EX. REL. STEVEN ADLER,

                Plaintiff-Relator,

      -against-

THE SPORN COMPANY, INC. AND
BIXLER'S, INC.

                Defendants.

Civil Case No. 1:20-cv-08194-AKH

## DEFENDANTS THE SPORN COMPANY, INC. AND BIXLER'S, INC.'S MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION TO DISMISS THE AMENDED COMPLAINT

DENTONS US LLP

Robert M. Wasnofski, Jr.
Samuel J. Weiner
1221 Avenue of the Americas
New York, NY 10020-1089
Phone: (212) 768-6748
Fax: (212) 768-6800
robert.wasnofski@dentons.com
samuel.weiner@dentons.com

Timothy J. Storino (*pro hac vice*)
233 South Wacker Drive, Suite 5900
Chicago, IL 60606-6361
Phone: (312) 876-2846
timothy.storino@dentons.com

*Attorneys for Defendants The Sporn Company, Inc. and Bixler's Inc.*

**TABLE OF CONTENTS**

**Page**

PRELIMINARY STATEMENT ................................................................................................ 1

FACTUAL BACKGROUND ................................................................................................... 3

LEGAL STANDARD ............................................................................................................... 8

ARGUMENT ........................................................................................................................... 10

    I.    THE COMPLAINT MUST BE DISMISSED AS TO BIXLER'S FOR LACK OF PERSONAL JURISDICTION. ............................................................. 10

    II.    THE COMPLAINT MUST BE DISMISSED FOR FAILURE TO JOIN AN INDISPENSABLE PARTY. ................................................................... 14

    III.    THE COMPLAINT SHOULD BE DISMISSED AS A MORE CONVENIENT VENUE EXISTS. ....................................................................... 16

    IV.    THE ALLEGED FAILURE TO PAY MARKING DUTIES DOES NOT VIOLATE THE FCA. .......................................................................... 18

    V.    DEFENDANTS' ALLEGEDLY FALSE STATEMENTS WERE NOT MATERIAL. ..................................................................................................... 31

    VI.    RELATOR FAILS TO PLEAD THAT DEFENDANTS ACTED WITH THE REQUISITE SCIENTER FROM 2016 THROUGH JULY 2018. ............. 35

CONCLUSION ........................................................................................................................ 42

**Page(s)**

**Cases**

*Am. Textile Mfrs. Inst. v. The Limited, Inc.*,
190 F.3d 729 (6th Cir. 1999) ...................................................................................20, 29

*Amidax Trading Grp. v. S.W.I.F.T. SCRL*,
607 F. Supp. 2d 500 (S.D.N.Y. 2009)..................................................................................41

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009).....................................................................................................8, 9

*Associated Dry Goods Corp. v. Towers Fin. Corp.*,
920 F.2d 1121 (2d Cir. 1990)...........................................................................................14

*United States ex rel. Bain v. Ga. Gulf Corp.*,
386 F.3d 648 (5th Cir. 2004) ...........................................................................................20

*Bayshore Cap. Advisors, LLC v. Creative Wealth Media Fin. Corp.*,
2023 WL 2751049 (S.D.N.Y. Mar. 31, 2023) ..............................................................13

*Bristol-Myers Squibb Co. v. Superior Court of Cal.*,
582 U.S. 255 (2017)........................................................................................................13

*Chen v. Bd. of Immigr. Appeals*,
164 F. Supp. 3d 612 (S.D.N.Y. 2016)..............................................................................27

*Chew v. Dietrich*,
143 F.3d 24 (2d Cir. 1998)...............................................................................................10

*Chloé v. Queen Bee of Beverly Hills, LLC*,
616 F.3d 158 (2d Cir. 2010)........................................................................................11, 13

*United States ex rel. Chorches v. Am. Med. Response, Inc.*,
865 F.3d. 71 (2d Cir. 2017)............................................................................................9, 39

*United States ex rel. CKD Project, LLC v. Fresenius Med. Care Holdings, Inc.*,
551 F. Supp. 3d 27 (E.D.N.Y. 2021) ............................................................................19, 25

*Clopay Plastic Prods. Co. v. Excelsior Packaging Grp.*,
2014 WL 4473352 (S.D.N.Y. Sept. 11, 2014)..................................................................10

*Cosmas v. Hassett*,
886 F.2d 8 (2d Cir. 1989)...................................................................................................9

*United States ex rel. Customs Fraud Investigations, LLC v. Victaulic Co.*,
2014 WL 4375638 (E.D. Pa. Sept. 4, 2014) ..............................................................23, 30, 41

*U.S. ex rel. Customs Fraud Investigations, LLC v. Victaulic Co.*,
37 ITRD 1730 (E.D. Pa. 2015) ...............................................................................23

*United States ex rel. Customs Fraud Investigations, LLC. V. Victaulic Co.*,
839 F.3d 242 (3d Cir. 2016)........................................................................ *passim*

*United States ex rel. Daugherty v. Tiversa Holding Corp.*,
342 F. Supp. 3d 418 (S.D.N.Y. 2018)....................................................................31

*United States ex rel. Donohue v. Carranza*,
585 F. Supp. 3d 383 (S.D.N.Y. 2022)....................................................................17

*Fagioli S.p.A. v. General Electric Co.*,
2014 WL 12768461 (S.D.N.Y. Nov. 25, 2014)......................................................15

*United States ex rel. Foreman v. AECOM*,
19 F.4th 85 (2d Cir. 2021) ...............................................................................32, 33

*Frontier Ins. Co. v. United States*,
185 F. Supp. 2d 1375 (Ct. Int'l Trade 2002) .........................................................21

*Gianatasio v. D'Agostino*,
2011 WL 5244961 (S.D.N.Y. Nov. 2, 2011)..........................................................14

*Glob. Disc. Travel Servs., LLC v. Trans World Airlines, Inc.*,
960 F. Supp. 701 (S.D.N.Y. 1997) ...................................................................15, 16

*Globemaster, Inc. v. United States*,
340 F. Supp. 974 (Cust. Ct. 1972) .........................................................................22

*Gordon v. Sonar Capital Mgmt. LLC*,
962 F. Supp. 2d 525 (S.D.N.Y. 2013)......................................................................9

*United States ex rel. Grubea v. Rosicki, Rosicki & Assocs., P.C.*,
318 F. Supp. 3d 680 (S.D.N.Y. 2018)....................................................................36

*Gulf Ins. Co. v. Glasbrenner*,
417 F.3d 353 (2d Cir. 2005).....................................................................................16

*Harris v. Mills*,
572 F.3d 66 (2d Cir. 2009)........................................................................................9

*Holey Soles Holdings, Ltd. v. Foam Creations, Inc.*,
2006 WL 1147963 (S.D.N.Y. May 1, 2006) .........................................................17

*Hoyte v. Am. Nat'l Red Cross*,
    518 F.3d 61 (D.C. Cir. 2008) ................................................................20

*Iragorri v. United Tech. Corp.*,
    274 F.3d 65 (2d Cir. 2001) .................................................................17

*J. McIntyre Mach., Ltd. V. Nicastro*,
    131 S. Ct. 2780 (2011) ...............................................................11, 12

*United States ex rel. Kasowitz Benson Torres LLP v. BASF Corp.*,
    929 F.3d 721 (D.C. Cir. 2019) ...........................................................20

*U.S. ex rel. Kirk v. Schindler Elevator Corp.*,
    926 F. Supp. 2d 510 (S.D.N.Y. 2013) ...............................................40

*United States ex rel. Kolchinsky v. Moody's Corp.*,
    2018 WL 1322183 (S.D.N.Y. Mar. 13, 2018) ...............................32, 35

*Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec.*,
    LLC, 797 F.3d 160 (2d Cir. 2015) .....................................................40

*LRN Corp. v. Markel Ins. Co.*,
    2021 WL 3727062 (S.D.N.Y. Aug. 23, 2021) ...................................15

*LS Parry, Inc. v. Tepeyac, LLC*,
    2020 WL 5026589 (S.D.N.Y. Aug. 25, 2020) ...................................18

*Lundy v. Catholic Health Sys. Of Long Island*,
    711 F.3d 106 (2d Cir. 2013) .................................................................9

*In re Olga Coal Co.*,
    159 F.3d 62 (2d Cir. 1998) .................................................................27

*Oticon, Inc. v. Sebotek Hearing Sys., LLC*,
    865 F. Supp. 2d 501 (D.N.J. 2011) .....................................................12

*Panjiva, Inc. v. United States Customs & Border Prot.*,
    975 F.3d 171 (2d Cir. 2020) ...............................................................27

*Pension Benefit Guar. Corp. v. Morgan Stanley Inv. Mgmt. Inc.*,
    712 F.3d 705 (2d Cir. 2013) .................................................................9

*Pentax Corp. v. Robison*,
    125 F.3d 1457 (Fed. Cir. 1997) .........................................................21

*Piotrowicz v. Techtronic Indus. N. Am., Inc.*,
    2022 WL 2870811 (S.D.N.Y. July 21, 2022) ...............................11, 12

*Reeves v. New York City Hous. Auth.*,
2023 WL 3902241 (S.D.N.Y. May 9, 2023) ...............................................................17

*United States ex rel. Scharff v. Camelot Counseling*,
2016 WL 5416494 (S.D.N.Y. Sept. 28, 2016).............................................................31

*United States ex rel. Schutte v. SuperValu Inc.*,
143 S. Ct. 1391 (2023).................................................................................................36

*Sullivan v. Barclays PLC*,
2017 WL 685570 (S.D.N.Y. Feb. 21, 2017)..................................................................8

*Thackurdeen v. Duke Univ.*,
2016 WL 4578662 (2d Cir. Sept. 1, 2016) .................................................................10

*Kane ex rel. United States v. Healthfirst, Inc.*,
120 F. Supp. 3d 370 (S.D.N.Y. 2015).........................................................................26

*United States v. Nature's Farm Prod., Inc.*,
2004 WL 1077968 (S.D.N.Y. May 13, 2004) .............................................................18

*United States v. Pentax Corp.*,
69 F. Supp. 2d 1361 (Ct. Int'l Trade 1999) ...............................................................22

*United States v. Q Int'l Courier, Inc.*,
131 F.3d 770 (8th Cir. 1997) ......................................................................................20

*United States v. Southland Gaming of the Virgin Islands, Inc.*,
182 F. Supp. 3d 297 (D.V.I. 2016) .............................................................................26

*Universal Health Servs., Inc. v. United States ex rel. Escobar*,
136 S. Ct. 1989 (2016).............................................................................31, 32, 33, 34

*Viacom International, Inc. v. Kearney*,
212 F.3d 721 (2d Cir. 2000).......................................................................................14

*United States ex rel. Yu v. Grifols USA, LLC*,
2021 WL 5827047 (S.D.N.Y. Dec. 8, 2021) ..............................................................19

**Statutes**

19 U.S.C. § 1304(a) ...............................................................................20, 23, 37, 40

19 U.S.C. § 1304(i) ............................................................................................ *passim*

19 U.S.C. § 1304(k) ....................................................................................................37

28 U.S.C. § 1404(a) ....................................................................................................17

28 U.S.C. § 1406(a) ...........................................................................................................17

31 U.S.C. § 3729 ...............................................................................................................31

31 U.S.C. § 3729(b)(1)(A) ...............................................................................................36

31 U.S.C. § 3729(a)(1)(G) ...................................................................................1, 18, 19

31 U.S.C. § 3729(b)(3) ......................................................................................................19

31 U.S.C. § 3729(b)(4) ......................................................................................................32

31 U.S.C. § 3732(a) ...........................................................................................................18

**Rules**

Fed. R. Civ. P. 9(b) ..................................................................................... *passim*

Fed. R. Civ. P. 12(b)(2)........................................................................................................8

Fed. R. Civ. P. 12(b)(3)......................................................................................................17

Fed. R. Civ. P. 12(b)(6)........................................................................................................8

Fed. R. Civ. P. 12(b)(7)...............................................................................................14, 16

Fed. R. Civ. P. 19(a) .....................................................................................................14, 15

Fed. R. Civ. P. 19(b) ...............................................................................................14, 15, 16

**Other Authorities**

S.Rep. No. 111-10.......................................................................................................28, 29

Defendants The Sporn Company, Inc. ("TSC") and Bixler's Inc. ("Bixler's") (collectively, "Defendants") respectfully submit this memorandum of law in support of their motion to dismiss Relator's Amended Complaint ("AC").

