UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

2025 MAY 12 PM 1: 53

CLERK

BY_____
DEPUTY CLERK

UNITED STATES OF AMERICA ex rel.         )
Steven Adler,                            )
                                         )
    Plaintiff-Relator,                   )
                                         )
v.                                       )    Case No. 2:24-cv-00617
                                         )
THE SPORN COMPANY INC. and,              )
BIXLER'S INC.,                           )
                                         )
    Defendants.                          )

**OPINION AND ORDER DENYING
DEFENDANTS' MOTION TO DISMISS AMENDED COMPLAINT**
(Doc. 74)

    Plaintiff-Relator Steven Adler, on behalf of the United States of America (the "Government"), and on his own behalf, brings this action against Defendants The Sporn Company Inc. ("TSC") and Bixler's Inc. ("Bixler's") under the *qui tam* provisions of the False Claims Act ("FCA"), 31 U.S.C. §§ 3729-33. Pending before the court is Defendants' Motion to Dismiss the Amended Complaint. (Doc. 74.) Mr. Adler filed his response on December 10, 2024 (Doc. 75), and the government filed a Statement of Interest in Response to Defendants' Motion to Dismiss on December 19, 2024 (Doc. 80).[1] Defendants filed their reply on January 10, 2025, at which point this court took the motion under advisement. (Doc. 81.)

    Mr. Adler is represented by Andrew S. Macurdy, Esq., Arthur J. Ruben, Esq., Frank Tong Xu, Esq., Russell L. Kornblith, Esq., and Shaun Rosenthal, Esq. Defendants are represented by Justin B. Barnard, Esq., Robert M. Wasnofski, Jr., Esq., and Timothy J. Storino, Esq.

---

[1] The government has declined to intervene in this action pursuant to 31 U.S.C. § 3730(b)(4)(B). It has, however, filed a Statement of Interest, (Doc. 80), which is addressed herein.

I.    **Factual Allegations in the Amended Complaint.**

TSC is a jewelry business incorporated in New York with its principal place of business in Vermont. Bixler's, TSC's wholly owned subsidiary, was incorporated in Delaware and shares TSC's corporate headquarters. Mr. Adler is a Florida citizen and former TSC employee. From January 2016 to May 2016, he worked for TSC as an independent consultant; from May 2016 to February 2018, he served as vice president of manufacturing; and from February 2018 to December 2019, he worked as chief technology officer and chief operating officer of a non-jewelry business unit.

According to Mr. Adler, TSC "manufactures fine jewelry and licensed jewelry products" and sells products wholesale to retailers and to consumers via e-commerce and retail stores. (Doc. 30 at 7, ¶ 19.) Mr. Adler alleges that in 2016, TSC acquired Bixler's, Inc. as well as Bixler's "America's Oldest Jeweler" trademark and, in doing so, "promoted its Bixler's Jewelers products as American-made." *Id.* at 8, ¶ 20. He alleges that TSC and Bixler's "share the same management team, policies, Montreal manufacturing facilities, Vermont corporate address, and distribution network, and both are overseen by Perry Sporn[,]" who is the owner, president, CEO, director, and secretary of TSC and who controls Bixler's operations and strategy. *Id.* at 8, ¶ 21.

Mr. Adler alleges that, between 2016 and 2020, TSC manufactured more than $16 million worth of jewelry at factories it owned in Montreal, Canada and imported the jewelry to be sold to consumers in the United States, including through Bixler's licensed brands. The Tariff Act requires that:

> [E]very article of foreign origin (or its container, as provided in subsection (b) hereof) imported into the United States shall be marked in a conspicuous place as legibly, indelibly, and permanently as the nature of the article (or container) will permit in such manner as to indicate to an ultimate purchaser in the United States the English name of the country of origin of the article.

19 U.S.C. § 1304(a). If articles covered by this provision are not marked in accordance with § 1304 at the time of importation or are exported, destroyed, or marked under customs supervision after importation, they are subject to "a duty of 10 per centum ad valorem[.]" *See* § 1304(i).

Mr. Adler asserts "Defendants did not legibly, indelibly, and permanently mark [the allegedly imported] jewelry as 'made in Canada' . . . nor did they [] mark the jewelry's packaging provided to the ultimate consumer." (Doc. 30 at 16, ¶ 50.) He alleges that Defendants intentionally opted not to mark their jewelry to identify Canada as the country of origin to consumers "in order to trade on Bixler's [] reputation as an American company." *Id.* at 17, ¶ 52. The Amended Complaint identifies two examples of jewelry lines allegedly made by Defendants in Canada and imported into the United States which were sold to consumers without being marked with the country of origin: the "Bixler" line, which, according to Plaintiff, "sold licensed jewelry products, including jewelry affixed with the registered trademarks of American institutions," and the "Devotion Diamonds" line, which, according to Plaintiff, was sold in the United States at licensed retailers. *Id.* at 17-18.

The Amended Complaint identifies several instances in which Mr. Sporn and other TSC executives were allegedly informed by Mr. Adler of the requirement to mark Defendants' jewelry with its country of origin. He alleges that, at a meeting in June 2016, in the course of developing the policies and procedures for one of TSC's Canadian manufacturing plants, Mr. Adler "informed Mr. Sporn and the other policy makers [at the meeting] that U.S. law required that jewelry manufactured in Canada and then imported in the United States must be marked with its country of origin[,]" and two other people, TSC's vice-president of marketing and a consultant, concurred. *Id.* at 19, ¶ 62. TSC had purchased a laser engraving machine for the plant that could be used to mark the jewelry, but nobody at the plant knew how to operate it. Consequently, it was agreed that "as an interim measure, TSC would have the plant's finished jewelry shipped to TSC's Burlington, Vermont facility, where it would be engraved before being delivered to its ultimate purchaser." *Id.* at 19-20, ¶ 62. Mr. Adler suggested that "Defendants should at minimum tag or mark the jewelry in some way as a good-faith attempt to comply with the spirit (although not the letter) of the marking requirement[,]" and those at the meeting agreed to attach string tags to the jewelry indicating the country of origin. *Id.* at 20, ¶ 63.

According to Mr. Adler, Defendants did not include a string tag on the jewelry or

3

permanently mark it with its country of origin, although it "did permanently mark the jewelry with other information that it apparently believed would be helpful to the product's sale valuation[,]" such as the "precious metal type and content." (Doc. 30 at 20, ¶¶ 64-65.) Consequently, Defendants "imported jewelry into the United States that was not marked with its country of origin when sold to the ultimate consumer." *Id.* at 21, ¶ 67. As an example, Mr. Adler alleges a FedEx invoice shows that jewelry valued at $3,157.15 was shipped from Defendants' Montreal plant to Burlington, Vermont. (Doc. 30-15.) The invoice identified the jewelry's country of origin as Canada and "certified that the 'information on this document is true and accurate,' including the applicable tariff rates, and that it complied 'with the origin requirements specified for those goods in [the North American Free Trade Agreement (NAFTA)].'" (Doc. 30 at 21, ¶ 68.) Mr. Adler "believes that the jewelry in this order was not indelibly marked with the country of origin, nor was there any packaging sent to consumers with the correct country of origin, because TSC's standard operating procedure was not to mark either its jewelry or the jewelry's packaging with a product's country of origin." *Id.* He contends this "failure was not unwitting" because Defendants' vice president of marketing, engraver, and director of product development "all inspected Devotion jewelry products at the Burlington facility to ensure quality standards for the engraving" and "Mr. Sporn thereafter performed regular quality inspections and provided the final approval for delivery to the consumer." *Id.* at 20, ¶ 66. He alleges that Defendants failed to report to the United States government, including on Form 7501 which is submitted to Customs and Border Protection ("CBP"), that they owed ten percent marking duties.