**PRELIMINARY STATEMENT**

The Relator attempts to shoehorn what, at most, amounts to a technical violation of an importation statute into a far-reaching fraudulent conspiracy under the False Claims Act case, but the facts just don't fit the alleged claim.

As an initial matter, this case presents a unique question of law not previously addressed in this Circuit: whether "reverse" false claims liability under the False Claims Act ("FCA"), 31 U.S.C. § 3729(a)(1)(G), may attach as a result of allegedly avoiding marking duties on imported goods related to the country-of-origin disclosure under 19 U.S.C. § 1304(i) where the importer allegedly failed to mark the goods and/or failed to mark the goods until the time of retail sale. The answer is decidedly no. The plain face of the statute related to marking duties imposes no duty to pay at the time of importation – here the alleged fraud – where imported products lack the country-of-origin disclosure because § 1304(i) provides a safe harbor for an importer to later correct the alleged marking failure, for example, by marking the goods or deporting the goods *after* importation. In this way, § 1304(i) imposes no "obligation," as defined by the FCA. Indeed, notwithstanding amendments to the FCA in 2009, the marking statute, while complicated, is not ambiguous, and statutory construction prohibits the Court from seeking solace in legislative history. For this reason alone, Relator's AC should be dismissed in its entirety without leave to amend.

Problems with Relator's AC do not end there though. While Relator clearly prefers this District, his preference is not entitled to more weight than the allegations in the AC, which do not

1

support the Court's exercise of personal jurisdiction over the out-of-state Defendant, Bixler's, where the allegations – even as pled – do not establish a "substantial nexus" (or any nexus) between Bixler's alleged contacts with this forum and the cause of action alleged. And since Bixler's is a necessary and indispensable party to this litigation but is not subject to personal jurisdiction in this District, the action should be dismissed in its entirety. Further, a much more convenient forum exists in the District of Vermont where Bixler's is headquartered and the evidence and witnesses, if any, actually reside. Relator expends significant efforts in the AC describing Bixler's alleged ties with New York City, including its alleged purchase of components from vendors in New York City (which Bixler's denies) and its alleged advertisement of "New York City-specific products" bearing trademarks associated with New York (which Bixler's denies), such as New York Yankees and New York Rangers branded rings, suggesting somehow that selling products bearing the trademark of a New York sports team establishes the Court's jurisdiction over Bixler's. This expansive view of jurisdiction, which would permit any court in the nation to exercise personal jurisdiction over a company that manufactures or sells products branded with the name or trademark associated with the locale in which that court sits, is not the law and should be rejected.

In addition to being legally inadequate, Relator's AC is also factually flawed as well, in a variety of ways. First, the AC fails to plausibly establish that the alleged failure-to-mark the imports with the country-of-origin was material to the government in any way, and the allegations in the AC, in fact, suggests the opposite. Applying the factors identified by the Supreme Court, it is clear that, even accepting the allegations as true at this stage, the alleged noncompliance related to marking jewelry was not material to the government. This is borne out by Plaintiff's own allegations and evidence attached to his AC, which acknowledge that Defendants, at all times relevant, indicated the proper country-of-origin on the required importation paperwork and other

invoices and, in addition, beginning in the summer of 2018, indicated the country-of-origin on packaging at the time of importation, even if, according to the AC, the imports themselves did not carry the same disclosure on each product at the time of retail sale. When the Plaintiff's allegations are closely considered, Plaintiff's alleged "massive fraud" is necessarily reduced to an immaterial technical violation, if at all, which is reinforced by the Department of Justice's decision not to intervene here.

Second, Relator has failed to plead that Defendants acted with the requisite intent under the FCA and Rule 9(b). This is most clear with respect to imports that occurred prior to July 2018. In particular, Relator bears the burden to prove, with sufficient particularity, that Defendants knew or acted in reckless disregard of their obligation to "mark[] in a conspicuous place as legibly, indelibly, and permanently as the nature of the article ... will permit in such manner as to indicate to an ultimate purchaser in the United States the English name of the country of origin of the article." Prior to July 2018, Relator offers only vague and general statements that he allegedly made to Defendants' executives that fall far short of what is required: "FCA's scienter requirement is rigorous, because, under Rule 9(b), the proponent of an FCA claim must allege facts that give rise to a strong inference of fraudulent intent." Relator has failed to do so here, and therefore his claim should be dismissed with respect to, at a minimum, imports prior to July 2018.

## FACTUAL BACKGROUND

This is a *qui tam* action filed by relator Steven Adler ("Plaintiff" or "Relator") against Defendants.

TSC manufactures jewelry for Bixler's, as well as other jewelry companies, including the De Beers Group. AC ¶¶ 19, 56. Perry Sporn is the President, CEO, Director, and Secretary of TSC. *Id.* ¶ 22. TSC acquired Bixler's in April 2016. *Id*. ¶ 20. Following the acquisition, in

May 2016, TSC also took over a jewelry manufacturing facility in Canada, which had previously been owned and operated by the Birks Group. *Id.* ¶ 61.

Relator was previously employed by TSC, originally as an independent consultant from January 2016 to May 2016, and then from May 2016 until late 2019 in several roles, including as Vice President ("VP") of Manufacturing, where, among other things, he oversaw manufacturing in Canada. *Id.* ¶¶ 18, 60. He also oversaw policies and procedures regarding the import of products from Canada into the United States. *Id.*

The regulations for importing goods manufactured outside of the United States are comprehensive. *Id.* ¶¶ 24–43. At the core of this regulatory framework is the declaration form, United States Customs and Border Patrol ("CBP") Form 7501, *id.* ¶¶ 28–30, that requires an affirmative declaration on the part of the individual bringing merchandise manufactured outside of the Untied States into the country regarding, to the best of the individual's "knowledge and belief," that the information declared to CBP via Form 7051 is "true and correct." *Id.* ¶ 18. That Form contains a place to identify the "country of origin" where the merchandise was manufactured. The marking regime exists to inform the "ultimate purchasers" about where goods are manufactured, and to allow the United States government to collect duties, where appropriate. *Id.* ¶¶ 32–35. Significantly, under applicable regulations, duties are not owed for products manufactured and imported from Canada. However, the government has the right to collect an additional duty on items that do not have the correct country of origin markings. *Id.* ¶¶ 36–37. Of particular significance and as reflected in Plaintiff's own allegations and exhibits attached thereto, TSC correctly identified Canada as the country-of-origin, including on invoices and documentation presented to and/or reviewed by CBP. *See, e.g.*, *id.* ¶¶ 68, 75, 88, 93, 94, Exs. 15, 16, 18, 20, 21. At no point did Defendants mislead CBP related to the country of origin.

4

*See id.* Further, the custom and practice in the jewelry industry is not to add country of origin markings on articles of jewelry for commercial sale, either by engraving them or otherwise adding stickers or labels that remain on the product until purchased by the consumer in a retail store.[1]

Notwithstanding the custom and practice, Relator alleges that Defendants violated the FCA by insufficiently marking jewelry imported into the United States that was manufactured in Montreal, Canada, thus engaging in a fraud to deny payments owed to the United States. *Id.* ¶¶ 3, 4. Relator claims that, first, Defendants imported jewelry "[b]eginning in June 2016" manufactured in Montreal, Canada, "without any marking showing its Canadian country of origin." *Id.* ¶ 3. Relator claims that he knew of the alleged misconduct and "repeatedly advised" on the marking requirements. *Id.* ¶ 3. More specifically, Relator alleges, without any documentary support, that, in June 2016, he advised Defendants that "U.S. law required that jewelry manufactured in Canada and then imported in the United Sates [sic] must be marked with its country of origin" and that he recommended using a "string tag" in lieu of indelible marking. *Id.* at ¶ 62. Next, in September 2017, according to Relator, he hired PwC to advise on tariffs and country of origin marking regulations "applicable to the repair of customer-owned jewelry and Rolex Watches" in relation to a new factory in Montreal. *Id.* ¶ 72. Relator claims that PwC advised him that "repairs may be exempted from customs duties as temporary export/imports, and accordingly a country of origin marking would not be required," *id.* ¶ 73; and, again without any documentary support, "that any of TSC's other commercial products manufactured in Canada must be permanently marked with Canada as the country of origin

---

[1] While Defendants understand that Plaintiff's allegations must be accepted as true at this stage, Defendants dispute all substantive allegations, and believe that it is nonetheless important to provide real-world context for the Court.

before being imported into the United States," *id*. These suggestions, per Relator, were not followed. *Id*. ¶¶ 3, 63. Significantly, though the AC alleges that PwC advised Adler and two others, including Perry Sporn (principal and CEO of Defendants), that repaired products are exempted from customs duties and marking requirements, the AC does not allege to whom PwC allegedly advised of the obligation to mark other commercial products manufactured in Canada before importing them into the United States. *See id.* at ¶ 73 ("Nonetheless, PwC reaffirmed that any of TSC's other commercial products…" but not indicating to whom PwC allegedly reaffirmed these statements).

Next, Relator claims that, in June 2018, he read an article online related to False Claims Act liability and country-of-origin marking, which he emailed to Perry Sporn. *Id*. ¶¶ 77–78. Sporn noted obvious differences in that case, explaining the importer there was "avoiding and not paying duty that was owed" and "we're not doing that." *Id*. (Ex. 17). Relator agreed with Sporn ("Yes… that is true"), but also noted that the regulations require more, ultimately sending the following:

> Perry
>
> I reviewed the Title 19 regulations and guidelines, we are NOT in compliance. I apologize … This is something I should have caught on my watch early on. ( attached )
>
> There are only a few unique exceptions to this regulation, none of which is directly applicable. When impractical to affix a permanent mark, the packaging mark may be appropriate or a string tag affixed to the product.
>
> Thus far none of the border agents have asked or inspected but, they will at some point seize one of our commercial shipments for this reason.
>
> I think you need to be pro-active on this

> Recommend immediately for our Southbound "commercial" courier shipments , we provide a "Made In Canada" label on every sealed plastic job envelope. (not repairs) This will demonstrate our awareness of the regulation.
> Recommend for the customer deliveries to provide a "Made in Canada" label in or on the box.
>
> In implementing these two practices we demonstrate our intent to be compliant and could fight off a seizure at the US border as well as any potential penalties.