Mr. Adler further alleges that, in early 2017, TSC "tasked [him] with securing, designing, and building out a new factory in Montreal as well as investigating methods to transition its jewelry-repair and Rolex-watch-repair operations to Canada." *Id.* at 22, ¶ 71. As part of this effort, Mr. Adler hired PricewaterhouseCoopers ("PwC") "to advise on tariffs and country of origin marking regulations applicable to the repair of customer-owned jewelry and Rolex watches." *Id.* at 22, ¶ 72. Mr. Adler contends that, in September 2017, he, Mr. Sporn, and TSC's director of finance met with two PwC

4

consultants to discuss the consultants' findings. The PwC consultants allegedly advised that jewelry repairs were exempt from customs duties, but "reaffirmed that any of TSC's other commercial products manufactured in Canada must be permanently marked with Canada as the country of origin before being imported into the United States." *Id.* at 22-23, ¶ 73.

Mr. Adler claims that Defendants ignored PwC's advice regarding marking regulations and "continued to deliberately conceal that their jewelry was made in Canada by failing to engrave it with its country of origin[.]" (Doc. 30 at 23, ¶ 74.) As an example, he cites a November 14, 2018 invoice allegedly showing that jewelry valued at $96,342.20 was imported from a Montreal plant to TSC headquarters in Vermont. Although the invoice identified the jewelry as "made in Canada" and included a certification that the information in the form complied with NAFTA origin requirements, Mr. Adler "believes that the jewelry in this order was not marked with the country of origin, nor was there any packaging identifying to the consumer that the jewelry was made in Canada, because TSC had a practice of not marking its jewelry and stripping country-of-origin information from consumer packaging." *Id.* at 23, ¶ 75. According to Mr. Adler, Defendants did not report to the government that they owed ten percent marking duties on this transaction.

On June 28, 2018, Mr. Adler emailed Mr. Sporn a link to a *National Jeweler* article about a case in which another jewelry company settled claims that it violated the FCA by failing to mark its jewelry with the country of origin. In his email to Mr. Sporn, Mr. Adler included a link to the article under the message "Some considerations for hallmarking our products in compliance for export from Canada to the [U.S.]" (Doc. 30-17 at 2.) He also included a link to a webpage containing the text of 19 U.S.C. 1304 and wrote, "Title 19, U.S. Code, Section 1304 requires jewelry be permanently marked with the country of origin at the time of import." *Id.* (internal quotation marks omitted).

Mr. Sporn responded, "They were avoiding and not paying duty that was owed[.] We're not doing that." *Id.* Mr. Adler then replied, "[y]es . . . that is true . . . but read closely it also references the lack of mark indicating country of origin as another

5

violation outlined in Title 19 Section 103" and he copied the following excerpt from the *National Jeweler* article: "The complaint also stated that the company, 'failed to affix permanent markings to jewelry manufactured in Sri Lanka or Thailand identifying the jewelry's country of origin' when it entered the U.S., then sold the jewelry to retailers without any markings indicating country of origin." *Id.* at 3.

Mr. Adler emailed Mr. Sporn on July 4, 2018, stating:

I reviewed the Title 19 regulations and guidelines, we are NOT in compliance. I apologize . . . This is something I should have caught on my watch early on. ( attached )

There are only a few unique exceptions to this regulation, none of which is directly applicable. When impractical to affix a permanent mark, the packaging mark may be appropriate or a string tag affixed to the product.

Thus far none of the border agents have asked or inspected but, they will at some point seize one of our commercial shipments for this reason.

I think you need to be pro-active on this[.]

- Recommend immediately for our Southbound "commercial" courier shipments[], we provide a "Made In Canada" label on every sealed plastic job envelope. ( not repairs ) This will demonstrate our awareness of the regulation.

- Recommend for the customer deliveries to provide a "Made in Canada" label in or on the box.

In implementing these two practices we demonstrate our intent to be compliant and could fight off a seizure at the [U.S.] border as well as any potential penalties.

Likewise we should be investigating the northbound regulations at CBSA for marking of the country of origin for commercial goods[.]

*Id.* at 3-4. Mr. Sporn stated "ok" in response to the first bullet point on Mr. Adler's email. *Id.* at 5. Regarding the second bullet point, Mr. Sporn wrote, "If delivered from Canada directly? If we ship from Vermont it doesn't matter, right?" *Id.* Mr. Adler responded stating, "No . . . we do need to include the Made [i]n Canada label/string tag with the packaged product going to a [U.S.] consumer . . . This is the primary purpose of the regulation so the consumer knows it is an import[.]" *Id.* at 5. Mr. Sporn responded, "Ok . . . we'll get a label for the polybag. I'll discuss this with Maj and Brian[.]" *Id.* at 5.

6

According to Mr. Adler, he spoke to Mr. Sporn in person on July 8, 2018 and
expressed "that TSC needed to begin permanently marking its jewelry[,]" to which Mr.
Sporn responded, "Thank you, I'll look into it." (Doc. 30 at 25, ¶ 83) (internal quotation
marks omitted). Mr. Adler periodically followed up with TSC's logistics manager about
this issue and was informed in September 2018 that "although TSC now applied a 'Made
in Canada' label to the polybags used to transport the products from Montreal to
Vermont, at the Burlington facility, the jewelry was then removed from the labeled
polybag and re-packaged for shipment to the consumer without any marking indicating
that the product was manufactured in Canada." *Id.* at 25, ¶ 84. Mr. Adler claims he
personally witnessed the assembly of jewelry in the "Bixler" line for shipment to
consumers without being marked with the country of origin. He cites another invoice,
dated December 17, 2018, showing that jewelry valued at $79,221.96 was imported from
TSC's Montreal plant to its headquarters in Vermont containing a certification that the
jewelry complied with NAFTA's origin requirements. Mr. Adler "believes that the
jewelry in this order was not marked with the country of origin, nor was there any
packaging sent to consumers with the correct country of origin, because TSC's standard
operating procedure was not to mark either its jewelry or the jewelry's polybag for the
ultimate consumer." *Id.* at 26, ¶ 88. According to Mr. Adler, TSC did not report or remit
any marking duties on this jewelry.

Mr. Adler alleges that in February 2019 he visited one of Defendants' Canadian
plants and observed that jewelry was not being marked with the country of origin. On
March 18, 2019, he met with Mr. Sporn and "confronted Mr. Sporn about Defendants'
failure to mark their jewelry with its country of origin." In response, Mr. Sporn
"reassured [Mr. Adler] he would bring the Defendants' practices into compliance." *Id.* at
27, ¶ 91. According to Mr. Adler, Defendants did not do so. He cites invoices dated
August 26, 2019 and November 22 and/or 25, 2019 for $44,000.99 and $238,545.80,
respectively, reflecting jewelry imported from TSC's Montreal plant to its Vermont
headquarters. Mr. Adler alleges, upon information and belief, that this jewelry "was not
marked with the country of origin, nor was there any packaging sent to consumers with

7

the correct country of origin, because it was Defendants' standard operating procedure not to include country of origin information on merchandise shipped to consumers." *Id.* at 28, ¶ 94.

Because Mr. Adler suspected that TSC was still not marking its jewelry with the country of origin, he ordered two pieces of jewelry sold under the Bixler line on September 26, 2019 to be shipped to his friend's home in Pennsylvania. According to Mr. Adler, these products were manufactured at TSC's Montreal plant and shipped to Vermont, where they were repackaged before being sold to the consumer. Upon arriving in Pennsylvania, the jewelry he purchased did not contain markings indicating its Canadian origin either on the product itself or on the container in which it was sold. Mr. Adler made two more purchases from Bixler's on June 24, 2020 and October 10, 2020 and, both times, when the jewelry arrived at the Florida address Plaintiff designated for delivery, neither the products nor their containers identified that the jewelry was made in Canada.