*Id.* ¶ 81 (citing Ex. 17).[2]  Two days later on July 6, 2018, Sporn agreed with Relator's recommendation and asked follow-up questions:

> Steven
> - *Recommend immediately for our Southbound "commercial" courier shipments , we provide a "Made In Canada" label on every sealed plastic job envelope. ( not repairs ) This will demonstrate our awareness of the regulation.*
> ok
> - *Recommend for the customer deliveries to provide a "Made in Canada" label in or on the box.*
> If delivered from Canada directly?
> If we ship from Vermont it doesn't matter, right?

*Id.* Ex. 17.  Relator responded that a "Made In Canada label/string tag" must be included "so the consumer knows it is an import."  *Id.*  Sporn responded again: "Ok … we'll get a label for the polybag," and that he would discuss with others within TSC.  *Id.*

Following the above exchange with Relator, Sporn, at the suggestion and direction of the Relator, changed the way TSC identified the country-of-origin of its jewelry.  *Id.* ¶ 82, Ex 17. Having previously believed that they were in compliance with the marking requirements, Defendants moved swiftly and, in less than one month, updated their marking procedures by

---

[2] Relator omits from the AC certain passages from the July 4, 2018 email, including the italicized part below where Relator expressly acknowledged his role in any failure to mark imports up to that date: "I reviewed the Title 19 regulations and guidelines, we are NOT in compliance. *I apologize … This is something I should have caught on my watch early on.*"  *Id.* Ex. 17.

labeling the "polybag" into which jewelry was packed for transport with a prominent label reading "Made in Canada." *See id.* ¶¶ 84–85.  Relator alleges that Defendants did not follow his exact suggestions precisely with respect to marking because "the jewelry was removed from the labeled polybag and repackaged for shipment to the consumer without any marking indicating that the product was manufactured in Canada." *Id*. ¶ 84.  Relator infers a negative intent to Defendants, claiming Defendants intended to "deceive CBP agents." *Id.* ¶ 86.  In December 2019, Relator's employment with TSC ended. *See id.* ¶¶ 18, 59.[3]  Prior to his departure, in September 2019, and following his departure, in June 2020, Relator allegedly purchased certain Bixler's products, and had them shipped to "trusted friends." *Id.* ¶¶ 98, 101, 102.  The items Relator received, according to him, were not marked as having been made in Canada. *Id.*[4]

### LEGAL STANDARD

This motion is made under Federal Rules of Civil Procedure 12(b)(2), 12(b)(3), 12(b)(6), and 12(b)(7).

To survive a motion under Rule 12(b)(2), the plaintiff must make a *prima facie* showing of personal jurisdiction. *Sullivan v. Barclays PLC*, 2017 WL 685570, *38 (S.D.N.Y. Feb. 21, 2017).  This includes making "'legally sufficient allegations of jurisdiction,' including 'an averment of facts that, if credited[,] would suffice to establish jurisdiction over the defendant.'" *Id.*  To survive a motion to dismiss under Rule 12(b)(6), a claim must set forth factual allegations, accepted as true, sufficient "to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation and citation omitted).  A complaint "must provide

---

[3] Defendants dispute Relator's claim that he "ultimately left TSC" "[m]otivative in part by TSC's repeated violations." *Id.* ¶ 48.  Defendants do not dispute that Relator did not work for TSC after December 2019.
[4] These purchases form the basis of Relator's motion for summary judgment, which he filed before any discovery began and before Defendants even filed their first motion to dismiss.

'more than an unadorned, the-defendant-unlawfully-harmed-me accusation.'" *Pension Benefit Guar. Corp. v. Morgan Stanley Inv. Mgmt. Inc.*, 712 F.3d 705, 717 (2d Cir. 2013) (quoting *Iqbal*, 556 U.S. at 678). "Mere conclusory statements in a complaint and formulaic recitation of the elements of a cause of action are insufficient." *Gordon v. Sonar Capital Mgmt. LLC*, 962 F. Supp. 2d 525, 527–28 (S.D.N.Y. 2013) (internal quotation omitted) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). So, too, are allegations that make little more than "'naked assertion[s]' devoid of 'further factual enhancement.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557).

Although all factual allegations in the complaint are to be accepted as true, and all reasonable inferences are to be drawn in a plaintiff's favor, a court need not credit "legal conclusions" in a claim or "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Harris v. Mills*, 572 F.3d 66, 72 (2d Cir. 2009) (quoting *Iqbal*, 556 U.S. at 663). A court is not "bound to accept as true a legal conclusion couched as factual allegation." *Iqbal*, 556 U.S. at 678 (citing Twombly, 550 U.S. at 555) (internal quotation omitted). Legal conclusions must instead be supported by factual allegations. *Id.*

As Relator's allegations are predicated on fraud, they are subject to heighted pleading standards under Rule 9(b) and "must adequately specify the statements it claims were false or misleading, give particulars as to the respect in which plaintiff contends the statements were fraudulent, state when and where the statements were made, and identify those responsible for the statements." *Lundy v. Catholic Health Sys. Of Long Island*, 711 F.3d 106, 119 (2d Cir. 2013). *See also Cosmas v. Hassett*, 886 F.2d 8, 11 (2d Cir. 1989); *United States ex rel. Chorches v. Am. Med. Response, Inc.*, 865 F.3d. 71, 86 (2d Cir. 2017).

## ARGUMENT

## I. THE COMPLAINT MUST BE DISMISSED AS TO BIXLER'S FOR LACK OF PERSONAL JURISDICTION.

The AC must be dismissed as to Bixler's as it fails to establish personal jurisdiction over it. To establish general jurisdiction over a corporation, due process is satisfied "only if [a company] is headquartered or incorporated in the forum state or is otherwise 'at home' in that state." *Thackurdeen v. Duke Univ.*, 2016 WL 4578662, at *1 (2d Cir. Sept. 1, 2016) (citing *Daimler AG v. Bauman*, 134 S. Ct. 746, 761 & n.19 (2014)). While Defendant TSC is incorporated in New York, and therefore subject to this Court's general jurisdiction, the AC's allegations are insufficient to establish general jurisdiction over Bixler's by proxy. Bixler's is neither headquartered nor incorporated in New York, *see* AC ¶ 20, and is thus not subject to this Court's general jurisdiction.

Relator must therefore establish this Court's ability to exercise specific personal jurisdiction over Bixler's, which he simply cannot do. Courts engage in a two-step analysis to determine whether they can exercise specific jurisdiction over a defendant. "The exercise of specific jurisdiction depends on in-state activity that 'gave rise to the *episode-in-suit*.'" *Waldman*, 835 F.3d at 331 (quoting *Goodyear*, 564 U.S. at 923) (emphasis added). Specific jurisdiction, therefore, can only be established where defendants have sufficient minimum contacts with the forum. To be sufficient for specific personal jurisdiction, "'there must be a "substantial nexus" between the [contacts] and the cause of action.'" *Clopay Plastic Prods. Co. v. Excelsior Packaging Grp.*, 2014 WL 4473352, at *4 (S.D.N.Y. Sept. 11, 2014). The Second Circuit requires, at a minimum, a "'but for' connection between the defendant's forum-directed activities and the claim and requires proximate cause where foreign defendants have limited contacts with the state." *Chew v. Dietrich*, 143 F.3d 24, 29 (2d Cir. 1998)). A court will look to

10

the "totality of [d]efendants' contacts with the forum state" in determining whether the exercise of jurisdiction is proper. *Chloé v. Queen Bee of Beverly Hills, LLC*, 616 F.3d 158, 164 (2d Cir. 2010).

Relator fails to establish specific jurisdiction over Bixler's as there is no connection between any of Bixler's alleged contacts with New York and the instant cause of action. First, there is an insufficient nexus between the activities alleged and New York. The activities described in the AC took place in Canada and the products at issue were imported to TSC's Burlington, Vermont facility. AC ¶¶ 48 & n.7, 62, 68, 75, 84, 85, 88, 93, 94, 99. Moreover, none of the purchases made by Relator and shipped to Relator's "trusted friends" were shipped into New York. *Id.* ¶¶ 98, 101, 102. Relator appears to rely on the stream-of-commerce theory to establish specific personal jurisdiction. *See id.* ¶¶ 9–10. But merely releasing goods into the stream of commerce is insufficient to establish personal jurisdiction over Bixler's. The stream-of-commerce theory stems from the plurality opinion in the Supreme Court's decision in *J. McIntyre Mach., Ltd. V. Nicastro*, 131 S. Ct. 2780 (2011). In the concurring (and controlling) opinion, Justice Breyer agreed that in the absence of a "regular … flow" or "regular course" of sales to a state, and the absence of "something more, such as special state-related design, advertising, advice, marketing, or anything else," the Constitution does not allow jurisdiction on the basis of a stream of commerce theory. *Id*. at 2792 (Breyer, J., concurring) (quotation marks omitted).

"[S]omething more" is missing here. Relator does not allege that Defendants specifically imported their jewelry directly to New York, just as there is no allegation that Defendants "actively participated in selecting New York as a destination" for the jewelry at issue here. *Piotrowicz v. Techtronic Indus. N. Am., Inc.*, 2022 WL 2870811, *11, *12 (S.D.N.Y. July 21,

11

2022) ("despite [Defendant's] sustained contacts with the United States as a whole, Plaintiff has not mustered any direct evidence of [Defendant's] purposeful contact with New York"). The absence of allegations showing Defendants' targeting of New York dooms Relator's stream-of-commerce theory. *Id.* at *12 ("Yet despite [Defendant's] sustained contacts with the United States as a whole, Plaintiff has not mustered any direct evidence of Dalton's purposeful contact with New York.") (quoting *Williams v. Romarm, SA*, 756 F.3d 777, 785–86 (D.C. Cir. 2014)); *see also Oticon, Inc. v. Sebotek Hearing Sys., LLC*, 865 F. Supp. 2d 501, 513 (D.N.J. 2011) ("there is no doubt that [*J. McIntyre*] stands for the proposition that targeting the national market is not enough to impute jurisdiction to all the forum States [and] … overruled the line of cases … which held to the contrary").

Second, the allegation that "Defendants also knew that injuries from the avoidance of customs duties would be felt in New York" is wholly conclusory and speculative, and certainly does not give rise to the episode in-suit. AC ¶ 16.

Third, allegations of the sale of goods "bearing popular New York trademarks" are facially insufficient to support a finding of specific jurisdiction. Relator implies that placing items bearing logos connected to a New York sports team or institution into the stream of commerce establishes this Court's specific jurisdiction over Bixler's. AC ¶ 10. Relator does not allege the sale of any such goods in New York, making his newfound theory of jurisdiction speculative and hypothetical as it applies to this case. But more importantly, this expansive view of jurisdiction is untenable. According to Relator, a company that produces a shirt bearing the words "North Dakota" may be sued in North Dakota, regardless of whether the same company ever sold a shirt that reached North Dakota. This is not the "something more" Justice Breyer had in mind.

12

Further Relator's allegations regarding Bixler's alleged purchase of components for use in the manufacture of jewelry (which is denied) and advertisement of products in New York (also denied) are wholly unsubstantiated. *See Chloé*, 616 F.3d at 163 (a prima facie showing of personal jurisdiction "must include an averment of facts that, if credited by the ultimate trier of fact, would suffice to establish jurisdiction over the defendant."); *compare* AC ¶¶ 9, 10, *with id.* ¶¶ 12, 13. Relator also points to Defendant TSC's brand, Devotion Diamonds, not Bixler's, specifically, in alleging the Defendants' products reached New York. *Id.* ¶ 14. This, too, is insufficient to establish jurisdiction over Bixler's. Moreover, with respect to component parts and Devotion Diamonds, Relator fails to connect these purported contacts with the episode-in-suit; rather, Relator simply regurgitates information about Defendants and New York into the AC, in hopes that the Court will not notice that none of these contacts have anything to do with the allegations in the cause of action.