Mr. Adler asserts that, between April 2017 and January 2020, Defendants "imported into the United States from [their] manufacturing facility in Canada . . . at least 289 separate importations totaling $14 million of jewelry" and thereby "avoided obligations to pay in excess of $1.4 million to the United States Government[.]" *Id.* at 30, ¶ 104 (footnote omitted).

## II.    Defendants' Settlement Agreement with CBP.

In their motion to dismiss, Defendants argue that Mr. Adler's FCA claim is precluded by an October 11, 2023 settlement agreement between TSC, Mr. Sporn, and CBP ("CBP Settlement"). The CBP Settlement was submitted by Defendants as an exhibit to their motion to dismiss but was not attached to or quoted in the Amended Complaint. Mr. Adler does not object to the court's consideration of the CBP Settlement in deciding Defendants' motion to dismiss, although he disputes that it released his pending FCA claim.

The CBP Settlement includes the following statements:

WHEREAS, CBP alleges that TSC and Perry Sporn are liable for marking

duties and a penalty pursuant to 19 U.S.C. §§ 1304 and 1592 for entries filed with CBP from October 1, 2017 through July 2018 for failing to mark articles it imported from Canada to the United States with the country-of-origin as prescribed by federal law.

WHEREAS, this agreement resolves CBP's claims for marking duties and penalties with regard to entries filed from October 1, 2017 to March 31, 2022. CBP has not determined whether there is a loss of revenue to the United States for the period of July 1, 2018 to March 31, 2022.

(Doc. 74-1 at 3.) Under the terms of the CBP Settlement, TSC agreed to pay $172,845.00 to CBP, and "CBP fully and finally releases TSC and Perry Sporn from any marking duties and administrative monetary claims pursuant to 19 U.S.C. §§ 1592 and 1304, based on [Defendants'] entries that occurred from October 1, 2017 to March 31, 2022." *Id.* at 4.

The CBP Settlement identified "the following claims of the Government" as "specifically reserved and [] not released by this Agreement:"

a. any liability arising under Title 26, United States Code (Internal Revenue Code);

b. any criminal liability;

c. except as explicitly stated in this Stipulation, any administrative liability;

d. any liability to the United States (or its agencies) for any conduct other than the alleged marking violations for entries that occurred from October 1, 2017 to March 31, 2022;

e. and any liability based upon obligations created by this Stipulation.

*Id.* at 4-5. The CBP Settlement also states that it "in and of itself is not outcome determinative in the ongoing litigation between [Mr. Adler] and TSC et al. filed under" this case's original case caption.[2] *Id.* at 6.

In its Statement of Interest, the DOJ notes that it is not a party to the CBP Settlement and that the settlement pertains only to claims arising under 19 U.S.C. § 1304 and § 1592 and not to claims arising under the FCA, 31 U.S.C. § 3729(a)(1)(G). (Doc. 80 at 3-4.)

---

[2] This case was transferred to the District of Vermont from the Southern District of New York on June 5, 2024. (Doc. 59.)

## III.    Conclusions of Law and Analysis.

### A.    Elements of FCA Claim.

Mr. Adler asserts an FCA claim against Defendants, alleging that, by failing to properly mark their imported jewelry and then failing to pay a ten percent duty on the unmarked jewelry pursuant to 19 U.S.C. § 1304(i), Defendants are liable under the FCA's reverse false claims provision. This provision "contains three theories of liability: (1) 'knowingly mak[ing], us[ing], or caus[ing] to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government,' (2) 'knowingly conceal[ing] . . . an obligation to pay or transmit money or property to the Government,' and (3) 'knowingly and improperly avoid[ing] or decreas[ing] an obligation to pay or transmit money or property to the Government . . ." *Miller v. United States ex rel. Miller*, 110 F.4th 533, 542 (2d Cir. 2024) (alterations in original) (quoting 31 U.S.C. § 3729(a)(1)(G)). Mr. Adler alleges that Defendants violated the FCA under the third theory.

### B.    Standard of Review.

To survive a motion to dismiss filed pursuant to Fed. R. Civ. P. 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A plaintiff must allege sufficient facts to "nudge[ ] their claims across the line from conceivable to plausible[.]" *Twombly*, 550 U.S. at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

The sufficiency of a plaintiff's complaint under Rule 12(b)(6) is evaluated using a "two-pronged approach[.]" *Hayden v. Paterson*, 594 F.3d 150, 161 (2d Cir. 2010) (internal quotation marks omitted) (quoting *Iqbal*, 556 U.S. at 679). First, the court discounts legal conclusions and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements[.]" *Iqbal*, 556 U.S. at 678. The court is also "'not bound to accept as true a legal conclusion couched as a factual allegation[.]'" *Id.*

(citation omitted). Second, the court considers whether the factual allegations, taken as true, "plausibly give rise to an entitlement to relief." *Id.* at 679. This second step is fact-bound and context-specific, requiring the court "to draw on its judicial experience and common sense." *Id.* The court does not "weigh the evidence" or "evaluate the likelihood" that a plaintiff's claims will prevail. *Christiansen v. Omnicom Grp., Inc.*, 852 F.3d 195, 201 (2d Cir. 2017).

FCA claims are subject to the heightened pleading standard set forth in Fed. R. Civ. P. 9(b). *See Bishop v. Wells Fargo & Co.*, 823 F.3d 35, 43 (2d Cir. 2016) ("This Court has held that FCA claims fall within the scope of Rule 9(b)[.]"). Rule 9(b) requires that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b).

To satisfy Rule 9(b) the complaint must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Bishop*, 823 F.3d at 43 (internal quotation marks omitted).

## C.    Whether the CBP Settlement Released Mr. Adler's FCA Claim Against Defendants.

When "[p]resented with documents extrinsic to the complaint at the motion-to-dismiss stage," district courts generally exclude them or, pursuant to Federal Rule of Civil Procedure 12(d), treat the motion to dismiss as a motion for summary judgment. *Goel v. Bunge, Ltd.*, 820 F.3d 554, 557 (2d Cir. 2016). "In ruling on a motion to dismiss, some district courts in the Second Circuit have considered settlement agreements that are extrinsic to the complaint." *Philadelphia Indem. Ins. Co. v. Life Safety Fire Prot., Inc.*, 2024 WL 3849973, at *3 n.2 (D. Vt. Aug. 16, 2024); *see, e.g., In re Refco Inc. Sec. Litig.*, 2012 WL 4053939, at *2 (S.D.N.Y. Aug. 8, 2012), *report & recommendation adopted sub nom., In re Refco Sec. Litig.*, 2012 WL 4009175 (S.D.N.Y. Sept. 12, 2012) (collecting cases where courts "granted motions to dismiss third-party complaints because the third-party defendant had settled with the principal plaintiff[]"); *Martinez v.*

11

*189 Chrystie St. Partners, LP*, 2023 WL 5390442, at *3 (S.D.N.Y. Aug. 22, 2023)
(noting courts have considered settlement agreements that were not incorporated into
complaint or subject to judicial notice if settlement agreement would completely
"dispose" of the action).