The Supreme Court has made clear that "specific jurisdiction is confined to adjudication of issues deriving from, or connected with, the very controversy that establishes jurisdiction." *Bristol-Myers Squibb Co. v. Superior Court of Cal.*, 582 U.S. 255, 262, (2017) (quotation marks and citation omitted). Such a nexus or relationship "exists where at least one element arises from the New York contacts;" however, "[t]he nexus is insufficient where the relationship between the claim and transaction is too attenuated or merely coincidental." *Bayshore Cap. Advisors, LLC v. Creative Wealth Media Fin. Corp.*, 2023 WL 2751049, at *29 (S.D.N.Y. Mar. 31, 2023) (quoting *D&R Glob. Selections, S.L. v. Bodega Olegario Falcon Pineiro*, 29 N.Y.3d 29 (2017)). The New York contacts Relator alleges as to Bixler's are completely attenuated from the claims at issue in the AC. Defendants' alleged misdeeds occurred in Canada and/or Vermont, if

anywhere, and Relator fails to allege or imply that any such activity took place in New York, let alone by Bixler's.

Plaintiff bears the burden of demonstrating that personal jurisdiction exists. In his AC, Relator tries but fails to establish the same for Defendant Bixler's. Accordingly, this Court lacks jurisdiction over Defendant Bixler's.

## II. THE COMPLAINT MUST BE DISMISSED FOR FAILURE TO JOIN AN INDISPENSABLE PARTY.

Bixler's is a necessary and indispensable party to this litigation, and because the Court does not have personal jurisdiction over it, as demonstrated above, the action should be dismissed in its entirety.

Rule 12(b)(7) provides that a complaint is subject to dismissal for "failure to join a party under Rule 19." Fed. R. Civ. P. 12(b)(7). On a motion to dismiss for failure to join an indispensable party, a court engages in a two-part analysis. *See Associated Dry Goods Corp. v. Towers Fin. Corp.*, 920 F.2d 1121, 1123 (2d Cir. 1990), *accord Gianatasio v. D'Agostino*, 2011 WL 5244961, at *3 (S.D.N.Y. Nov. 2, 2011). The threshold inquiry is whether the absent party is a necessary "party to be joined if feasible" under Rule 19(a). Fed. R. Civ. P. 19(a). Upon determination that a party is necessary, but cannot be joined, the court must then decide whether, under the non-exhaustive factors stated in Rule 19(b), the absent party is "indispensable" and the action should "in equity and good conscience" be dismissed. Fed. R. Civ. P. 19(b); *see Viacom International, Inc. v. Kearney*, 212 F.3d 721, 724 (2d Cir. 2000) ("[W]here the court makes a threshold determination that a party is necessary under Rule 19(a), and joinder of the absent party is not feasible for jurisdictional or other reasons . . . the court must finally determine whether the party is 'indispensable' [pursuant to Rule 19(b)]."). "If a court concludes that a

14

party is indispensable, it should dismiss the case." *LRN Corp. v. Markel Ins. Co.*, 2021 WL 3727062, at *2 (S.D.N.Y. Aug. 23, 2021).

As a threshold matter, Bixler's is a necessary party to this action. Relator accuses Bixler's of violating the marking statute and defrauding the Government. The necessary nature of Bixler's is demonstrated by Relator's allegations that Defendant TSC traded on Bixler's brand and reputation in the market, and the jewelry at issue was manufactured for sale by Bixler's. Without limitation, Bixler's reputation could be damaged by the potential finding that Defendants defrauded the Government. Disposing of the action in Bixler's absence "may . . . as a practical matter impair or impede [its] ability to protect [its] interest." Fed. R. Civ. P. 19(a)(B)(i); *see Fagioli S.p.A. v. General Electric Co.*, 2014 WL 12768461 (S.D.N.Y. Nov. 25, 2014) (finding that an absent party was necessary because "any adjudication of the rights and obligations of the parties under the [contract] in this Court is likely to affect the interests" of the absent party…..."). Further, should Relator proceed against TSC alone, TSC would be left "subject to a substantial risk of incurring … multiple, or otherwise inconsistent obligations" if Relator pursues litigation against Bixler's in an alternate forum where it is subject to personal jurisdiction. *See* Fed. R. Civ. P. 19(a)(B)(ii).

Bixler's is an indispensable party. Courts can look at a number of factors in interpreting indispensability under Rule 19(b), including the extent to which a judgment rendered in the person's absence might prejudice that person or the existing parties, whether the defendant has "strong interest in avoiding multiple litigations and potentially inconsistent relief if [the] action was to proceed without [the defendant] as a party," whether plaintiff has "an alternative forum" to litigate its dispute, and the public's interest in efficient settlement of controversies. *See* Fed. R. Civ. P. 19(a)(B)(ii); *see also Glob. Disc. Travel Servs., LLC v. Trans World Airlines, Inc.*, 960

F. Supp. 701, 709–10 (S.D.N.Y. 1997). Through the instant action, Relator seeks a finding that both Defendants "knowingly, deliberately, and/or with reckless disregard, concealed or improperly avoided or decreased an obligation to pay or transmit money or property, in the form of customs duties, to the United States." AC ¶ 108. Any judgment rendered against TSC on these claims would undoubtedly prejudice Bixler's, and any potential future litigation, including for the reasons mentioned above. *See* Fed. R. Civ. P. 19(b)(1). As such, each party named in this litigation is indispensable to its outcome and this action cannot proceed in the absence of Bixler's.

Furthermore, Relator has an alternative – and more appropriate – forum to litigate this dispute, *see infra* Section III. Bixler's has a strong interest in avoiding multiple disputes in different districts should Relator choose to file suit in a different forum, and it would be an inefficient use of the Court's time and resources to adjudicate a dispute involving TSC only while another potential action is filed against Bixler's in a different forum. *See Glo. Disc. Travel Servs.*, 960 F. Supp. at 710 (finding that the public's interest in efficient settlement of controversies supports finding that a party is indispensable when the absence of that party will lead to a risk of further litigation). Accordingly, since this Court does not have personal jurisdiction over Bixler's, this matter should be dismissed pursuant to Rule 12(b)(7).

## III. THE COMPLAINT SHOULD BE DISMISSED AS A MORE CONVENIENT VENUE EXISTS.

The Southern District of New York is also the wrong judicial venue for this suit. The proper forum for this matter is the District of Vermont. This is yet another flaw that justifies dismissal of the action. *See Gulf Ins. Co. v. Glasbrenner*, 417 F.3d 353, 355 (2d Cir. 2005). The AC falls far short of establishing this District as a proper venue for this action, where clearly another, more convenient venue exists in Vermont.

16

In deciding a motion to dismiss under Rule 12(b)(3), courts may dismiss an action or transfer venue to a more proper forum. *See Reeves v. New York City Hous. Auth.*, 2023 WL 3902241, at *2 (S.D.N.Y. May 9, 2023) (listing ten factors courts consider "in determining whether transfer is appropriate" and finding that transfer from the Southern District of New York to the Eastern District of New York was appropriate where the underlying events took place in the Eastern District of New York and relevant documents and witnesses were located there). Further, the court need not show deference to a plaintiff's choice of forum when, as here, the Relator does not reside in chosen forum and the operative events did not occur in the chosen forum. *See Iragorri v. United Tech. Corp.*, 274 F.3d 65, 72 (2d Cir. 2001).

The court has broad discretion to transfer a case, "[f]or the convenience of parties and witnesses, in the interest of justice … to any other district or division where it might have been brought or to any district or division to which all parties have consented." 28 U.S.C. § 1404(a). If a case is filed in the wrong district, a court "shall dismiss, or if it be in the interest of justice, transfer such case to any district or division in which it could have been brought" 28 U.S.C. § 1406(a). "The decision of whether to dismiss or transfer lies within the broad discretion of the district court." *United States ex rel. Donohue v. Carranza*, 585 F. Supp. 3d 383, 388 (S.D.N.Y. 2022); *see also Holey Soles Holdings, Ltd. v. Foam Creations, Inc.*, 2006 WL 1147963, at *9 (S.D.N.Y. May 1, 2006) ("A court may transfer a case pursuant to 28 U.S.C. § 1406(a) *sua sponte* even if the defendant moves only to dismiss.").

Here, the proper forum for this matter is the District of Vermont because TSC's principal place of business is in Vermont and Bixler's principal place of business is Vermont. AC ¶¶ 19–20. A "substantial part" of the events alleged in the AC took place in Vermont and/or in Canada, and witnesses and documents central to this case are located in Vermont, and certainly not the

17

Southern District of New York. Also, Relator is not a New York resident, and the Court need not defer to his chosen venue. *See United States v. Nature's Farm Prod., Inc.*, 2004 WL 1077968, at *7 (S.D.N.Y. May 13, 2004) ("plaintiff's selected forum has such a relatively weak connection to the operative facts of the litigation, that even a heightened deference for plaintiff's forum selection [under 31 U.S.C. § 3732(a)] does not support the selection of the Southern District of New York."). In fact, the only connection to the Southern District of New York appears to be the address of Relator's counsel, but, of course, this too is insufficient.

In attempting to justify his choice of venue, Relator also confuses jurisdiction and venue, arguing that venue is also proper because Defendants "placed products on which they avoided obligations to pay customs duties into the stream of commerce." This is also insufficient to establish proper venue. *See LS Parry, Inc. v. Tepeyac, LLC*, 2020 WL 5026589, at *5 & n.1 (S.D.N.Y. Aug. 25, 2020) (venue is improper where Defendant shipped goods to store in New York and finding a lack of "sufficient factual allegations of 'substantial' actions that occurred in New York."); *Ne. Landscape & Masonry Assocs., Inc.*, 2015 WL 8492755, at *4 (venue is improper "because Defendants did not commit any of the alleged acts or omissions underlying Plaintiff's . . . claim in the Southern District of New York, and any relevant economic injury suffered by Plaintiff was tangential to that claim.").

Accordingly, this Court should exercise its discretion and dismiss or transfer this matter in favor of a more convenient and appropriate forum in the District of Vermont.

## IV. THE ALLEGED FAILURE TO PAY MARKING DUTIES DOES NOT VIOLATE THE FCA.

Relator alleges a "reverse false claim" under 31 U.S.C. § 3729(a)(1)(G). Relator's claim must be dismissed because an obligation to pay marking duties arises only if unmarked imports enter the country *and* are not *subsequently* remarked, exported, or destroyed. In this way, the

18

failure to properly mark goods or to pay marking duties under § 1304(i) does not give rise to any claim under the FCA because, at the time of importation, there is no established duty owed (i.e., no obligation to pay marking duties at the time of importation).