Defendants contend that the CBP Settlement mandates dismissal of this case
because it fully released Defendants of all duties concerning their import of jewelry from
October 1, 2017 until March 31, 2022. This overstates the plain language of the CBP
Settlement, which releases TSC and Mr. Sporn only "from any marking duties and
administrative monetary claims *pursuant to 19 U.S.C. §§ 1592 and 1304*" for imports
from this time period. (Doc. 74-1 at 4) (emphasis supplied). The claim currently pending
before this court arises under the FCA, 31 U.S.C. § 3729(a)(1)(G). *See United States v.
Wanxiang Am. Corp.*, 654 F. Supp. 3d 1279, 1294 (Ct. Int'l Trade 2018) (describing FCA
as "a statute analogous to § 1592"). More specifically, the CBP Settlement unequivocally
states that it "is not outcome determinative" in the present case. (Doc 74-1 at 6.) This
provision would be rendered meaningless if the CBP Settlement released Defendants
from liability for Mr. Adler's FCA claim. *See James River Ins. Co. v. Inn-One Home*,
LLC, 468 F. Supp. 3d 662, 672 (D. Vt. 2020) ("Because the court 'assume[s] that parties
included contract provisions for a reason, [it] . . . will not embrace a construction of a
contract that would render a provision meaningless.'") (alterations in original) (quoting
*Rounds v. Malletts Bay Club, Inc.*, 2016 VT 102, ¶ 16, 203 Vt. 473, 479, 157 A.3d 1101,
1106)).

Defendants cite *United States ex rel. Hall v. Teledyne Wah Chang Albany*, 104
F.3d 230 (9th Cir. 1997) and *United States ex rel. McNulty v. Reddy Ice Holdings, Inc.*,
835 F. Supp. 2d 341 (E.D. Mich. 2011) for the proposition that "the Government's
knowledge of a settlement should ordinarily bar a subsequent qui tam suit." (Doc. 74 at
12.) This, too, overstates this non-binding precedent. In *Hall*, the Ninth Circuit affirmed
the district court's dismissal of a *qui tam* action because the plaintiff had already sued the
same defendant in state court and settled, "executing a release that also encompassed any
future *qui tam* claim." 104 F.3d at 231. Although the plaintiff's state court action did not

include an FCA claim, it involved similar facts, and the settlement agreement contained "a broadly worded general mutual release" that included "all claims which were, or could have been, brought as claims or counterclaims in [the state court case]." *Id.* at 232.

In *McNulty*, the Eastern District of Michigan court found the pre-filing release of a *qui tam* complaint unenforceable because, when the release was signed, the government had no knowledge of the claims that formed the basis of the *qui tam* action so that enforcement of the release would "frustrate[] the FCA's goals of incentivizing individuals to reveal fraudulent conduct to the government." 835 F. Supp. 2d at 360. In contrast, the CBP was apparently fully aware of Mr. Adler's FCA claim when settling with TSC and Mr. Sporn because it identifies the claim therein and acknowledges that it does not determine its outcome. Because the CBP Settlement does not contain broad release language and recognizes and arguably excludes Mr. Adler's FCA claim, *Hall* and *McNulty* are easily distinguishable.

The court therefore DENIES Defendants' motion to dismiss the Amended Complaint on the basis that Mr. Adler's claim is allegedly barred by the CBP Settlement Agreement.

### D.    Whether Defendants Established, as a Matter of Law, They Had No Obligation Pursuant to 19 U.S.C. § 1304(i).

"[A] *qui tam* plaintiff does not state a reverse false claim if the defendant does not have an obligation — that is, an established duty — to pay the government." *Miller*, 110 F.4th at 544; *United States ex rel. Billington v. HCL Tech. Ltd.*, 126 F.4th 799, 804 (2d Cir. 2025). In this case, Mr. Adler's FCA claim turns on Defendants' alleged obligation to pay the government marking duties under 19 U.S.C. § 1304(i). Defendants argue that Mr. Adler has failed to plead an obligation sufficient to support his FCA claim because (1) Defendants' imported jewelry constitutes original works of art, which are exempt from marking requirements and (2) even if Defendants potentially owed marking duties under 19 U.S.C. § 1304(i), they had no obligation to pay at the time they imported the jewelry because the government had not yet assessed any duties.

### 1.    Whether Defendants' Imports Were Exempt from § 1304 Marking Requirements.

Under 19 U.S.C. §§ 1304(k)(2)(A) and 1304(k)(3), "original work[s] of art" and their containers are exempt from the statute's country of origin marking requirements if they "qualif[y] as a good of a USMCA country[.]" USMCA refers to the U.S. Mexico Canada Trade Agreement. Canada is a USMCA country provided the USMCA is in force between the United States and Canada. 19 U.S.C. § 4502(10). If Defendants' jewelry imports qualify under this exemption, they would have no obligation to pay the government under 19 U.S.C. § 1304(i).

Neither party cites controlling precedent or even persuasive precedent regarding how to determine whether jewelry constitutes an "original work of art" within the meaning of 19 U.S.C. § 1304. Defendants rely on authorities stating that jewelry is classified as original artwork under copyright law and assert the same rationale applies to § 1304 because "[i]t would be strange" to do otherwise. (Doc. 74 at 11.) It is well settled, however, "that identical language may convey varying content when used in different statutes[.]" *Yates v. United States*, 574 U.S. 528, 537 (2015).

Courts interpreting tariff acts have distinguished between articles that are "artistic in the sense of being beautiful, and requiring a high degree of artistic merit for their production" and those that constitute "art" for the purpose of applying duties. *See, e.g., United States v. Perry*, 146 U.S. 71, 74 (1892) (holding that painted glass windows were, for tariff purposes, "decorative and industrial, rather than among the fine, arts"); *United States v. Wanamaker*, 19 C.C.P.A. 229, 231 (1931) ("It is well settled that, in a tariff sense, the phrase 'works of art' is limited to those artistic productions of the artist which are, in fact, examples of the free fine arts."). These cases support the conclusion that "art" as used in § 1304 is narrower than the definition of "art" in the copyright act, which includes any work that "might arguably be regarded as a work of art by any meaningful segment of the population[.]" 1 Nimmer on Copyright § 2.08.

Assuming that all jewelry is a "work of art[,]" an unlikely proposition, § 1304(k)(2)(A) exempts only "original" works of art. Under copyright law, "originality

requires independent creation plus a modicum of creativity[.]" *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co., Inc.*, 499 U.S. 340, 346 (1991). "Original" is commonly defined as "being the first instance or source from which a copy, reproduction, or translation is or can be made[.]" *Original*, https://www.merriam-webster.com/dictionary/original (last visited Feb. 21, 2025). This definition of "original" does not include the mass production of identical items.

When interpreting a statutory provision, courts "consider not only the bare meaning of the critical word or phrase but also its placement and purpose in the statutory scheme." *Zepeda-Lopez v. Garland*, 38 F.4th 315, 320 (2d Cir. 2022) (internal quotation marks omitted) (quoting *Kar Onn Lee v. Holder*, 701 F.3d 931, 936 (2d Cir. 2012)). In enforcing marking requirements, the CBP does not typically assess an artwork's degree of creativity or originality. A bright line, however, can be drawn between whether artwork is an "original" and whether it is a copy or reproduction. This distinction appears elsewhere in the customs enforcement context. For example, federal regulations related to the import of "works of art claimed to be free of duty" under the Harmonized Tariff Schedule of the United States distinguishes between "originals, replicas, reproductions, or copies[.]" 19 C.F.R. § 10.48(a). To qualify for these duty exceptions, artwork must be accompanied by a declaration affirming, among other things, that "any sculptures or statuary included in [the] invoice are the original works or models or one of the first twelve castings, replicas, or reproductions made from the sculptor's original work or model[.]" 19 C.F.R. § 10.48(b). Defendants' definition of "original works of art" would not satisfy this requirement.