A reverse false claim arises when a person withholds money or property that rightfully belongs to the United States. *See generally*, *United States ex rel. Yu v. Grifols USA, LLC*, 2021 WL 5827047, at *12–13 (S.D.N.Y. Dec. 8, 2021). Specifically, a defendant may be liable for an FCA violation if it "knowingly makes, uses or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government." 31 U.S.C. § 3729(a)(1)(G). The Fraud Enforcement and Recovery Act of 2009 ("FERA"), which amended the FCA to its current version, defined the term "obligation" (which was previously undefined by Congress) as an "*established* duty, whether or not fixed, arising from an express or implied contractual, grantor-grantee, or licensor-licensee relationship, from a fee-based or similar relationship, from statute or regulation, or from the retention of any overpayment." 31 U.S.C. § 3729(b)(3) (emphasis added). A reverse false claim thus requires the existence of an "obligation" – or established duty – to transmit money or property to the government *at the time* of the purported fraud.

Accordingly, to state such a reverse false claim under the FCA, the Relator must allege (1) "the defendant made a false record or statement (2) *at a time that the defendant had a presently-existing obligation to the government*—a duty to pay money or property." *United States ex rel. CKD Project, LLC v. Fresenius Med. Care Holdings, Inc.*, 551 F. Supp. 3d 27, 47 (E.D.N.Y. 2021), *aff'd*, 2022 WL 17818587 (2d Cir. Dec. 20, 2022) (citation omitted) (emphasis added). A violation of a statute that creates only a potential obligation to pay money to the

government in the future, if penalties or fees are later assessed, does not implicate the FCA. *See, e.g.*, *United States ex rel. Kasowitz Benson Torres LLP v. BASF Corp.*, 929 F.3d 721, 725 (D.C. Cir. 2019) (where the Environmental Protection Agency did not assess "penalties against the defendants for failing to report" substantial risk information under the Toxic Substances Control Act Compliance Audit Program regarding certain chemicals, there was no "obligation" under the FCA); *Hoyte v. Am. Nat'l Red Cross*, 518 F.3d 61, 67 (D.C. Cir. 2008) (affirming dismissal of reverse false claim qui tam suit where the Food and Drug Administration had entered a consent decree with the American Red Cross ("ARC") regarding ARC's blood handling and reporting requirements, as the Consent Decree "imposed no obligation on [the ARC] to tender money or property to the government" and finding that "an unassessed potential penalty for regulatory noncompliance does not constitute an obligation that gives rise to a viable FCA claim"); *United States ex rel. Bain v. Ga. Gulf Corp.*, 386 F.3d 648, 658 (5th Cir. 2004); *Am. Textile Mfrs. Inst. v. The Limited, Inc.*, 190 F.3d 729, 738 (6th Cir. 1999); *United States v. Q Int'l Courier, Inc.*, 131 F.3d 770, 773 (8th Cir. 1997).

Here, and as noted above, Relator looks to the Tariff Act to impose a presently-existing obligation on Defendants at the time of import. That act requires, with some exceptions, that "every article of foreign origin ... imported into the United States shall be marked in a conspicuous place as legibly, indelibly, and permanently as the nature of the article ... will permit in such manner as to indicate to an ultimate purchaser in the United States the English name of the country of origin of the article." 19 U.S.C. § 1304(a). It further provides that "[i]f at the time of importation any article … is not marked in accordance with the requirements of this section, *and if such article is not exported or destroyed or the article … marked after importation in accordance with the requirements of this section* (such exportation, destruction, or

marking to be accomplished under customs supervision prior to the liquidation of the entry covering the article, and to be allowed whether or not the article has remained in continuous customs custody), there shall be levied, collected, and paid upon such article a duty of 10 per centum ad valorem, which shall be deemed to have accrued at the time of importation, shall not be construed as penal, and shall not be remitted wholly or in part nor shall payment thereof be avoidable for any cause." 19 U.S.C. § 1304(i) (emphasis added). CBP regulations confirm that "[a]rticles not marked as required … shall be subject to additional duties of 10 percent of the final appraised value *unless* exported or destroyed under Customs supervision prior to liquidation of the entry . . ." 19 C.F.R. § 134.2 (emphasis added).

A plain reading of the statute confirms that marking duties are not owed to the government upon the importation of the unmarked goods and, therefore, Defendants do not have a presently-existing obligation to pay money at the time of the alleged false statement, that is, at the time of importation. As § 1304 spells out, marking duties may be imposed on such unmarked goods only *if* they are imported into the United States and are not thereafter *exported or destroyed or marked after importation.* Courts have agreed with this interpretation of § 1304 and the timing of the imposition of the marking duties. *See, e.g.*, *Pentax Corp. v. Robison*, 125 F.3d 1457, 1463 (Fed. Cir. 1997) ("The act of culpably mismarking goods cannot be said to have deprived the government of the 10 percent ad valorem duty assessed under 1304(f). To the contrary, but for the mismarkings (*followed by the failure to export, destroy, or remark the articles in accordance with section 1304*), the duty could not have arisen."), *amended on reh'g by*, 135 F.3d 760 (Fed. Cir. 1998) (emphasis added); *Frontier Ins. Co. v. United States*, 185 F. Supp. 2d 1375, 1379 (Ct. Int'l Trade 2002) ("As Customs correctly concludes, § 1304 mandates the assessment of a 10% marking duty when (1) at the time of importation an article is not

21

marked in accordance with the provisions of § 1304(a) *and* (2) *the merchandise is not exported, destroyed or re-marked under the supervision of Customs prior to the liquidation of the entry.*") (emphasis added); *United States v. Pentax Corp.*, 69 F. Supp. 2d 1361, 1363 (Ct. Int'l Trade 1999) ("Had the mismarking been discovered before release by Customs, the goods would not have been admitted as marked.  Marking, exportation, or destruction, would have been required.  If none of these measures were accomplished and if the mismarking had been discovered before liquidation, marking duties would have been assessed." (citations and footnote omitted)).  Further support that marking duties are triggered sometime after importation is the fact that an importer at the border with unmarked goods in hand does not have the option to pay marking duties to enter the country.  *See Globemaster, Inc. v. United States*, 340 F. Supp. 974, 977 (Cust. Ct. 1972).  It is plainly inconsistent to say, on the one hand, marking duties are owed at the time of importation, but on the other hand, an importer may not pay the same at the time of importation.  Marking duties are simply not owed at the time of importation as dictated by the statute, and therefore, cannot form the basis of an FCA claim as a matter of law.

After a thorough search, Defendants are only aware of one case where a court determined that marking duties under § 1304(i) may serve as the basis of an FCA violation.[5]  In *United States ex rel. Customs Fraud Investigations, LLC. V. Victaulic Co.*, 839 F.3d 242 (3d Cir. 2016), Customs Fraud Investigations, LLC ("CFI"), a company that conducts research and analysis on possible customs fraud, initiated a *qui tam* action as the relator on behalf of the United States against the Victaulic Company ("Victaulic"), a producer of iron and steel pipe fittings

---

[5] Anticipating this potential legal bar to his theory, the Relator takes the unusual step of citing case law in its AC to support its legal theory of recovery.  *See* AC ¶ 46.  Relator also points to a case in the Southern District of New York, in which the parties entered into a stipulation and settled.  *See id*.  That court did not make any finding related to the viability of § 1304 and the FCA, and it lends no support for Relator's position.

manufactured in the United States, China, Poland, and Mexico. *Id.* at 255. CFI alleged that

Victaulic violated the FCA by failing to mark and improperly marking foreign-made pipe fittings

as required under § 1304(a), ***and falsifying CBP Form 7501 forms***, to avoid an obligation to pay

"marking duties" owed on unmarked or improperly marked goods. Victaulic moved to dismiss

the case, arguing that failure to pay a marking duty does not constitute a FCA violation and that

CFI failed to state a claim under Rule 8(a) or Rule 9(b) of the Federal Rules of Civil Procedure.

*United States ex rel. Customs Fraud Investigations, LLC v. Victaulic Co.*, 2014 WL 4375638, at

*11, *13 (E.D. Pa. Sept. 4, 2014).[6]

The district court walked through the process of how an importer comes to owe marking

duties, highlighting the plain language of § 1304. *Victaulic*, 2015 WL 1608455, at *10–11.

Based on the statute and regulations, the district court determined the following:

> Marking duties are therefore not a duty owed to the Government
> upon the importation of foreign merchandise. They are, rather,
> additional duties imposed after the fact on noncompliant
> merchandise that has been erroneously released into the stream of
> commerce.

*Id.* at 11. As such, the district court found an amendment to the complaint would be futile.

On appeal, the United States Court of Appeals for the Third Circuit reversed, holding that

reverse false claims liability may attach as a result of avoiding marking duties, which, it

---

[6] The *Victaulic* case has a long history. In the district court's September 4, 2014
"Memorandum" on the first motion to dismiss the complaint, the district court did not decide
"whether a failure to mark imported goods or to pay marking duties under the Tariff Act gives
rise to a claim under either version of the FCA" because the district court dismissed the
complaint for other pleading failures. *Victaulic*, 2014 WL 4375638, at *13. In a subsequent
opinion, however, the district court denied the plaintiff's motion for leave to file an amended
complaint, reasoning the same was futile. *U.S. ex rel. Customs Fraud Investigations, LLC v.
Victaulic Co.*, 37 ITRD 1730 (E.D. Pa. 2015), *vacated and remanded sub nom. United States ex
rel. Customs Fraud Investigations, LLC. v. Victaulic Co.*, 839 F.3d 242 (3d Cir. 2016). The
Third Circuit later vacated that second opinion on that point.

determined despite the language of the statute, accrued at the time Victaulic imported the improperly marked goods into the United States and knowingly avoided its obligation to pay. *Victaulic*, 839 F.3d at 254–55. The Court glossed over the definition of "obligation" in the FCA statute and quickly jumped to legislative history, noting that, when Congress amended the FCA, the Senate Report referred to "Custom duties for mismarking country of origin" and how such duties would be covered by the FCA. *Id.* at 254–55. The Third Circuit then explained how Victaulic's conduct fit within the definition of "obligation." *Id.* at 254 ("This is precisely what CFI alleges Victaulic did in a systematic way for years. Victaulic, according to CFI, knew its goods were not marked properly and, therefore, knew that the imported pipe fittings should not have been released from government custody."). The Third Circuit elaborated:

> Hence, in CFI's view, Victaulic knowingly concealed information from the government by not informing customs officials that the imported pipe fittings were not marked properly. According to CFI, once the pipe fittings cleared customs, Victaulic knew it owed marking duties that accrued on importation but did not pay them. This, in CFI's view, gives rise to reverse false claims liability for the unpaid marking duties.

*Id.* Against that backdrop, the Third Circuit reasoned that Victaulic, when it brought the unmarked or improperly marked goods into the United States, declined to notify CBP of the non-conforming status of the marked goods, which resulted in the goods being released into the stream of commerce into the United States. At that point, the ten percent duty attached. After considering the statute, its legislative history, and public policy "underlying the regulatory scheme," the Third Circuit held "reverse false claims liability may attach as a result of avoiding marking duties." *Id.* at 256.