Because on a motion to dismiss the court accepts the Amended Complaint's well-pleading factual allegations as true, Defendants' jewelry imports at issue do not appear to be original works of art but rather appear to be multiple copies of a presumably original design made in a Canadian manufacturing plant for mass production. Drawing all reasonable inferences in Mr. Adler's favor, Defendants have not established as a matter of law that the items in question are exempt from marking requirements under § 1304(k)(2)(A) as "original work[s] of art."

15

**2.    Whether 19 U.S.C. § 1304(i) Triggers an Established Duty to Pay the Government.**

Defendants contend that the actions alleged in the Amended Complaint do not give rise to a reverse false claims provision under 31 U.S.C. § 3729(a)(1)(G) because the alleged marking deficiencies did not create an "obligation to pay[.]" 31 U.S.C. § 3729(a)(1)(G). The FCA defines "obligation" as "an established duty[.]" *Id.* § 3729(b)(3). The Second Circuit has held that "a duty to pay is 'established' only when it triggers an immediate and self-executing duty to pay. In contrast, a duty to pay is not established — and there is no cognizable 'obligation' under the reverse false claim provision — when the imposition of penalties depends on government discretion." *Miller*, 110 F.4th at 545. The relevant statutory language sets out the following "duties for failure to mark":

> If at the time of importation any article (or its container, as provided in subsection (b)) is not marked in accordance with the requirements of this section, and if such article is not exported or destroyed or the article (or its container, as provided in subsection (b)) marked after importation in accordance with the requirements of this section (such exportation, destruction, or marking to be accomplished under customs supervision prior to the liquidation of the entry covering the article, and to be allowed whether or not the article has remained in continuous customs custody), there shall be levied, collected, and paid upon such article a duty of 10 per centum ad valorem, which shall be deemed to have accrued at the time of importation, shall not be construed to be penal, and shall not be remitted wholly or in part nor shall payment thereof be avoidable for any cause.

19 U.S.C. § 1304(i). The Second Circuit has not considered a reverse FCA claim based on an alleged violation of 19 U.S.C. § 1304(i). Mr. Adler relies on, and Defendants attempt to distinguish, *United States ex rel. Customs Fraud Investigations, LLC v. Victaulic Company* ("*Victaulic*"), in which the Third Circuit recognized § 1304(i) as creating a cognizable duty to pay within the meaning of the reverse false claims provision of the FCA. 839 F.3d 242, 252-53 (3d Cir. 2016).

In *Victaulic*, the plaintiff-relator alleged that the defendant imported pipe fittings subject to § 1304 marking requirements but did not properly mark its imports. Because an importer that released unmarked or improperly marked goods into the stream of commerce in the United States owes a 10 per centum ad valorem on those goods, the

16

defendant avoided paying marking duties on its pipe fittings by failing to disclose that they were improperly marked. The relator alleged that this wrongful retention of marking duties violated the FCA's reverse false claims provision. Granting the defendant's motion to dismiss, the district court "mentioned that it believed the FCA's reverse false claims provision did not cover failure to pay marking duties," although it granted the motion to dismiss on different grounds. *Id.* at 247.

The district court subsequently denied the relator's motion to amend the complaint, holding that amendment would be futile because "failure to pay marking duties could not, as a matter of law, give rise to a reverse false claims action because the duties were too attenuated and contingent to qualify as the types of obligations to pay money to the government covered by the FCA." *Id.* at 248.

The Third Circuit disagreed with the district court's conclusion that amendment would be futile, reasoning as follows:

> The plain text of the FCA's reverse claims provision is clear: any individual who "knowingly conceals *or knowingly and improperly avoids or decreases an obligation to pay or transmit money* or property to the Government" may be subject to liability. As alleged by [the relator] in the amended complaint, [the defendant] declined to notify the Bureau of Customs and Border Protection of its pipe fittings' non-conforming status. This failure to notify resulted in the pipe fittings being released into the stream of commerce in the United States and, consequently, marking duties being owed and not paid.

*Victaulic*, 839 F.3d at 254-55 (emphasis in original). The Third Circuit examined the legislative history underlying the relevant regulatory scheme to reach their determination, pointing out that,

> [p]rior to 2009, the reverse false claims provision provided for a civil penalty for one who "knowingly makes, uses, or causes to be made or used, a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Government." The word "obligation" was not defined in the statute. The [Fraud Enforcement and Recovery Act of 2009 ("FERA")] made two substantial changes. First, it added to the reverse false claims provision the phrase "or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government". Second, it defined

an "obligation" as "an established duty, whether or not fixed, arising from an express or implied contractual, grantor-grantee, or licensor-licensee relationship, from a fee-based or similar relationship, from statute or regulation, or from the retention of any overpayment." These two sections broadened the scope to which reverse false claims liability would attach.

*Id.* at 253.

The Third Circuit noted it was "[o]f particular importance" that the Senate Report on FERA "discussed 'customs duties for mismarking country of origin,' and how such duties would be covered by the amended reverse false claims provision." *Id.* at 254 (quoting S. Rep. 111-10, at 14 n.10 (2009)). It held that, after FERA, the FCA did not require the defendant to "have made any express statement to the government to give rise to reverse false claims liability." *Victaulic*, 839 F.3d at 255.

Noting that "19 U.S.C. § 1484(a)(1)[] requires an importer to provide 'such information as is necessary to enable CBP to determine whether its merchandise may be released from the custody of CBP' and to 'enable CBP to properly assess duties on imported merchandise[,]'" the Third Circuit court reasoned that the defendant's knowing failure to disclose that its goods were unmarked or improperly marked resulted in liability under the FCA "if such goods nevertheless escaped detection and were released into the United States," at which point the defendant would owe a duty. *Id.* (alterations adopted) (quoting 19 U.S.C. § 1484(a)(1)).

"[T]he possibility of reverse false claims liability in such circumstances makes sense in the context of the larger import/export regulatory scheme created by Congress[,]" because importers would otherwise "have an incentive to decline to mention that its goods are mismarked on the assumption that the mismarking will not be discovered." *Id.* "[I]f the importer believes the value of bringing unmarked or improperly marked goods into the country exceeds the risk that the deception will be discovered and the ten percent ad valorem duty will be owed[,]" it may receive a "net gain" from such deception even if some mismarked goods are discovered. *Id.* at 255-56. "Reverse false claims liability changes that value proposition because a finding of deception carries the possibility of treble damages." *Id.* at 256.

Defendants contend that *Victaulic* was wrongly decided because the FCA requires the relator to "allege (1) 'the defendant made a false record or statement (2) ***at a time that the defendant had a presently-existing obligation to the government*** — a duty to pay money or property.'" (Doc. 74 at 25) (emphasis in original) (quoting *United States ex rel. CKD Project, LLC v. Fresenius Med. Care Holdings, Inc.*, 551 F. Supp. 3d 27, 47 (E.D.N.Y. 2021), *aff'd*, 2022 WL 17818587 (2d Cir. Dec. 20, 2022)). According to Defendants, § 1304(i) creates no obligation to pay duties at the time of importation, since the statute provides that no duties are owed if the unmarked or mismarked goods are exported, destroyed, or marked after importation.[3]

No Circuit Court of Appeals that cites *Victaulic*, a 2016 case, has disagreed with its application of the FCA reverse false claims provision. *Cf. United States ex rel. Simoneaux v. E.I. duPont de Nemours & Co.*, 843 F.3d 1033, 1039-40 (5th Cir. 2016) (citing *Victaulic* to illustrate proposition that "the fact that further governmental action is required to collect a fine or penalty does not, standing alone, mean that a duty is not established"). The Second Circuit has recently held that no "affirmative misrepresentation" is necessary to state a reverse false claim. *Miller*, 110 F.4th at 548.