As an initial point, as this Court is well aware, it is not bound by the Third Circuit's decision in *Victaulic*, the only federal case to hold that Relator's theory of recovery is a viable

24

one under the FCA. No matter, Defendants contend that, not only was *Victaulic* wrongly decided, it is nonetheless distinguishable in material ways. First, *Victaulic* is wrong. It glosses over the plain language of the statute, pays lip service to when a duty is owed versus "accrued" pretending there is no distinction, and gives deference to legislative history, while ignoring the fact that reliance on legislative history was both premature and unnecessary. The Third Circuit in *Victaulic* acknowledged the *fact* that an importer owed nothing at the time of importation, even if mismarked or unmarked, as "technically correct," but quickly dismissed this point as "mak[ing] too fine a distinction between the time at which an importer must pay marking duties and the time at which such duties accrue." *Id.* at 254. This distinction is not too fine – words and context matter – and precedent in this District mandates a "presently-existing obligation to the government" to pay at the time of the false statement (here, that would be at the time goods are imported without the appropriate marking). *CKD Project, LLC*, 551 F. Supp. 3d at 47. Rather, an obligation to pay marking duties arises only when the importation of unmarked goods is detected after entry into commerce, and then only if the goods are not marked, exported, or destroyed. *See* 19 U.S.C. § 1304(i). This sort of safe-harbor provision confirms that an importer does not owe a marking duty at the time of importation, regardless of whether or not such duties "accrue" earlier. Therefore, there is no "obligation" at the time of the false statement when goods are imported without the appropriate marking.

The Third Circuit chose to skip over this problem and noted that the duty "accrued" on the date of importation, per 19 U.S.C. § 1304, which it found somehow sufficient. To state that a duty accrues on a date certain does not impose an "established duty" owed. First, and as noted above, at the time of importation, an importer who fails to mark a good owes nothing to the government and, in fact, *cannot* pay the duty purportedly then owed, as demonstrated by the fact

25

that "when mismarked or unmarked goods are in government custody the importer may not simply pay marking duties to obtain the release of such goods," which the Third Circuit acknowledged as "true." *Victaulic*, 839 F.3d at 254. At the time of importation, the duty remains potential only.

Second, and further showing the contingent nature of the marking duty, the same statute provides means for the importer to avoid the marking duty, for example, by self-deporting the goods. It would be strange indeed for an importer to be *unable* to pay a duty at the time of importation and have a future remedy to avoid the same, yet at the same time, for the duty to be considered "due and owing, without exception" because it "accrued" at the time of import. By its very essence, the 10% duty is not owed at the time of importation, but remains a potential monetary liability if noncompliance is not addressed by exportation, destruction, or marking. The unique nature of the marking statute simply does not fit within the FCA.

Furthermore, the phrase "whether or not fixed" in the post-FERA definition of "obligation" does not save Relator's claim. "[The] phrase refers to 'whether or not the amount owed was fixed at the time of the violation' rather than whether an obligation to pay was fixed." *United States v. Southland Gaming of the Virgin Islands, Inc.*, 182 F. Supp. 3d 297, 315 (D.V.I. 2016) (quoting *United States ex rel. Boise v. Cephalon, Inc.*, 2015 WL 4461793, *1 n. 1, 2015 U.S. Dist. LEXIS 94448, at *3 n. 1 (E.D. Pa. July 21, 2015)). *See also Kane ex rel. United States v. Healthfirst, Inc.*, 120 F. Supp. 3d 370, 388 (S.D.N.Y. 2015) (stating that "[the] legislative history indicates that Congress intended for FCA liability to attach in circumstances where ... there is an established duty to pay money to the government, even if the precise amount due has yet to be determined"). Here, there is no established duty to pay for failure to mark under § 1304(i) at the time of importation; rather, the obligation related to a marking duty turns

on future, post-importation conduct, and, therefore, falls outside the ambit of the FCA, even after the 2009 amendments.

While the legislative history to FERA shows an intent for the FCA to capture fraudulently *mismarking*, as further explained below, there is no need to look at such history in the first place. As demonstrated above, the starting (and ending) point is the language of the statute itself. "If the statutory terms are unambiguous, we construe the statute according to the plain meaning of its words." *Panjiva, Inc. v. United States Customs & Border Prot.*, 975 F.3d 171, 176 (2d Cir. 2020) (citations omitted). "If, however, the terms are ambiguous or unclear, we may consider legislative history and other tools of statutory interpretation." *Id.* (citation omitted). There is no ambiguity in § 1304's safe-harbor provision as to when a duty may be owed: "[i]f at the time of importation any article … is not marked in accordance with the requirements of this section, *and if such article is not exported or destroyed or the article … marked **after importation** in accordance with the requirements of this section… ."* 19 U.S.C. § 1304(i) (emphasis added). The Third Circuit all-too-quickly jumped to legislative history as a way to justify its interpretation, but there was no need to do so in the first place. Nothing about the FCA or the importation statute contains ambiguity, thus requiring clarity from legislative history or other tools of statutory construction. In fact, the Third Circuit never noted any ambiguity in the statute, thus failing to justify its own foray into legislative history and it is inappropriate for a court to jump to legislative history without finding any ambiguity. *See In re Olga Coal Co.*, 159 F.3d 62, 67 (2d Cir. 1998) (providing "where … the meaning of a statutory provision is otherwise unambiguous, resort to legislative history is inappropriate"); *Chen v. Bd. of Immigr. Appeals*, 164 F. Supp. 3d 612, 620 (S.D.N.Y. 2016) ("Where the statute permits but one reading, it is inappropriate to resort to legislative history.").

Further, any foray into legislative history simply bestows more confusion, not clarity. While the Senate Judiciary Committee Report reflected an intent to capture "contingent, non-fixed obligations," S.Rep. 111-10, at 14, Congress ultimately removed the word "contingent" from the definition of obligation, and explained the need for the duty to be "formally established:"

> The bill's new definition of the word 'obligation,' in particular, posed several problems. The original language spoke of 'contingent' obligations. Such contingent or potential duties could include duties to pay penalties or fines, which could arise—and at least become 'contingent' obligations—as soon as the conduct that is the basis for the fine has occurred.
>
> ***Obviously, we don't want the Government or anyone else suing under the False Claims Act to treble and enforce a fine before the duty to pay that fine has been formally established***. It is unlikely that [Department of] Justice would ever have brought suit to enforce a claim of this nature, but the FCA can also be enforced by private [relators] who often may be motivated by personal gain and not always exercise the same good judgment that the Government usually does. (emphasis added).

155 Cong. Rec. S. 4539 (daily ed. Apr. 22, 2009) (statement of Sen. Kyl). Senator Kyl's statements ring true here: the Department of Justice has exercised good judgment and declined to intervene, whereas the Relator, motivated by personal gain, is attempting to shoehorn a marking violation, which at most amounts to negligence, into a fraudulent FCA claim.

To the extent Relator contends that Congress intended to capture "customs duties for ***mismarking*** country of origin," *Victaulic*, 839 F.3d at 254 (citing S.Rep. 111-10, at 14 n. 10) (emphasis added), this is not such a case. Relator alleges Defendants ***failed to mark*** the goods, not that they *mismarked* the country-of-origin (fraudulently added the wrong country of origin). *See* AC ¶¶ 47, 57, 58, 74, 83, 87, 91, 104. This distinction is significant because Congress specified that the 2009 FERA amendments were intended to address, in part, situations like those

28

in *Am. Textile Mfrs. Inst.*, where importers mismarked the country-of-origin on their products in order to avoid paying custom duties.[7] S.Rep. 111-10, at 24 n.10. More specifically in *Am. Textile Mfrs. Inst.*, the plaintiff alleged that the defendants-importers "engaged in a pattern or practice of trade pursuant to which articles of apparel produced in the People's Republic of China have been transhipped to Hong Kong or Macau; have been falsely labeled as the products of Hong Kong or Macau; and have been knowingly represented to be the products of Hong Kong or Macau in official entry documents submitted to Customs by or on behalf of said Defendants." *Am. Textile Mfrs. Inst.*, 190 F.3d at 731. This is a far cry from a simple failure to mark, especially where the Defendants otherwise complied and informed the government of the prior country-of-origin on importation forms, which Defendants did here, as shown below, and which Relator does not contest in the AC. *See* AC ¶¶ 68, 75, 88, 93, 94, Exs. 15, 16, 18, 20, 21. The reasoning for treating mismarking different than non-marking makes sense: an importer's lack of understanding as to a complicated regulatory framework does not give rise to a fraud case under the FCA. Indeed, post-2009, FCA cases relating to customs duties have involved duties owed based on a misrepresentation of the country-of-origin or the value of the merchandise, not a simple failure to mark.[8]

---

[7] That certainly is not the case here. But for the alleged failure to mark, Relator does not claim that Defendants had an obligation to pay duties on the jewelry it imported from Canada.

[8] *See, e.g.*, *United States ex rel. Mehmet Mustafa Karadag v. Luchiano Visconti Loutie LLC D/B/A Luciano Visconti, et al.*, No. 1:18-cv-11228-PKC, Dkt. No. 21, at 2 (S.D.N.Y. Aug. 11, 2022); *United States ex rel. Blount Int'l, Inc. v. Trikink Saw Chain, LLC, and Trilink Global, LLC*, No. 1:20-cv-00058, Dkt. No. 1, at 1-2, 9-11 (N.D. Ia. June 3, 2020); *United States ex rel. Alan Robins v. Roman & Sunstone, LLC, et al.*, No. 1:18-cv-10170-LTS, Dkt. No. 30, at 1-2 (D. Mass. Sept. 30, 2020); *United States of America ex rel Michael Krigstein v. Queen Apparel NY, Inc., and Hank Hyunho Choi*, No. 1:13-cv-09030, Dkt. No. 25, at 2 (S.D.N.Y. Feb. 20, 2019); *United States ex rel. William Day v. Ellab, Inc. & Ellab A/S*, No. 18-cv-00768-NRN, Dkt. No. 1, at 1 (D. Colo. April 3, 2018); *United States ex rel. Crystal Johnson v. Linde AG and Linde Engineering N. Amer., Inc.*, No. 2:17-cv-01012-HB, Dkt. No. 1, at 7-8 (E.D. Pa. March 7, 2017); *United States ex rel. Jeffrey Hawk v. CWD Holdings, LLC, et al.*, No. 2:17-cv-12225, Dkt. No. 1,

To the extent this Court finds *Victaulic* correctly decided, the facts are so different from the instant case it is rendered unhelpful to Relator. Unlike the defendants in *Victaulic*, Defendants here not only did not falsify "customs entry documents" submitted to CBP, but they affirmatively notified CBP, via the same forms, that the jewelry in question had been manufactured in Canada, as acknowledged by Relator and reflected in documents attached to his own AC. *Compare* AC ¶¶ 68, 75, 88, 93, 94, Exs. 15, 16, 18, 20, 21, *with Victaulic*, 2014 WL 4375638, at *2 (detailing complaint as alleging that defendant "failed to mark its imported pipe fittings with country-of-origin markings," and that "Victaulic has knowingly concealed the true origin of its pipe fittings, and falsified customs entry documents, both to avoid paying customs marking duties and so that it can pass off its foreign pipe fittings as U.S.-made, to command the higher price generally paid for domestic-made pipe fittings"); *see also id.* Exs. 15, 16, 18, 20, 21. In particular, as shown on Exhibits 15, 16, 18, 20, and 21 to Relator's AC, respectively, Defendants noted the proper country of origin as "CA" or Canada on official customs forms entitled, "North American Free Trade Agreement / Certificate of Origin." *Id.* It defies logic that Defendants were advising the government of the proper country-of-origin on official government forms, yet, at the same time according to Relator, engaged in a nefarious, far-reaching conspiratorial scheme to withhold money from the same government by not placing a sticker or label on imports indicating what Defendants already told the government, i.e., that the products were made in Canada. Unlike the allegations in *Victaulic*, Defendants here properly advised

---

at 2 (E.D. Mi. July 7, 2017); *United States ex rel. Kristin S. Vale and Stephen Vale v. Selective Marketplace Ltd. et al.*, No. 2:17-cv-380-LEW, Dkt. No. 1, at 1-2, 7 (D. Me. Sept. 28, 2017); *United States ex rel. Valenti v. Tai Shan Golden Aluminum Prods., Ltd.*, No. 3:11-cv-00368, Dkt. No. 11, at 2 (M.D. Fla. Nov. 13, 2014); *United States ex rel. Doe v. Siouni & Zarr Corp.*, No. 1:11-cv-04247, Dkt. No. 33, at 3 (S.D.N.Y. Apr. 9, 2014); *United States ex rel. Karlin v. Noble Jewelry Holdings Ltd.*, No. 1:08-cv-07826, Dkt. No. 18, at 3-4 (S.D.N.Y. Aug. 29, 2011).