---

[3] Defendants' citation to the essential elements of a § 1304 claim, although quoted in *CKD Project*, a recent Eastern District of New York case, derive from language in a Sixth Circuit case decided prior to FERA. *See Am. Textile Mfrs. Inst., Inc. v. The Ltd., Inc.*, 190 F.3d 729, 736 (6th Cir. 1999) (holding that "a reverse false claim action cannot proceed without proof that the defendant made a false record or statement at a time that the defendant owed to the government an obligation sufficiently certain to give rise to an action of debt at common law"). *CKD Project* is distinguishable because the relator's reverse false claim depended upon a payment obligation that stemmed from the defendant's alleged violation of the Anti-Kickback Statute and the relator was unable to state a claim that the defendant violated this statute. 551 F. Supp.3d at 47-48. The *CKD Project* court's decision to dismiss the relator's reverse false claim, therefore, was based on the relator's failure to allege any payment obligation at all, not, as Defendants argue, the failure to allege a payment obligation that existed at a certain point in time.

Defendants further argue that the *Victaulic* panel "erred by jumping to legislative history as a way to justify its interpretation" even though "[n]othing about the FCA or the importation statute is ambiguous, thus requiring clarity from legislative history." (Doc. 74 at 28.) The Third Circuit found that "[t]he plain text of the FCA's reverse claims provision is clear" and that its interpretation of the statutory text was supported by legislative history and public policy considerations. *Victaulic*, 839 F.3d at 254. The court agrees.

The plain text of the FCA imposes liability on an importer that "knowingly and improperly avoids" its obligation to pay the government. 31 U.S.C. § 3729(a)(1)(G). It does not require a presently existing obligation to the government at the time of importation. Even if an importer of unmarked goods, at the time of importation, could escape marking duties by subsequently marking the goods, an importer that decides not to do so would be avoiding its obligation to pay duties to the government.

The obligation imposed by 19 U.S.C. § 1304(i) does not consist merely of "potential or contingent exposure to penalties." *Miller*, 110 F.4th at 545. As *Miller* explained, "a duty is not established when it 'is dependent on a future discretionary act.'" *Id.* at 544 (quoting *United States ex rel. Petras v. Simparel, Inc.*, 857 F.3d 497, 505 (3d Cir. 2017)). Section 1304(i) affords the government no discretion in levying marking duties because it states that marking duties "shall not be remitted wholly or in part nor shall payment thereof be avoidable for any cause." 19 U.S.C. § 1304(i). In *Miller*, the Second Circuit found no established duty to pay because the relevant enforcement agency had statutory authority to "compromise, modify, or remit any penalty" that it assessed. 110 F.4th at 547. It would create a perverse incentive to hold that an obligation to pay marking duties is only a "potential" obligation to pay because payment is contingent on an importer of mismarked or unmarked goods being apprehended by the CBP. *Cf. Victaulic*, 839 F.3d at 246 ("Customs officials at United States ports of entry are unable to inspect every import; they rely primarily on the importers themselves to self-report any duties owed and any goods that are unmarked or improperly marked.").

For purposes of the pending motion, the court agrees with *Victaulic* that § 1304(i) triggers an "obligation" to pay sufficient for the reverse false claims provision of the FCA.[4]

---

[4] Defendants further attempt to distinguish *Victaulic* because the relator in that case accused the defendant of, not only failing to properly mark imports, but also "falsifying its entry documents" to conceal the pipe fittings' foreign origin. 839 F.3d at 246. In contrast, Defendants contend they "truthfully informed CBP where the articles were made through documentation submitted to CBP[,]" (Doc. 74 at 29), citing the Amended Complaint's statements that TSC identified its jewelry as "made in Canada" on various invoices. (Doc. 30 at 23.) In *Victaulic*, the court did not

### 3.    Whether Mr. Adler Plausibly Pled that Defendants Owed Duties Pursuant to 19 U.S.C. § 1304(i).

Because § 1304(i) duties only applied to unmarked imports, the plausibility of Mr. Adler's claims depends on whether he sufficiently alleged that Defendants failed to mark the jewelry they imported from Canada.

The Amended Complaint states that, in 2019 and 2020, Mr. Adler made three purchases of jewelry from Defendants. The items arrived from Canada to the United States without proper markings indicating their country of origin. Defendants argue that these purchases cannot establish any violation of the marking statute because they fell within a statutory exemption from marking requirements for articles if "[a]n ultimate purchaser, by reason of . . . the circumstances of its importation, must necessarily know the country of origin of such article even though it is not marked[.]" 19 U.S.C. § 1304(a)(3)(H). According to Defendants, because Mr. Adler was an employee of the company and knew the origin of the items he purchased, no duties were owed on those purchases.

No court has interpreted § 1304(a)(3)(H) to exclude purchases made by an importer's individual employee from marking requirements. To the contrary, "[t]he phrase 'circumstances of its importation' is narrowly defined and is applied only in situations where the importer is also the ultimate purchaser.'" Laws of Int'l Trade § 18:7, Westlaw (database updated March 2025). In this case, the ultimate purchaser was not the importer. Because the Amended Complaint's allegations unrelated to Mr. Adler's purchases plausibly assert that Defendants had an obligation to pay duties and failed to do so, with or without Mr. Adler's own purchases, they plausibly state a reverse false claim under the FCA.

Mr. Adler alleges that, in September of 2018, Defendants' logistics manager informed him that it was the company's practice to re-package jewelry for shipment to

---

find that the defendant was obligated to pay marking duties because it failed to mark its imports *and* failed to disclose the country of origin on customs documents. It only found a duty based on the former conduct. The court explained that "discussion of whether Victaulic filled out its customs forms in a proper manner [was] ultimately of no import[.]" 839 F.3d at 255.

consumers "without any marking indicating that the product was manufactured in Canada." (Doc. 30 at 25, ¶ 84.) Mr. Adler further alleges that, on March 18, 2019 at a meeting with Mr. Sporn at TSC's headquarters, he "confronted Mr. Sporn about Defendants' failure to mark their jewelry with its country of origin" and Mr. Sporn "reassured [Mr. Adler] he would bring the Defendants' practices into compliance." *Id.* at 27. Accepting the truth of these allegations, a reasonable inference is that, as of September 2018, it was Defendants' practice not to mark its imported jewelry and, as of March 18, 2019, this practice had not changed. The Amended Complaint identifies at least one import that occurred between these dates: the December 17, 2018 import of jewelry valued at $79,221.96 from Montreal to Vermont.

Defendants argue that, because the "polybags containing [their] goods bore a 'MADE IN CANADA' label at the time of importation after summer 2018," no marking violation can be alleged subsequent to that time. (Doc. 81 at 9.) 19 U.S.C. § 1304 does not only require articles or their containers to be marked "at the time of importation[.]" 19 U.S.C. § 1304(i). The statute explicitly requires that the article or container be marked "in such manner as to indicate to an ultimate purchaser in the United States the English name of the country of origin of the article." *Id.* at § 1304(a). The Amended Complaint asserts that Defendant removed the jewelry "from the labeled polybag and re-packaged [it] for shipment to the consumer without any marking indicating that the product was manufactured in Canada." (Doc. 30 at 25, ¶ 84.) It thus plausibly alleges that Defendants failed to properly mark imported jewelry and, in turn, incurred an obligation to pay duties to the government under 19 U.S.C. § 1304(i). [5]

---

[5] Defendants assert Mr. Adler "is essentially seeking to squeeze a disguised class action claim on behalf of ultimate purchasers into the FCA in order to obtain enhanced damages for his own benefit." (Doc. 81 at 10.) Mr. Adler's claims, arising from his knowledge as a former employee, that Defendants allegedly failed to pay the government money it was owed is consistent with the FCA's purpose of "encourag[ing] private individuals who are aware of fraud being perpetrated against the Government to bring such information forward." *United States ex rel. Dick v. Long Island Lighting Co.*, 912 F.2d 13, 18 (2d Cir. 1990) (internal quotation marks omitted) (quoting H.R.Rep. No. 660, 99th Cong., 2d Sess. 22 (1986)). The Amended Complaint contains no request for class certification, nor does it allege claims based on injuries suffered by consumers.