CBP of the country-of-origin – as Plaintiff concedes. *See, e.g.*, *id.* ¶¶ 68, 75, 88, 93, 94 (acknowledging that the respective invoices reflected properly "Made in Canada"); *see id.* Exs. 15, 16, 18, 20, 21. Thus, here, unlike *Victaulic*, Defendants did not try to deceive or otherwise hide anything from CBP before importing the jewelry into the United States. Accordingly, the Third Circuit's finding that liability may attach as a result of avoidance is inapplicable here.

Significantly, "[t]he False Claims Act is not an all-purpose antifraud statute, or a vehicle for punishing garden-variety breaches of contract or regulatory violations." *Universal Health Servs., Inc. v. United States ex rel. Escobar*, 136 S. Ct. 1989, 2003 (2016) (quotation marks and citation omitted). Identifying an "obligation" is necessary to establish a violation of the reverse false claims provision. Marking duties, by the plain language of the statute, are not due and owing at the time of importation, but instead, hinge on conduct that may or may not occur after importation. As such, marking duties are not only contingent on future action but speculative and unassessed at the time of the alleged fraud and therefore do not fall within the definition of an "obligation" under the FCA. Accordingly, failure to mark imported goods cannot support FCA liability, and the AC should be dismissed in its entirety.

## V. DEFENDANTS' ALLEGEDLY FALSE STATEMENTS WERE NOT MATERIAL.

To the extent the Court concludes that marking duties may serve as the basis for an FCA claim, Defendants' alleged "false" statements here were not material to an obligation to pay duties to the government in light of Plaintiff's own allegations. *See generally* 31 U.S.C. § 3729.

Courts may dispose of an FCA claim at the motion to dismiss stage if a plaintiff fails to plausibly plead materiality. *United States ex rel. Daugherty v. Tiversa Holding Corp.*, 342 F. Supp. 3d 418, 428 (S.D.N.Y. 2018); *United States ex rel. Scharff v. Camelot Counseling*, 2016 WL 5416494, at *9 (S.D.N.Y. Sept. 28, 2016). The FCA defines materiality as "having a natural

tendency to influence, or be capable of influencing, the payment or receipt of money or property." 31 U.S.C. § 3729(b)(4). The Supreme Court has identified relevant but non-dispositive factors to assess materiality. *See Escobar*, 136 S. Ct. at 2002. Under *Escobar*, relevant factors in evaluating materiality include: (1) whether the government expressly designates compliance with a particular statutory, regulatory, or contractual requirement as a condition of payment; (2) the government's response to noncompliance with the relevant contractual, statutory, or regulatory provision; and (3) whether the defendants' alleged noncompliance was "minor or insubstantial." *Id*. at 2003–04. This standard is "demanding" and requires showing more than "the Government's decision to expressly identify a provision as a condition of payment." *United States ex rel. Kolchinsky v. Moody's Corp.*, 2018 WL 1322183, at *3–4 (S.D.N.Y. Mar. 13, 2018) (Pauley, J.). *See also Escobar*, 136 S. Ct. at 2003 (providing that a misrepresentation "cannot be deemed material merely because the Government designates compliance with a particular statutory, regulatory, or contractual requirement as a condition of payment").

"The first factor that *Escobar* identifies as relevant to materiality is whether the government 'expressly identif[ied] a provision as a condition of payment.'" *Strock*, 982 F.3d at 62 (quoting *Escobar*, 136 S. Ct. at 2003). Section 1304 does not "expressly identify" a provision as a condition of payment. Furthermore, while *Escobar* indicated that the express identification of a provision as a condition of payment is relevant, it emphasized that this factor is not "automatically dispositive," *Escobar*, 136 S. Ct. at 2003, and the Second Circuit has determined that this factor is entitled to "less weight" in certain circumstances, *United States ex rel. Foreman v. AECOM*, 19 F.4th 85, 111 (2d Cir. 2021).

The second materiality factor "concerns the government's response to noncompliance with the relevant contractual, statutory, or regulatory provision." *Strock*, 982 F.3d at 62. "*Escobar* directs examination of the government's reaction to noncompliance both 'in the mine run of cases,' as well as in the 'particular' case at issue." *Id.* (quoting *Escobar*, 136 S. Ct. at 2003). Applied here, the government – specifically CBP and Department of Homeland Security – was well aware of Defendants' purported noncompliance over the years. According to the Relator, Defendants first regularly imported goods into the United States without any marking in June 2016 and, then after the summer of 2018, imported goods into the United States without individual markings on each good albeit within polybags marked as "Made in Canada." Despite the alleged years of noncompliance, Relator does not allege a single instance where CBP stopped or questioned Defendants as they crossed the border with imported goods, according to Relator, not in compliance with federal regulations. As Relator himself plead, "[a]t the time of entry into the United States, the importer must present to CBP: (1) a bill of lading or air waybill; (2) a commercial invoice; and (3) an entry summary, also known as CBP Form 7501." AC ¶ 25 (citing 19 C.F.R. §§ 141.11, 141.19(a), 141.81, 141.86(a), 142.3(a), 142.6(a)). Nonetheless, the government's reaction – apparently since 2016, according to the AC – was to do nothing in response and to allow Defendants to import the goods and to continue importing its goods for years. Perhaps the best explanation for the government's disinterest is the fact that, as Relator acknowledges, Defendants disclosed the proper country-of-origin on customs documents filed with CBP and other accompanying paperwork, such as invoices with the carrier-importer. The government's seeming indifference to what Relator asks this Court to view as a wide-ranging fraudulent scheme weighs against a finding of materiality.

33

And third, in evaluating the final *Escobar* factor, courts "examine whether the defendants' alleged noncompliance was substantial." *Strock*, 982 F.3d at 65. Materiality "cannot be found where noncompliance is minor or insubstantial," *Escobar*, 136 S. Ct. at 2003, because material falsehoods are those that go to "the very essence of the bargain." *Id*. at 2003 n.5. Here, this factor weighs strongly against a finding of materiality. Unlike the myriad of cases post-2009 involving instances of mismarking the country-of-origin, *see supra* n.7, Defendants did not attempt to hide, mislead or obfuscate the country-of-origin of its imports to CBP in any way. Quite to the contrary, and as Relator himself alleges in the AC and in the Exhibits attached thereto, Defendants made CBP fully aware that Defendants' imported goods were manufactured in Canada by way of the executed customs forms. *See, e.g.*, AC ¶¶ 68, 75, 88, 93, 94, Exs. 15, 16, 18, 20, 21.[9] Rather, Defendants' sin, according to Plaintiff, involved (1) failing to mark imported goods for a period of time, *id.* ¶¶ 62–75, and (2) then marking only the container as opposed to each good individually, *id.* ¶¶ 82–88, *but at all relevant times* properly advising CBP of the country-of-origin in importation records, *see id.* Exs. 15, 16, 18, 20, 21. In this way, Defendants' purported violations became even less material when, beginning in or around July 2018, according to Relator's own allegations, Defendants used "Made in Canada" stickers on containers for the imported goods. Defendants' violation, to the extent there was any

---

[9] Defendants stand ready to provide the Court with numerous representative Forms 7501 completed by Defendants and upon which Defendants properly advised CBP of the country-of-origin, which merely confirms what Relator's Exhibits to the Amended Complaint already demonstrate: Defendants properly identified the correct country-of-origin on importation documents to the government.

violation, was merely technical and does not rise to the materiality standard anticipated by the FCA.[10]

Determining "materiality is essentially a matter of common sense rather than technical exegesis of statutes and regulations." *Kolchinsky*, 2018 WL 1322183, at *4 (quoting *United States ex rel. Gelman v. Donovan*, 2017 WL 4280543, at *5 (E.D.N.Y. Sept. 25, 2017)). Common sense dictates that any alleged failure to mark imports – where Defendants otherwise complied with the more strenuous documentation requirements identifying the proper country-of-origin on customs forms, as Plaintiff's own evidence and allegations concede, and where Defendants did not otherwise have an obligation to pay duties under the United States-Mexico-Canada Agreement ("USMCA"), formerly the North America Free Trade Agreement ("NAFTA") – was not material.

## VI. RELATOR FAILS TO PLEAD THAT DEFENDANTS ACTED WITH THE REQUISITE SCIENTER FROM 2016 THROUGH JULY 2018.

Reduced to its simplest form, there are two essential elements of an FCA violation: (1) the false claim itself, and (2) the defendant's knowledge of fact that the claim is false. The AC fails to adequately allege Defendants' knowledge or intent not to comply with the marking requirements prior to July 2018.[11] This is yet another reason why the Court should dismiss this action.

"Because the False Claims Act is an anti-fraud statute, 'claims brought under the FCA fall within the express scope of Rule 9(b).'" *United States v. New York Soc. for the Relief of the*

---

[10] The technical nature of the alleged violation similarly does not account for the lack of import duty Defendants owed under the United States-Mexico-Canada Agreement ("USMCA"), formerly the North America Free Trade Agreement ("NAFTA").

[11] Defendants vehemently dispute that Plaintiff can establish that they acted with the requisite intent at any time, but limits this discussion to the period prior to July 2018.

35

*Ruptured & Crippled, Maintaining the Hosp. for Special Surgery*, No. 07 Civ. 292(PKC), 2014

WL 3905742, at *7 (S.D.N.Y. Aug. 7, 2014) (quoting *Gold v. Morrison–Knudsen Co.*, 68 F.3d

1475, 1477 (2d Cir. 1995)).  "The FCA's scienter requirement is rigorous, because, under Rule

9(b), the proponent of an FCA claim must allege facts that give rise to a strong inference of

fraudulent intent.  Conclusory allegations that defendants knew or were reckless in not knowing

... do not satisfy the requirements of Rule 9(b)."  *United States ex rel. Grubea v. Rosicki, Rosicki*

*& Assocs., P.C.*, 318 F. Supp. 3d 680, 694 (S.D.N.Y. 2018) (cleaned up and internal quotation

marks and citations omitted).  To survive a motion to dismiss, a complaint "must set forth

particularized allegations of fact regarding both the fraudulent "scheme" and the submission of

false claims."  *Id.*

The FCA defines "knowingly" as acting under one of three mental states: actual

knowledge, deliberate ignorance, or reckless disregard.  *See* 31 U.S.C. § 3729(b)(1)(A).