For these reasons, the court DENIES Defendants' motion to dismiss the Amended Complaint based on the failure to plead an obligation to pay the government.

### E.  Whether the Amended Complaint Pled With Particularity Knowing Avoidance of an Obligation to Pay the Government.

Defendants argue that, even if they had an obligation to pay marking duties to the U.S. government, the Amended Complaint failed to allege that Defendants acted with requisite knowledge of their marking obligations and failed to plead with particularity as required by Rule 9(b).

#### 1.  Whether the Amended Complaint Alleges with Particularity that Defendants had Knowledge of an Obligation to Pay the Government.

The FCA defines the term "knowingly" to include "actual knowledge," "deliberate ignorance of the truth or falsity of the information," or "reckless disregard of the truth or falsity of the information[.]" *United States ex rel. Schutte v. SuperValu Inc.*, 598 U.S. 739, 749-50 (2023) (internal quotation marks omitted) (quoting 31 U.S.C. § 3729(b)(1)(A)(i)-(iii)). "The FCA's scienter element refers to respondents' knowledge and subjective beliefs — not to what an objectively reasonable person may have known or believed." *Id.* at 749.

In the context of a reverse false claim action, courts require the relator to allege that the defendant had knowledge of or acted with deliberate ignorance or reckless disregard of its obligation to pay the government. *See United States ex rel Sibley v. Univ. of Chicago Med. Ctr.*, 44 F.4th 646, 657 (7th Cir. 2022) (stating that, because "the relators themselves disavow any notion that [the defendant] had actual knowledge of an obligation to repay the government[,]" they must show that the defendant acted with either deliberate ignorance or reckless disregard); *United States ex rel. Harper v. Muskingum Watershed Conservancy Dist.*, 842 F.3d 430, 437 (6th Cir. 2016) (rejecting argument that "defendant acts 'knowingly' when he has notice of a legal obligation, even if the defendant believes that the obligation does not apply under the circumstances"); *United States ex rel. Landis v. Tailwind Sports Corp.*, 51 F. Supp. 3d 9, 61 (D.D.C. 2014) (affirming dismissal of reverse false claims where relator did not sufficiently allege

23

defendant "had knowledge of any obligation to repay the government").

Where the defendants are corporations, pleading scienter "requires pleading facts that give rise to 'a strong inference that someone whose intent could be imputed to the corporation acted with the requisite scienter.'" *Jackson v. Abernathy*, 960 F.3d 94, 98 (2d Cir. 2020) (quoting *Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*, 531 F.3d 190, 195 (2d Cir. 2008)). "There is no formulaic method or seniority prerequisite for employee scienter to be imputed to the corporation, but scienter by management-level employees is generally sufficient to attribute scienter to corporate defendants[]." *In re BHP Billiton Ltd. Sec. Litig.*, 276 F. Supp. 3d 65, 90 (S.D.N.Y. 2017) (collecting cases).

The Amended Complaint identifies several communications between Mr. Adler and Mr. Sporn, who allegedly controls the corporate Defendants, in which Mr. Adler specifically informed Mr. Sporn of the marking requirements for the imported jewelry. The earliest of these is alleged to have occurred in June of 2016 at a meeting where Mr. Adler contends he informed Mr. Sporn "that U.S. law required that jewelry manufactured in Canada and then imported in the United States must be marked with its country of origin." (Doc. 30 at 19, ¶ 62.) According to Mr. Adler, TSC's vice president of marketing and an outside consultant were present at the meeting and "concurred" with this statement. *Id.* Similarly, Mr. Adler alleges that, at a meeting in September 2017, PwC consultants informed Mr. Sporn and another high-level TSC employee that the company's "commercial products manufactured in Canada must be permanently marked with Canada as the country of origin before being imported into the United States." *Id.* at 22-23, ¶ 73.

Mr. Adler claims he discussed marking regulations in an email exchange with Mr. Sporn beginning on June 28, 2018. In this email exchange, Mr. Adler purportedly sent a link to a webpage with the text of 19 U.S.C. § 1304, reiterated that the statute requires permanent marking of imports, emailed Mr. Sporn on July 4, 2018 stating "we are NOT in compliance[,]" and outlined suggestions for affixing labels to Defendants' products showing their country of origin. (Doc. 30-17 at 2-3.) Mr. Adler noted that his proposed

solutions "could fight off a seizure at the [U.S.] border as well as any potential penalties." *Id.* at 4.

After Mr. Sporn replied on July 6, 2018 saying "ok" to one of Mr. Adler's suggestions and asking whether the labels were still necessary if the products were shipped from Vermont, Mr. Adler answered that a "Made In Canada label/string tag with the packaged product" would still be necessary to inform the consumer that the product "is an import[.]" *Id.* at 5. Mr. Sporn replied, "Ok . . . we'll get a label for the polybag[.]" According to the Amended Complaint, the term "polybag" referred to plastic bags in which the jewelry was shipped.

At the pleading stage, accepting the allegations as true and drawing all reasonable inferences in Mr. Adler's favor, the Amended Complaint alleges with particularity that, at least as of July 2018, Defendants knew that they were not in compliance with U.S.C. § 1304 marking requirements, knew there was a potential penalty if they were not, and nonetheless proceeded to import items that were not permanently marked with their country of origin. This, in turn, suffices to allege that Defendants deliberately ignored or recklessly disregarded the risk that unmarked imports were subject to the payment of duties. *See Kane ex rel. United States v. Healthfirst, Inc.*, 120 F. Supp. 3d 370, 377 (S.D.N.Y. 2015) (finding relator sufficiently pled reckless disregard where defendant failed to take steps to timely identify overpaid claims despite warnings from the state comptroller and analysis conducted by one of its employees); *see also United States v. Bourseau*, 531 F.3d 1159, 1168 (9th Cir. 2008) (noting that deliberate ignorance includes an "'ostrich type' situation where an individual has 'buried his head in the sand' and failed to make simple inquiries which would alert him that false claims are being submitted") (quoting S.Rep. No. 99–345, at 21 (1986), *as reprinted in* 1986 U.S.C.C.A.N. 5266, 5286)).

### 2. Whether the Amended Complaint Alleges with Particularity that Defendants Avoided an Obligation to Pay the Government.

Mr. Adler alleges that a November 14, 2018 invoice for $96,342.20 worth of jewelry shipped from Montreal to Vermont contained a certification by TSC's director of

manufacturing that the information in the document complied with country of origin requirements, even though the jewelry was unmarked and Defendants did not remit any marking duties. This importation took place while Defendants were allegedly aware of their noncompliance with marking duties. Because the Amended Complaint specifies the allegedly fraudulent statement, identifies the speaker, states the date of the invoice, and explains why the statement was fraudulent, it satisfies Rule 9(b).