Recently, in *United States ex rel. Schutte v. SuperValu Inc.*, 143 S. Ct. 1391 (2023), the Supreme

Court expounded on what is required:

> First, that the person "has actual knowledge of the information," §
> 3729(b)(1)(A)(i).  Second, that the person "acts in deliberate
> ignorance of the truth or falsity of the information," §
> 3729(b)(1)(A)(ii).  And, third, that the person "acts in reckless
> disregard of the truth or falsity of the information," §
> 3729(b)(1)(A)(iii).  In short, either actual knowledge, deliberate
> ignorance, or recklessness will suffice.

*Id*. at 1399–400.  A unanimous Supreme Court further clarified that the "FCA's scienter element

refers to respondents' knowledge and subjective beliefs—not to what an objectively reasonable

person may have known or believed."  *Id.* at 1399.

Applied here, the Tariff Act requires that, with some exceptions, "every article of foreign origin[12] ... imported into the United States shall be marked in a conspicuous[13] place as legibly, indelibly, and permanently as the nature of the article ... will permit in such manner as to indicate to an ultimate purchaser[14] in the United States the English name of the country of origin[15] of the article." 19 U.S.C. § 1304(a). Within that guidance, regulations separately define each element of the marking statute, indicating the complexities faced by those who encounter it for the first time. While the statute appears unambiguous on its face, compliance with this regime is arduous, requiring an exacting reading of the applicable requirements, let alone determining the "ultimate purchaser" for whom these markings are made. Further complicating the matter is the impact of what is formerly called NAFTA (now the USMCA), for which the marking statute provides an entirely different scheme for "Treatment of Goods of a USMCA Country." 19 U.S.C. § 1304(k). Certain goods are exempted from tariffs under the "Harmonized Tariff Schedule of the United States" and certain marking requirements do not apply to goods from a USMCA country. *Id.* Here, Defendants manufactured jewelry in Canada, a USMCA country, thus further complicating an already unclear situation for Defendants.

---

[12] "Foreign origin" refers to a country of origin other than the United States, as defined in paragraph (e) of this section, or its possessions and territories. 19 CFR § 134.1(e).
[13] "Conspicuous" means capable of being easily seen with normal handling of the article or container. 19 CFR § 134.1(k).
[14] The "ultimate purchaser" refers generally to the last person in the United States who will receive the article in the form in which it was imported; however, for a good of a NAFTA or USMCA country, the "ultimate purchaser" is the last person in the United States who purchases the good in the form in which it was imported. It is not feasible to state who will be the "ultimate purchaser" in every circumstance. 19 CFR § 134.1(d).
[15] "Country of origin" means the country of manufacture, production, or growth of any article of foreign origin entering the United States. Further work or material added to an article in another country must effect a substantial transformation in order to render such other country the "country of origin" within the meaning of this part; however, for a good of a NAFTA or USMCA country, the marking rules set forth in part 102 of this chapter (hereinafter referred to as the part 102 Rules) will determine the country of origin. 19 CFR § 134.1(b).

Here, Relator's AC fails to adequately allege that, prior to July 2018, Defendants' acted with requisite knowledge of their marking obligations to "mark[] in a conspicuous place as legibly, indelibly, and permanently as the nature of the article ... will permit in such manner as to indicate to an ultimate purchaser in the United States the English name of the country of origin of the article." Prior to July 2018, Relator attempts to establish Defendants' intent in two ways: (1) in June 2016, Relator claims that he "informed Mr. Sporn and the other policy makers that U.S. law required that jewelry manufactured in Canada and then imported in the United Sates [sic] must be marked with its country or origin," and that "it was agreed in the June 2016 meeting to attach string tags with the country of origin for jewelry being manufactured in Canada," *id*. at 62 & 63; and (2) in September 2017, Relator claims he hired PwC to "to advise on tariffs and country of origin marking regulations applicable to the repair of customer-owned jewelry and Rolex watches" but, in the context of that different topic, PwC spontaneously advised "that any of TSC's other commercial products manufactured in Canada must be permanently marked with Canada as the country of origin before being imported into the United States," *id*. at 73. Neither of the alleged incidents meet Rule 9(b)'s and the FCA's rigorous pleading requirements.

First, Relator's alleged statements in June 2016 are vague and general. By Relator's own admission, he advised Defendants that imports must be marked with the country of origin, but that is far from enough to plead a plausible claim for relief under the FCA and Rule 9(b). The AC does not allege, in any way, that Relator discussed each exacting step that Defendants would need to take to fully comply with the marking statute. According to the AC, Relator merely "informed Mr. Sporn and the other policy makers that U.S. law required that jewelry manufactured in Canada and then imported in the United Sates must be marked with its country

38

of origin." AC ¶ 62. What this means is entirely unclear: did Relator explain how the imports should be marked, whether marking the bag (as he would later recommend in 2018) was sufficient, whether the import must be marked until retail sale or only at the time of importation, and who the ultimate purchaser was? Questions abound, but what is clear is that Relator's broad and general allegation that "I told Defendants to mark" certainly does not comply with Rule 9(b). Relator also claims to have suggested that "Defendants should at minimum tag or mark the jewelry in some way as a good-faith attempt to comply with the spirit (although not the letter) of the marking requirement." AC ¶ 63. Despite claiming that "TSC did not provide a string tag," Relator fails to plead Defendants' intent to violate the requirements that Relator allegedly partially explained to them. This hardly meets the rigorous standard required to make out a fraud claim under Rule 9(b)'s heighted pleading standard. "[T]he adequacy of particularized allegations under Rule 9(b) is case- and context-specific." *Chorches*, 865 F.3d at 81. Here, Relator fails to make out a fraud claim when his "advice" to Defendants regarding any marking requirements in June 2016 was woefully incomplete.

The second alleged incident fares no better under the FCA and Rule 9(b). Relator acknowledges that he himself hired PwC to address a separate and distinct issue: marking of repair jewelry. In that context, Relator then claims that in September 2017 "PwC," without specifying who at PwC or referencing any documentation provided by PwC, addressed an unrelated topic, namely, "that any of TSC's other commercial products manufactured in Canada must be permanently marked with Canada as the country of origin." AC ¶ 73. But the AC does not identify who made the statements putting Defendants on notice, nor does it allege *to whom* "PwC" gave the advice, and a fair reading of the AC indicates PwC allegedly gave any such alleged advice to the Relator only. *See id.* These allegations fail at the most basic level of Rule

9(b) by failing to allege the circumstances surrounding the fraud with sufficient particularity. *See* Fed. R. Civ. P. 9(b) ("In alleging fraud or mistake, a party must state with *particularity the circumstances* constituting fraud or mistake.") (emphasis added); *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec.*, LLC, 797 F.3d 160, 171 (2d Cir. 2015) ("Under Rule 9(b), Plaintiffs must "identify the speaker" of the allegedly fraudulent statements."). In the same way Relator's allegations also lack the context for the meeting at which PwC made these alleged statements.

In both instances, moreover, Relator's allegations still fall short of a fraudulent intent: "a 'pleading technique that couples a factual statement with a conclusory allegation of fraudulent intent' is insufficient to 'support the inference that the defendants acted recklessly or with fraudulent intent.'" *U.S. ex rel. Kirk v. Schindler Elevator Corp.*, 926 F. Supp. 2d 510, 522 (S.D.N.Y. 2013) (*quoting Rombach v. Chang*, 355 F.3d 164, 176 (2d Cir. 2004)). Relator alleges he provided to Defendants what can only be described as incomplete information related to the requirements under § 1304(a); even if relator did so, it does not automatically translate to a fraudulent intent, especially where, as Relator also alleges, Defendants were otherwise complying with its importation requirements and disclosing the country-of-origin on the appropriate documents. Even assuming Relator's allegations as true, he failed to meet Rule 9(b)'s and the FCA's rigorous pleading requirements. And moreover, negligence is not the same as fraud.

Furthermore, Relator's own allegations cast serious doubt on his claims of what he allegedly communicated in June 2016 and September 2017. For the period of time when Relator claims Defendants failed to mark their imports, Relator himself acknowledged his responsibility and role in failing to mark in an email to Sporn on July 4, 2018: "I reviewed the Title 19 regulations and guidelines, we are NOT in compliance. ***I apologize … This is something I***

*should have caught on my watch early on***.**" AC, Ex. 17 (emphasis added). It strains credulity for Relator to claim that he sufficiently advised Defendants of the duty to mark in June 2016 and September 2017, yet in July 2018, Relator*, in a written email attached to his own AC*, apologized to Sporn for "not hav[ing] caught on my watch early on" these marking regulations. Relator cannot have it both ways.

Making matters worse for Relator is that the exhibit to his Amended Complaint controls. "Where a conclusory allegation in the complaint conflicts with a statement made in a document attached to the complaint, the document controls and the allegation is not accepted as true." *Amidax Trading Grp. v. S.W.I.F.T. SCRL*, 607 F. Supp. 2d 500, 502 (S.D.N.Y. 2009). The same goes here. Relator claims, in passing fashion, that he in June 2016 and an unknown person from PwC in September 2017 advised Defendants of the requirement to mark imported jewelry in a manner sufficient to establish Defendants' knowledge of the same under the FCA and Rule 9(b). Yet, in written correspondence in July 2018, Relator apologized to his then-employer for failing to have raised these very same marking regulations "early on." In this way, the exhibit conflicts with Relator's allegations and the exhibit controls, which demonstrates that in no uncertain terms Relator never raised marking regulations with Defendants until, at the very earliest, July 2018. The district court in *Victaulic* described the requirements under § 1304 this way:

> "[T]he language of the Tariff Act itself is not very clear as to precisely when the obligation to pay marking duties arises, even if the duty is 'deemed to have accrued at importation.' It is difficult to determine, therefore, at what point an importer may be said to have 'avoided' or 'concealed' an 'established' duty to pay marking duties arising under § 1304(i)."

*Victaulic*, 2014 WL 4375638, at *13. Despite the difficulty of federal courts to interpret this morass, Plaintiff alleges that he, in undocumented and unsupported conversations which lacked any specificity as to the marking requirements and which directly contrast with his own evidence

attached to the AC, sufficiently put Defendants on notice as to what it means to "mark[] in a conspicuous place as legibly, indelibly, and permanently as the nature of the article ... will permit in such manner as to indicate to an ultimate purchaser in the United States the English name of the country of origin of the article."  At least with respect to the period prior to July 2018, Relator's allegations are woefully deficient to plead that Defendants acted with the requisite scienter, and therefore, any claim for recovery prior to that date should be barred.

## CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court dismiss Relator's AC in its entirety.

Dated: August 3, 2023  
New York, New York

Respectfully submitted,

DENTONS US LLP

By:  */s/ Robert M. Wasnofski, Jr.*  
Robert M. Wasnofski, Jr.  
Samuel J. Weiner  
1221 Avenue of the Americas  
New York, NY 10020-1089  
Phone: (212) 768-6748  
Fax: (212) 768-6800  
robert.wasnofski@dentons.com  
samuel.weiner@dentons.com

Timothy J. Storino (*pro hac vice*)  
233 South Wacker Drive, Suite 5900  
Chicago, IL 60606-6361  
Phone: (312) 876-2846  
timothy.storino@dentons.com

*Attorneys for Defendants The Sporn Company, Inc. and Bixler's Inc.*

## **CERTIFICATE OF SERVICE**

I, Robert M. Wasnofski, Jr., hereby certify that on August 3, 2023, a true and correct copy of the foregoing document was served on all counsel of record who have consented to electronic service via the Court's CM/ECF system.

*/s/ Robert M. Wasnofski, Jr.*