Defendants, however, contend that this and similar allegations in the Amended Complaint fall short of Rule 9(b)'s requirements because Mr. Adler stated he "believes" that the jewelry in the order was unmarked and allegations of fraud cannot be predicated on information and belief. (Doc. 30 at 23, ¶ 75.) "Pleading on information and belief is a desirable and essential expedient when matters that are necessary to complete the statement of a claim are not within the knowledge of the plaintiff but he has sufficient data to justify interposing an allegation on the subject." *United States ex rel. Chorches for Bankruptcy Est. of Fabula v. Am. Med. Response Inc.*, 865 F.3d 71, 81-82 (2d Cir. 2017) (internal quotation marks omitted) (quoting 5C C. Wright et al., Fed. Prac. & Proc. § 1224 (3d ed. April 2017 Update)).

In this case, Mr. Adler could not have known that the jewelry corresponding to the November 14, 2018 invoice was unmarked without inspecting it himself. Mr. Adler pleads additional facts, however, supporting a reasonable inference that this jewelry was unmarked because he not only alleges facts regarding Defendants' marking practices, but also alleges that TSC's logistics manager told him in September of 2018 that it was the company's practice not to mark the jewelry or packaging that was shipped to consumers.

For the foregoing reasons, Mr. Adler has adequately pled scienter and avoidance of an obligation to pay the government with particularity. Because Mr. Adler has pled his FCA claim with particularity, Defendants' motion to dismiss for non-compliance with Rule 9(b) is DENIED.

### F.    Whether Defendants' Alleged FCA Violations Were Material.

"A misrepresentation about compliance with a statutory, regulatory, or contractual requirement must be material to the Government's payment decision in order to be

actionable under the False Claims Act." *Universal Health Serv., Inc. v. United States. ex rel. Escobar*, 579 U.S. 176, 181 (2016). According to Defendants, the fact that "CBP allowed the import of thousands of items over many years and never held up a single import[] demonstrate[es] the immateriality of any violation." (Doc. 74 at 23.) These facts do not appear in the Amended Complaint and cannot be considered on a motion to dismiss.

The FCA defines "material" as "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." 31 U.S.C. § 3729(b)(4). "[M]ateriality 'looks to the effect on the likely or actual behavior of the recipient of the alleged misrepresentation.'" *Escobar*, 579 U.S. at 193 (2016) (alterations adopted) (quoting 26 R. Lord, Williston on Contracts § 69:12, p. 549 (4th ed. 2003)). Mr. Adler alleges that Defendants failed to disclose to the government that they owed duties on unmarked imports. Such duties are mandatory under 19 U.S.C. § 1304(i). Because disclosure would influence whether the CBP assessed these duties, the alleged failure to disclose this obligation is material. *See United States ex rel. Bahrani v. Conagra, Inc.*, 465 F.3d 1189, 1204 (10th Cir. 2006) (explaining that materiality inquiry focuses on potential rather than actual effect of false statement, and "[t]he fact that a government official may subsequently waive an established fee does not negate the 'potential effect' of a false record or statement.") The court thus DENIES Defendants' motion to dismiss the Amended Complaint for failing to plead the materiality of the alleged FCA violation.

G.    **Whether the *Qui Tam* Provision of the FCA is Constitutional.**

Defendants argue that this case should be dismissed because it was brought under a provision of the FCA that is unconstitutional and allows private persons to "bring a civil action for a violation of section 3729 for the person and for the United States Government . . . in the name of the Government." 31 U.S.C. § 3730(b). Defendants assert that, by allowing private persons to bring FCA actions on behalf of the government, Congress appointed such persons as officers within the meaning of the Appointments Clause, which is not permitted by the U.S. Constitution. According to the Appointments Clause, only the president may appoint "Officers of the United States[,]" and Congress

may only "by Law vest the Appointment of such inferior, Officers, as they think proper, in the President alone, in the Courts of Law, or in the Heads of Departments." U.S. Const. art. III, § 2.

Defendants cite an out-of-circuit district court decision for the proposition that *qui tam* suits are unconstitutional under the Appointments Clause. *See United States ex rel. Zafirov v. Fla. Med. Assoc., LLC*, 2024 WL 4349242, at *18 (M.D. Fla. Sept. 30, 2024). Other courts, however, have rejected similar challenges to the constitutionality of the FCA. *See, e.g., United States ex rel Stone v. Rockwell Intern. Corp.*, 282 F.3d 787, 805 (10th Cir. 2002) (holding that *qui tam* plaintiffs under the FCA are not "officers" within the meaning of the Appointments Clause because they "do not serve in any office of the United States"); *Riley v. St. Luke's Episcopal Hosp.*, 252 F.3d 749, 757 (5th Cir. 2001) (en banc) (holding that *qui tam* plaintiffs are not "officers" because "the constitutional definition of an 'officer' encompasses, at a minimum, a continuing and formalized relationship of employment with the United States Government").

"To qualify as an officer, an individual must (1) 'exercis[e] significant authority pursuant to the laws of the United States' and (2) 'occupy a continuing position established by law.'" *United States v. Donziger*, 38 F.4th 290, 296 (2d Cir. 2022) (alterations in original) (quoting *Lucia v. SEC*, 585 U.S. 237, 245 (2018)). The Second Circuit has identified three factors for determining whether a temporary position qualifies a person as an "officer": whether (1) the position is not personal to a particular individual; (2) the position is not transient or fleeting; and (3) the duties of the position are more than incidental." *Id.* at 297. In *Donziger*, the Second Circuit held that special prosecutors were "officers" within the meaning of the Appointment Clause in part because "the special prosecutor positions are not specific to the attorneys appointed to prosecute [an individual]" and "the individuals appointed as special prosecutors could be replaced without the duties of the positions terminating." *Id.* In contrast, Mr. Adler "has no general functions, nor any employment which has any duration as to time[.]" *Auffmordt v. Hedden*, 137 U.S. 310, 327 (1890). His position is transient because the government "may dismiss [a *qui tam*] action notwithstanding the objections of the person

28

initiating the action[.]" 31 U.S.C. § 3730(c)(2)(A).

In holding that relators are "officers" under the Appointments Clause, *Zafirov* likens relators to self-appointed special prosecutors. 2024 WL 4349242, at *12. This characterization, however, cannot be squared with the Supreme Court's holding that the act of bringing an action for the United States Government "does not make the relator anything other than a private person[.]" *Cochise Consultancy, Inc. v. United States ex rel. Hunt*, 587 U.S. 262, 272 (2019). As the government points out in its Statement of Interest, "[c]ourts rejecting constitutional challenges to the FCA have also observed that the United States retains significant control over qui tam suits," (Doc. 80 at 8). *See, e.g., United States ex rel. Miller v. ManPow, LLC*, 2023 WL 8290402, at *4 (C.D. Cal. Aug. 30, 2023) (noting "that FCA relators conduct litigation . . . with only the resources of private plaintiffs" and "must yield to the government's assumption of primary responsibility when it elects to intervene in a qui tam action") (internal quotation marks omitted) (alteration in original) (quoting *United States ex rel. Kelly v. Boeing Co.*, 9 F.3d 743, 758 (9th Cir. 1993)); *United States ex rel. Taxpayers Against Fraud v. Gen. Elec. Co.*, 41 F.3d 1032, 1041 (6th Cir. 1994) ("Although a relator may sue in the government's name, the relator is not vested with governmental power. Indeed . . . the government may take complete control of the case if it wishes.").

*Zafirov* is not binding, nor does this court find its reasoning persuasive. The court therefore DENIES Defendants' motion to dismiss the Amended Complaint because the FCA's *qui tam* provision is allegedly unconstitutional.

**IV.    Conclusion.**

For the reasons stated above, Defendants' motion to dismiss is DENIED.

SO ORDERED.

Dated at Burlington, in the District of Vermont, this _12th_ day of May, 2025.

Christina Reiss, Chief Judge
United States District Court