U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

2026 SEP 10 A 10: 44

CLERK
BY [signature]
DEPUTY CLERK

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

UNITED STATES OF AMERICA ex rel. Steven Adler,

Plaintiff-Relator,

v.

THE SPORN COMPANY, INC., and BIXLER'S, INC.,

Defendants.

Case No. 2:24-cv-00617

**OPINION AND ORDER DENYING DEFENDANTS' MOTION TO DISMISS THE SECOND AMENDED COMPLAINT**
(Doc. 140)

Plaintiff-Relator Steven Adler, on behalf of the United States of America (the "government"), and on his own behalf, brings this action against Defendants The Sporn Company, Inc. ("TSC"), Bixler's, Inc. ("Bixler's"), and Perry Sporn (collectively, the "Defendants") under the *qui tam* provisions of the False Claims Act ("FCA"), 31 U.S.C. §§ 3729-33.

On March 27, 2026, the court granted Mr. Adler's motion for leave to file a Second Amended Complaint ("SAC"), (Doc. 134), which was filed on April 16, 2026. (Doc. 136.) Pending before the court is Defendants' motion to dismiss the SAC. (Doc. 140.) The government filed a Statement of Interest in Response to Defendants' motion to dismiss on June 8, 2026, (Doc. 143), and Mr. Adler filed his response the same day. (Doc. 144.) Defendants filed their reply on June 29, 2026, at which point the court took the pending motion under advisement. (Doc. 152.)

Mr. Adler is represented by Andrew S. Macurdy, Esq.; Arthur J. Ruben, Esq.; Frank Tong Xu, Esq.; Shaun Rosenthal, Esq.; and Ting Cheung, Esq. Defendants are represented by Justin B. Barnard, Esq.; Robert M. Wasnofski, Jr., Esq.; and Timothy J. Storino, Esq.

## I. Factual Allegations in the Second Amended Complaint.

In his SAC, Mr. Adler repeats the allegations made in his Amended Complaint and merely adds Mr. Sporn as a defendant. Mr. Sporn is a natural person and a citizen of either Vermont or New Hampshire. The facts before the court remain materially unchanged from when it decided Defendants' first motion to dismiss, (Doc. 91), and are set forth below.

> TSC is a jewelry business incorporated in New York with its principal place of business in Vermont. Bixler's, TSC's wholly owned subsidiary, was incorporated in Delaware and shares TSC's corporate headquarters. Mr. Adler is a Florida citizen and former TSC employee. From January 2016 to May 2016, he worked for TSC as an independent consultant; from May 2016 to February 2018, he served as vice president of manufacturing; and from February 2018 to December 2019, he worked as chief technology officer and chief operating officer of a non-jewelry business unit.
>
> According to Mr. Adler, TSC "manufactures fine jewelry and licensed jewelry products" and sells products wholesale to retailers and to consumers via e-commerce and retail stores. (Doc. 30 at 7, ¶ 19.) Mr. Adler alleges that in 2016, TSC acquired Bixler's, Inc. as well as Bixler's "America's Oldest Jeweler" trademark and, in doing so, "promoted its Bixler's Jewelers products as American-made." *Id.* at 8, ¶ 20. He alleges that TSC and Bixler's "share the same management team, policies, Montreal manufacturing facilities, Vermont corporate address, and distribution network, and both are overseen by Perry Sporn[,]" who is the owner, president, CEO, director, and secretary of TSC and who controls Bixler's operations and strategy. *Id.* at 8, ¶ 21.
>
> Mr. Adler alleges that, between 2016 and 2020, TSC manufactured more than $16 million worth of jewelry at factories it owned in Montreal, Canada and imported the jewelry to be sold to consumers in the United States, including through Bixler's licensed brands. The Tariff Act requires that:
>
>> [E]very article of foreign origin (or its container, as provided in subsection (b) hereof) imported into the United States shall be marked in a conspicuous place as legibly, indelibly, and permanently as the nature of the article (or container) will permit in such manner as to indicate to an ultimate purchaser in the United States the English name of the country of origin of the article.
>
> 19 U.S.C. § 1304(a). If articles covered by this provision are not marked in accordance with § 1304 at the time of importation or are exported,

destroyed, or marked under customs supervision after importation, they are subject to "a duty of 10 per centum ad valorem[.]" See § 1304(i).

Mr. Adler asserts "Defendants did not legibly, indelibly, and permanently mark [the allegedly imported] jewelry as 'made in Canada' . . . nor did they [] mark the jewelry's packaging provided to the ultimate consumer." (Doc. 30 at 16, ¶ 50.) He alleges that Defendants intentionally opted not to mark their jewelry to identify Canada as the country of origin to consumers "in order to trade on Bixler's [] reputation as an American company." *Id.* at 17, ¶ 52. The Amended Complaint identifies two examples of jewelry lines allegedly made by Defendants in Canada and imported into the United States which were sold to consumers without being marked with the country of origin: the "Bixler" line, which, according to [Mr. Adler], "sold licensed jewelry products, including jewelry affixed with the registered trademarks of American institutions," and the "Devotion Diamonds" line, which, according to [Mr. Adler], was sold in the United States at licensed retailers. *Id.* at 17-18.

The Amended Complaint identifies several instances in which Mr. Sporn and other TSC executives were allegedly informed by Mr. Adler of the requirement to mark Defendants' jewelry with its country of origin. He alleges that, at a meeting in June 2016, in the course of developing the policies and procedures for one of TSC's Canadian manufacturing plants, Mr. Adler "informed Mr. Sporn and the other policy makers [at the meeting] that U.S. law required that jewelry manufactured in Canada and then imported in the United States must be marked with its country of origin[,]" and two other people, TSC's vice-president of marketing and a consultant, concurred. *Id.* at 19, ¶ 62. TSC had purchased a laser engraving machine for the plant that could be used to mark the jewelry, but nobody at the plant knew how to operate it. Consequently, it was agreed that "as an interim measure, TSC would have the plant's finished jewelry shipped to TSC's Burlington, Vermont facility, where it would be engraved before being delivered to its ultimate purchaser." *Id.* at 19-20, ¶ 62. Mr. Adler suggested that "Defendants should at minimum tag or mark the jewelry in some way as a good-faith attempt to comply with the spirit (although not the letter) of the marking requirement[,]" and those at the meeting agreed to attach string tags to the jewelry indicating the country of origin. *Id.* at 20, ¶ 63.

According to Mr. Adler, Defendants did not include a string tag on the jewelry or permanently mark it with its country of origin, although it "did permanently mark the jewelry with other information that it apparently believed would be helpful to the product's sale valuation[,]" such as the "precious metal type and content." (Doc. 30 at 20, ¶¶ 64-65.) Consequently, Defendants "imported jewelry into the United States that was not marked

with its country of origin when sold to the ultimate consumer." *Id.* at 21, ¶ 67. As an example, Mr. Adler alleges a FedEx invoice shows that jewelry valued at $3,157.15 was shipped from Defendants' Montreal plant to Burlington, Vermont. (Doc. 30-15.) The invoice identified the jewelry's country of origin as Canada and "certified that the 'information on this document is true and accurate,' including the applicable tariff rates, and that it complied 'with the origin requirements specified for those goods in [the North American Free Trade Agreement (NAFTA)].'" (Doc. 30 at 21, ¶ 68.) Mr. Adler "believes that the jewelry in this order was not indelibly marked with the country of origin, nor was there any packaging sent to consumers with the correct country of origin, because TSC's standard operating procedure was not to mark either its jewelry or the jewelry's packaging with a product's country of origin." *Id.* He contends this "failure was not unwitting" because Defendants' vice president of marketing, engraver, and director of product development "all inspected Devotion jewelry products at the Burlington facility to ensure quality standards for the engraving" and "Mr. Sporn thereafter performed regular quality inspections and provided the final approval for delivery to the consumer." *Id.* at 20, ¶ 66. He alleges that Defendants failed to report to the United States government, including on Form 7501 which is submitted to Customs and Border Protection ("CBP"), that they owed ten percent marking duties.

Mr. Adler further alleges that, in early 2017, TSC "tasked [him] with securing, designing, and building out a new factory in Montreal as well as investigating methods to transition its jewelry-repair and Rolex-watch-repair operations to Canada." *Id.* at 22, ¶ 71. As part of this effort, Mr. Adler hired PricewaterhouseCoopers ("PwC") "to advise on tariffs and country of origin marking regulations applicable to the repair of customer-owned jewelry and Rolex watches." *Id.* at 22, ¶ 72. Mr. Adler contends that, in September 2017, he, Mr. Sporn, and TSC's director of finance met with two PwC consultants to discuss the consultants' findings. The PwC consultants allegedly advised that jewelry repairs were exempt from customs duties, but "reaffirmed that any of TSC's other commercial products manufactured in Canada must be permanently marked with Canada as the country of origin before being imported into the United States." *Id.* at 22-23, ¶ 73.

Mr. Adler claims that Defendants ignored PwC's advice regarding marking regulations and "continued to deliberately conceal that their jewelry was made in Canada by failing to engrave it with its country of origin[.]" (Doc. 30 at 23, ¶ 74.) As an example, he cites a November 14, 2018 invoice allegedly showing that jewelry valued at $96,342.20 was imported from a Montreal plant to TSC headquarters in Vermont. Although the invoice identified the jewelry as "made in Canada" and included a certification that the information in the form complied with NAFTA origin requirements, Mr.

Adler "believes that the jewelry in this order was not marked with the country of origin, nor was there any packaging identifying to the consumer that the jewelry was made in Canada, because TSC had a practice of not marking its jewelry and stripping country-of-origin information from consumer packaging." *Id.* at 23, ¶ 75. According to Mr. Adler, Defendants did not report to the government that they owed ten percent marking duties on this transaction.

On June 28, 2018, Mr. Adler emailed Mr. Sporn a link to a *National Jeweler* article about a case in which another jewelry company settled claims that it violated the FCA by failing to mark its jewelry with the country of origin. In his email to Mr. Sporn, Mr. Adler included a link to the article under the message "Some considerations for hallmarking our products in compliance for export from Canada to the [U.S.]" (Doc. 30-17 at 2.) He also included a link to a webpage containing the text of 19 U.S.C. 1304 and wrote, "Title 19, U.S. Code, Section 1304 requires jewelry be permanently marked with the country of origin at the time of import." *Id.* (internal quotation marks omitted).

Mr. Sporn responded, "They were avoiding and not paying duty that was owed[.] We're not doing that." *Id.* Mr. Adler then replied, "[y]es . . . that is true . . . but read closely it also references the lack of mark indicating country of origin as another violation outlined in Title 19 Section 103" and he copied the following excerpt from the *National Jeweler* article: "The complaint also stated that the company, 'failed to affix permanent markings to jewelry manufactured in Sri Lanka or Thailand identifying the jewelry's country of origin' when it entered the U.S., then sold the jewelry to retailers without any markings indicating country of origin." *Id.* at 3.

Mr. Adler emailed Mr. Sporn on July 4, 2018, stating:

> I reviewed the Title 19 regulations and guidelines, we are NOT in compliance. I apologize . . . This is something I should have caught on my watch early on. ( attached )
>
> There are only a few unique exceptions to this regulation, none of which is directly applicable. When impractical to affix a permanent mark, the packaging mark may be appropriate or a string tag affixed to the product.
>
> Thus far none of the border agents have asked or inspected but, they will at some point seize one of our commercial shipments for this reason.
>
> I think you need to be pro-active on this[.]
>
> - Recommend immediately for our Southbound "commercial" courier shipments[], we provide a "Made In

> Canada" label on every sealed plastic job envelope. ( not repairs ) This will demonstrate our awareness of the regulation.
>
> • Recommend for the customer deliveries to provide a "Made in Canada" label in or on the box.
>
> In implementing these two practices we demonstrate our intent to be compliant and could fight off a seizure at the [U.S.] border as well as any potential penalties.
>
> Likewise we should be investigating the northbound regulations at [Canada Border Services Agency] for marking of the country of origin for commercial goods[.]

*Id.* at 3-4. Mr. Sporn stated "ok" in response to the first bullet point on Mr. Adler's email. *Id.* at 5. Regarding the second bullet point, Mr. Sporn wrote, "If delivered from Canada directly? If we ship from Vermont it doesn't matter, right?" *Id.* Mr. Adler responded stating, "No . . . we do need to include the Made [i]n Canada label/string tag with the packaged product going to a [U.S.] consumer . . . This is the primary purpose of the regulation so the consumer knows it is an import[.]" *Id.* at 5. Mr. Sporn responded, "Ok . . . we'll get a label for the polybag. I'll discuss this with Maj and Brian[.]" *Id.* at 5.

According to Mr. Adler, he spoke to Mr. Sporn in person on July 8, 2018 and expressed "that TSC needed to begin permanently marking its jewelry[,]" to which Mr. Sporn responded, "Thank you, I'll look into it." (Doc. 30 at 25, ¶ 83) (internal quotation marks omitted). Mr. Adler periodically followed up with TSC's logistics manager about this issue and was informed in September 2018 that "although TSC now applied a 'Made in Canada' label to the polybags used to transport the products from Montreal to Vermont, at the Burlington facility, the jewelry was then removed from the labeled polybag and re-packaged for shipment to the consumer without any marking indicating that the product was manufactured in Canada." *Id.* at 25, ¶ 84. Mr. Adler claims he personally witnessed the assembly of jewelry in the "Bixler" line for shipment to consumers without being marked with the country of origin. He cites another invoice, dated December 17, 2018, showing that jewelry valued at $79,221.96 was imported from TSC's Montreal plant to its headquarters in Vermont containing a certification that the jewelry complied with NAFTA's origin requirements. Mr. Adler "believes that the jewelry in this order was not marked with the country of origin, nor was there any packaging sent to consumers with the correct country of origin, because TSC's standard operating procedure was not to mark either its jewelry or the jewelry's

> polybag for the ultimate consumer." *Id.* at 26, ¶ 88. According to Mr. Adler, TSC did not report or remit any marking duties on this jewelry.
>
> Mr. Adler alleges that in February 2019 he visited one of Defendants' Canadian plants and observed that jewelry was not being marked with the country of origin. On March 18, 2019, he met with Mr. Sporn and "confronted Mr. Sporn about Defendants' failure to mark their jewelry with its country of origin." In response, Mr. Sporn "reassured [Mr. Adler] he would bring the Defendants' practices into compliance." *Id.* at 27, ¶ 91. According to Mr. Adler, Defendants did not do so. He cites invoices dated August 26, 2019 and November 22 and/or 25, 2019 for $44,000.99 and $238,545.80, respectively, reflecting jewelry imported from TSC's Montreal plant to its Vermont headquarters. Mr. Adler alleges, upon information and belief, that this jewelry "was not marked with the country of origin, nor was there any packaging sent to consumers with the correct country of origin, because it was Defendants' standard operating procedure not to include country of origin information on merchandise shipped to consumers." *Id.* at 28, ¶ 94.
>
> Because Mr. Adler suspected that TSC was still not marking its jewelry with the country of origin, he ordered two pieces of jewelry sold under the Bixler line on September 26, 2019 to be shipped to his friend's home in Pennsylvania. According to Mr. Adler, these products were manufactured at TSC's Montreal plant and shipped to Vermont, where they were repackaged before being sold to the consumer. Upon arriving in Pennsylvania, the jewelry he purchased did not contain markings indicating its Canadian origin either on the product itself or on the container in which it was sold. Mr. Adler made two more purchases from Bixler's on June 24, 2020 and October 10, 2020 and, both times, when the jewelry arrived at the Florida address [Mr. Adler] designated for delivery, neither the products nor their containers identified that the jewelry was made in Canada.
>
> Mr. Adler asserts that, between April 2017 and January 2020, Defendants "imported into the United States from [their] manufacturing facility in Canada . . . at least 289 separate importations totaling $14 million of jewelry" and thereby "avoided obligations to pay in excess of $1.4 million to the United States Government[.]" *Id.* at 30, ¶ 104 (footnote omitted).

*Id.* at 2-8 (alterations in original).

## II. Defendants' Settlement Agreement with CBP.

In their motion to dismiss, Defendants argue that an October 11, 2023 settlement agreement between TSC, Mr. Sporn, and CBP (the "CBP Settlement") precludes Mr. Adler's FCA claim with respect to allegations occurring between October 1, 2017 and

March 31, 2022 (the "Settlement Period"). Alternatively, Defendants argue that the Department of Justice's ("DOJ") "referr[al of] Defendants to CBP"[1] and the subsequent CBP Settlement constitutes an "alternate remedy" under the FCA and forecloses "damages and penalties for the [Settlement] Period." (Doc. 140 at 19.)

The CBP Settlement was submitted by Defendants as an exhibit to their first motion to dismiss, (Doc. 74), but was not attached to or quoted in the SAC, nor were the circumstances surrounding the CBP Settlement described. Mr. Adler does not object to the court's consideration of the CBP Settlement in deciding the pending motion to dismiss, although he argues that the court has already held that the CBP Settlement does not preclude FCA liability in this matter. He further argues that Defendants waived their "alternate remedy" argument by failing to raise it in their initial motion to dismiss.

The CBP Settlement includes the following statements:

> WHEREAS, CBP alleges that TSC and Perry Sporn are liable for marking duties and a penalty pursuant to 19 U.S.C. §§ 1304 and 1592 for entries filed with CBP from October 1, 2017 through July 2018 for failing to mark articles it imported from Canada to the United States with the country-of-origin as prescribed by federal law.
>
> WHEREAS, this agreement resolves CBP's claims for marking duties and penalties with regard to entries filed [during the Settlement Period]. CBP has not determined whether there is a loss of revenue to the United States for the period of July 1, 2018 to March 31, 2022.

(Doc. 74-1 at 3.)

Under the terms of the CBP Settlement, TSC agreed to pay $172,845.00 to CBP, and "CBP fully and finally releases TSC and Perry Sporn from any marking duties and

[1] The government challenges the consideration of this alleged fact because it is not contained in the SAC and therefore is not "properly before the [c]ourt on a motion to dismiss." (Doc. 143 at 7); *see also Berkley Ins. Co. v. Bouchard*, 2020 WL 7646542, at *3 (D. Vt. Dec. 23, 2020) ("To the extent Defendants allege additional facts in their motion to dismiss . . . , those facts cannot be considered in determining the sufficiency of the [c]omplaint."). The Second Circuit has held, however, that "a motion under Rule 12(b)(1) may also rely on evidence beyond the pleadings." *SM Kids, LLC v. Google LLC*, 963 F.3d 206, 210 (2d Cir. 2020). The court will therefore consider the DOJ's referral to the CBP to the extent it is material to a Rule 12(b)(1) subject matter jurisdiction determination.

administrative monetary claims pursuant to 19 U.S.C. §§ 1592 and 1304, based on [Defendants'] entries that occurred [during the Settlement Period]." *Id.* at 4.

The CBP Settlement identified "the following claims of the Government" as "specifically reserved and [] not released by this Agreement:"

> a. any liability arising under Title 26, United States Code (Internal Revenue Code);
>
> b. any criminal liability;
>
> c. except as explicitly stated in this Stipulation, any administrative liability;
>
> d. any liability to the United States (or its agencies) for any conduct other than the alleged marking violations for entries that occurred [during the Settlement Period];
>
> e. and any liability based upon obligations created by this Stipulation.

*Id.* at 4-5. The CBP Settlement also states that it "in and of itself is not outcome determinative in the ongoing litigation between [Mr. Adler] and TSC et al. filed under" this case's original case caption.[2] *Id.* at 6.

The government agrees that the CBP Settlement does not preclude Mr. Adler's FCA claim, noting in its Statement of Interest that it is not a party to the CBP Settlement and that the settlement pertains only to claims arising under 19 U.S.C. §§ 1304 and 1592 and not under the FCA, 31 U.S.C. § 3729(a)(1)(G).[3]

## III. Conclusions of Law and Analysis.

Seeking dismissal of Mr. Adler's entire suit, Defendants argue that his claim falls within the exclusive jurisdiction of the Court of International Trade ("CIT") because it was "commenced by the United States" within the meaning of 28 U.S.C. § 1582. (Doc. 140 at 6) (internal quotation marks and citation omitted). Alternatively, Defendants

---

[2] This case was transferred to the District of Vermont from the Southern District of New York on June 5, 2024. (Doc. 59.)

[3] *See* Doc. 143 at 5 ("Defendants' position [that the CBP Settlement binds the entire federal government] misconstrues not only the limited nature of authority vested in United States agencies, but also mischaracterizes the plain language of the CBP Settlement."); *id.* at 4 (observing that the CBP Settlement released Defendants "only from any marking duties and administrative monetary claims *pursuant to 19 U.S.C. §§ 1592 and 1304* for imports from [the Settlement Period.]") (emphasis in original) (internal quotation marks and citation omitted).

attempt to narrow the claims of the SAC with a two-pronged challenge based on the CBP Settlement. First, they contend that the CBP Settlement released Mr. Adler's FCA claim with respect to the Settlement Period. Second, they claim that the CBP Settlement constitutes an "alternate remedy" under the FCA and thereby forecloses "damages and penalties for the [Settlement] Period." (Doc. 140 at 19.)

**A. Standard of Review.**

"A case is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it." *Nike, Inc. v. Already, LLC*, 663 F.3d 89, 94 (2d Cir. 2011) (internal quotation marks and citation omitted), *aff'd*, 568 U.S. 85 (2013). "'The party invoking federal jurisdiction bears the burden of establishing' that jurisdiction exists." *Sharkey v. Quarantillo*, 541 F.3d 75, 82-83 (2d Cir. 2008) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992)). In resolving a motion to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1), "the district court must take all uncontroverted facts in the complaint . . . as true[] and draw all reasonable inferences in favor of the party asserting jurisdiction." *Fountain v. Karim*, 838 F.3d 129, 134 (2d Cir. 2016) (internal quotation marks and citation omitted).

To survive a motion to dismiss filed pursuant to Fed. R. Civ. P. 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Parties must allege sufficient facts to "nudge[] their claims across the line from conceivable to plausible[.]" *Twombly*, 550 U.S. at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

The sufficiency of a complaint under Rule 12(b)(6) is evaluated using a "two-pronged approach[.]" *Hayden v. Paterson*, 594 F.3d 150, 161 (2d Cir. 2010) (internal quotation marks omitted) (quoting *Iqbal*, 556 U.S. at 679). First, the court discounts legal conclusions and "[t]hreadbare recitals of the elements of a cause of action, supported by

mere conclusory statements[.]" *Iqbal*, 556 U.S. at 678. The court is also "not bound to accept as true a legal conclusion couched as a factual allegation[.]" *Id.* (citation omitted). Second, the court considers whether the factual allegations, taken as true, "plausibly give rise to an entitlement to relief." *Id.* at 679. This second step is fact-bound and context-specific, requiring the court "to draw on its judicial experience and common sense." *Id.* The court does not "weigh the evidence" or "evaluate the likelihood" that a party will prevail. *Christiansen v. Omnicom Grp., Inc.*, 852 F.3d 195, 201 (2d Cir. 2017).

**B. Whether the Court Lacks Subject Matter Jurisdiction.**

Pursuant to 28 U.S.C. § 1340, "[t]he district courts shall have original jurisdiction of any civil action arising under any Act of Congress providing for . . . revenue from imports . . . except matters within the jurisdiction of the [CIT]." Congress vested in the CIT "exclusive jurisdiction of any civil action which arises out of an import transaction and which is commenced by the United States . . . to recover customs duties." 28 U.S.C. § 1582(3). However, Congress's enactment of § 1582 "did not commit to the [CIT]'s exclusive jurisdiction *every* suit . . . challenging customs-related laws and regulations." *K Mart Corp. v. Cartier, Inc.*, 485 U.S. 176, 188 (1988) (emphasis in original). Congress instead "reject[ed] bills that would have implemented such a categorical approach" and "delineat[ed] precisely the particular customs-related matters over which the [CIT] would have exclusive jurisdiction." *Id.*

Defendants argue that because the United States is the "real party in interest" in a *qui tam* action, the instant action was "commenced by the United States" within the meaning of § 1582. (Doc. 140 at 27) (internal quotation marks and citation omitted). Mr. Adler counters that he, not the United States, commenced this action.

The Second Circuit has not addressed whether a *qui tam* suit is commenced by a private actor or by the United States. The Ninth Circuit, however, recently held that "§ 1582 poses no jurisdictional obstacle to a relator's FCA action in federal district court to recover customs duties." *Island Indus., Inc. v. Sigma Corp.*, 151 F.4th 1003, 1013 (9th Cir. 2025). It noted that, pursuant to Fed. R. Civ. P. 3, "[a] civil action is commenced by filing a complaint with the court[,]" and thus a "civil action commenced by the United

States . . . is therefore a lawsuit in which 'the United States' filed the complaint." *Id.* (alteration adopted) (internal quotation marks and citations omitted). It found that the term "the United States" did not include FCA relators "for purposes of interpreting § 1582's grant of exclusive jurisdiction to the CIT[,]" *id.* at 1014, and relied on precedent that held "[t]he United States . . . is a 'party' to a privately filed FCA action only if it intervenes[.]" *United States ex rel. Eisenstein v. City of New York*, 556 U.S. 928, 933 (2009). The Ninth Circuit reasoned that "[t]his holding necessarily means that a relator is not 'the United States' for purposes of interpreting the appeal deadline statute." *Island Indus.*, 151 F.4th at 1014. It recognized that, "in the standing context[,]" relators have been said to "effectively stand in the shoes" of the United States, but distinguished standing from "a statute's reference to 'the United States[.]'" *Id.* at 1014 (alteration adopted) (internal quotation marks and citation omitted). The assignment theory of standing in FCA actions[4] further "suggests that the term 'the United States' does not include relators because assignment necessarily involves two distinct parties: an assignor and an assignee." *Id.*

Defendants argue that the court should not follow the Ninth Circuit's rationale because it relied on *Eisenstein*, which addressed "an entirely different question" about "whether the United States is a 'party' to an FCA action if it has declined to intervene." (Doc. 152 at 16.) Although Defendants acknowledge that, "[i]n interpreting any statute, [courts] start with the plain meaning of the text," *Murray v. UBS Sec., LLC*, 128 F.4th 363, 369 (2d Cir. 2025), they contend that "it is likely that Congress did not intend Section 1582 to be construed *literally*, but rather intended to refer to persons authorized to act on behalf of the United States[,]" such as a *qui tam* relator. (Doc. 152 at 13) (emphasis in original). A district court in the Second Circuit addressed this argument and concluded "that the mere fact that the United States is the real party in interest does not

---

[4] *See Vt. Agency of Nat. Res. v. United States ex rel. Stevens*, 529 U.S. 765, 773-74 (2000) (holding that "the United States' injury in fact suffices to confer standing on" a *qui tam* relator because the Act "can reasonably be regarded as effecting a partial assignment of the [g]overnment's damages claim[]").

necessarily lead to the conclusion that the action was 'commenced by the United States' for purposes of 28 U.S.C. § 1582." *United States ex rel. Vallejo v. Investronica, Inc.*, 2 F. Supp. 2d 330, 334 (W.D.N.Y. 1998). The court relied on a CIT decision that rejected "the precise argument advanced here by the [D]efendants." *Id.* at 333.

> In *United States ex rel. Felton v. Allflex USA, Inc.*, 989 F. Supp. 259[] ([Ct. Int'l Trade] 1997), the CIT held that it did not have jurisdiction over relator's FCA suit, which arose out of defendant's failure to pay import duties, because the action was not one "commenced by the United States." According to the CIT, the district court was the proper forum for the action.

*Id.*

The CIT considered the text of the FCA and observed that "[t]he most relevant provision, 31 U.S.C.[] § 3730(b)(1), states that '[a] *person* may *bring* a civil action . . . for the *person* and for the United States [g]overnment.'" *Allflex*, 989 F. Supp. at 262 (alterations and emphasis in original). It concluded that the "language is clear: the statute distinguishes the one who 'brings' the case from the beneficiary 'for' whom the case is brought." *Id.* Considering the plain meaning of other subsections, the CIT noted that the FCA "specifically allows the [g]overnment to 'proceed' with the action without being bound by the acts of the private party who filed the complaint[,] . . . reflect[ing] the lack of control the [g]overnment holds over the private party and, thus, the initial filing of the suit." *Id.* Similarly, it observed that provisions throughout the FCA identify the relator as the party "responsible for having 'brought' the suit, 31 U.S.C.[] § 3730(d)(1)," and "as the 'person initiating the action,' *see* 31 U.S.C.[] § 3730(c)(2)(A)-(D) and § 3730(c)(3)-(5)," language "synonymous with" and "equivalent to 'commenced,' as used in § 1582." *Id.* at 263. "While not using the identical language of [the CIT's] jurisdictional statute, the [FCA] clearly contemplates the private party as the one who 'commenced' the action, and the [g]overnment as the party who may join and assume responsibility for the suit at a later time." *Id.* The CIT "cannot shoehorn customs duties into a statute that unequivocally provides for damages and penalties. . . . [It] is of limited jurisdiction and is not vested with the authority to grant [p]laintiff's claim for damages and penalties

pursuant to the FCA." *United States v. Universal Fruits & Vegetables Corp.*, 30 C.I.T. 706, 712 (Ct. Int'l Trade 2006).

The CIT considered that "the United States may be the real party in interest during the proceedings" of an FCA action but recognized "that the private party also has its own interests in the outcome of the action, interests which serve as the motivation for individuals to act as private attorneys-general in this context." *Allflex*, 989 F. Supp. at 263. Consequently, the CIT held that "classifying the United States as the real party in interest [does not] necessarily lead[] to the conclusion that the United States 'commenced' the suit for the purposes of § 1582." *Id.* at 262. It therefore concluded it lacks jurisdiction over *qui tam* suits because they are "'commenced by' the private actor, not the [g]overnment." *Id.* at 263.

This court finds the CIT's statutory interpretation persuasive and adopts it here. Mr. Adler, not the United States, commenced this action by filing the Complaint. Accordingly, the court has subject matter jurisdiction and the CIT does not. The court therefore DENIES Defendants' motion to dismiss the SAC on the basis that it lacks jurisdiction over Mr. Adler's claim.

### C. Whether the CBP Settlement Released Mr. Adler's FCA Claim Against Defendants During the Settlement Period.

Defendants assert that the CBP Settlement binds the entire federal government, including the DOJ, although they acknowledge that the CBP Settlement "is not outcome determinative" in the present case. Instead, according to Defendants, it narrows the period of time for which Mr. Adler can assert his FCA claim and recover damages. (Doc. 74-1 at 6.) They argue that, because the CBP Settlement released Defendants "from the payment of all duties and penalties for the [Settlement] Period[,]" the government has no damages claim to assign to Mr. Adler under the FCA for the Settlement Period. (Doc. 140 at 16.)

Defendants' claim that the CBP Settlement binds the entire federal government is premised on the preamble "defin[ing] CBP as 'CBP' or the 'Government[]'" and the agreement "mak[ing] numerous references to the 'United States.'" (Doc. 140 at 13.) The

plain language of the CBP Settlement, however, defines "CBP" and "Government" as shorthand designations for U.S. Customs and Border Protection. *See* Doc. 74-1 at 2 ("The Settlement Agreement ('Agreement') is entered into by and among U.S. Customs and Border Protection ('CBP' or 'Government'), The Sporn Company, Inc. ('TSC')[,] and Perry Sporn ('Sporn') (TSC and Sporn collectively, 'Importer') (collectively, 'Parties').").

Similarly, the CBP Settlement's references to the "United States" do not purport to bind the DOJ or any other federal agency. *See, e.g.*, *id.* at 4, ¶ 5 ("TSC fully and finally releases the United States, its agencies, officers, employees, servants, and agents . . ."); *id.* at 6, ¶ 10 ("Nothing in this Settlement Agreement shall preclude the United States from taking appropriate action against TSC or [Mr.] Sporn concerning any matter not addressed in the Settlement Agreement."); *id.* at ¶ 12 ("This Settlement Agreement is in no way related to or concerned with any Federal income taxes collect[a]ble by the United States for which TSC, [Mr.] Sporn, or any other related or associated entity may in the future be liable to the United States.").

Finally, "[i]t is well settled that an agency may only act within the authority granted to it by statute." *Nat. Res. Def. Council v. Nat'l Highway Traffic Safety Admin.*, 894 F.3d 95, 108 (2d Cir. 2018). The CBP does not have the authority to release FCA liability, as "[o]nly the United States Attorney General has the authority to settle a violation of the [FCA]." *United States v. Hughes Aircraft Co.*, 1991 WL 11693422, at *3 (C.D. Cal. Jan. 17, 1991).[5] Defendants' reliance on *Hughes* is misplaced because the *Hughes* court merely "reserve[d] judgment as to whether [defendant] should be permitted, during the trial of this case, . . . to argue the legal effect, if any, of" a non-DOJ

---

[5] Defendants argue that 31 U.S.C. § 3730(b)(1), which states that an FCA action "may be dismissed only if the court and the Attorney General give written consent to the dismissal and their reasons for consenting[,]" does not bar their motion because they seek only to "narrow[]" the case, not "dismiss[] [it] in its entirety." (Doc. 140 at 16.) The court agrees that, at this juncture, § 3730(b)(1) is inapplicable.

agreement on FCA liability. *Id.* Defendants cite no authority for a non-DOJ release of FCA liability.

In any event, Defendants

> overstate[] the plain language of the CBP Settlement, which releases TSC and Mr. Sporn only "from any marking duties and administrative monetary claims *pursuant to 19 U.S.C. §§ 1592 and 1304*" for imports [during the Settlement Period]. (Doc. 74-1 at 4) (emphasis supplied). The claim currently pending before this court arises under the FCA, 31 U.S.C. § 3729(a)(1)(G). *See United States v. Wanxiang Am. Corp.*, 654 F. Supp. 3d 1279, 1294 (Ct. Int'l Trade 2018) (describing FCA as "a statute analogous to § 1592").

(Doc. 91 at 12.)[6] The release of TSC and Mr. Sporn does not address the obligation to pay monies to the United States during the Settlement Period. *See id.* at 20 ("The obligation imposed by 19 U.S.C. § 1304(i) does not consist merely of 'potential or contingent exposure to penalties.'") (quoting *Miller v. United States ex rel. Miller*, 110 F.4th 533, 545 (2d Cir. 2024)). Defendants' citation to *United Sates v. Unisys Corp.*, 178 F. Supp. 3d 358, 375 (E.D. Va. 2016), is thus inapposite, as *Unisys* involved a release of FCA liability by the DOJ, not another federal agency releasing administrative claims.

"Because the court 'assume[s] that parties included contract provisions for a reason, [it] . . . will not embrace a construction of a contract that would render a provision meaningless.'" *James River Ins. Co. v. Inn-One Home, LLC*, 468 F. Supp. 3d 662, 671-72 (D. Vt. 2020) (alterations in original) (quoting *Rounds v. Malletts Bay Club, Inc.*, 2016 VT 102, ¶ 16, 203 Vt. 473, 479, 157 A.3d 1101, 1106)). The court therefore DENIES Defendants' motion to dismiss the SAC on the basis that the CBP Settlement released Defendants from FCA liability during the Settlement Period. This, of course, does not thereby entitle Mr. Adler or any other entity to a double recovery. Defendants claim that Mr. Adler has already received a portion of the CBP Settlement and cannot seek to

[6] The limited scope of the release is also supported by the Settlement Agreement's preamble, which states that "this agreement resolves CBP's claims for marking duties and penalties" and that "CBP has not determined whether there is a loss of revenue to the United States for the period of July 1, 2018 to March 31, 2022." (Doc. 74-1 at 3.)

recover that amount twice. As those facts are not before the court, the court need not address them at this time.

### D. Whether the CBP Settlement is an "Alternate Remedy" that Precludes Mr. Adler's FCA Claim.

Defendants alternatively argue that Mr. Adler's claim is barred with respect to the Settlement Period because the CBP Settlement constitutes an "alternate remedy" under the FCA. Mr. Adler asserts that Defendants waived this argument under Rule 12(g) because they did not raise it in their initial motion to dismiss. He further contends that the CBP Settlement is not an "alternate remedy" and that, even if it is, an "alternate remedy" does not preclude a relator's *qui tam* suit.

#### 1. Whether Defendants' Argument That the CBP Settlement Is An "Alternate Remedy" Under the FCA Is Waived Under Rule 12(g).

Under Rule 12(g)(2), "[e]xcept as provided in Rule 12(h)(2) or (3), a party that makes a motion under [Rule 12] must not make another motion under [Rule 12] raising a defense or objection that was available to the party but omitted from its earlier motion." Fed. R. Civ. P. 12(g)(2). Rule 12(h)(2) states, however, that a defense of "[f]ailure to state a claim upon which relief can be granted . . . may be raised . . . in any pleading allowed or ordered under Rule 7(a)[.]" "Thus, the defense of failure to state a claim is not waivable." *Patel v. Contemp. Classics of Beverly Hills*, 259 F.3d 123, 126 (2d Cir. 2001). In addition, "subject matter jurisdiction is not waivable and may be raised at any time by a party or by the court *sua sponte*." *Lyndonville Sav. Bank & Tr. Co. v. Lussier*, 211 F.3d 697, 700 (2d Cir. 2000). Defendants do not indicate whether they raise their "alternate remedy" argument under Rule 12(b)(6) or (b)(1), but, under either, it is "preserved from [Rule 12(g)'s] waiver mechanism[.]"[7] *Patel*, 259 F.3d at 126. To the extent Defendants

[7] Defendants' argument may also be understood as an "accord and satisfaction" claim, which is an affirmative defense. *See e.g.*, *Bibawy v. DeJoy*, 2022 WL 17337892, at *7 (D. Conn. Nov. 30, 2022) (describing "accord and satisfaction" and "release" defenses as "affirmative defenses") (internal quotation marks omitted). "Ordinarily, 'a failure to plead an affirmative defense results in a waiver[.]'" *Id.* (quoting *Nat'l Mkt. Share, Inc. v. Sterling Nat'l Bank*, 392 F.3d 520, 526 (2d Cir. 2004) (internal quotation marks omitted)).

raise their "alternate remedy" theory as an affirmative defense, because it may also be raised as a jurisdictional defense and a failure to state a claim, the court will not find a waiver on the record before it.

### 2. Whether the CBP Settlement Is An "Alternate Remedy" Under the FCA.

The FCA provides that:

> [n]otwithstanding subsection (b), [which outlines procedures of a *qui tam* action,] the [g]overnment may elect to pursue its claim through any alternate remedy available to the [g]overnment, including any administrative proceeding to determine a civil money penalty. If any such alternate remedy is pursued in another proceeding, the person initiating the action shall have the same rights in such proceeding as such person would have had if the action had continued under this section.

31 U.S.C. § 3730(c)(5).

According to Defendants, the CBP Settlement constitutes an "alternate remedy" under the FCA because it addressed the same conduct and claim for marking duties as Mr. Adler's FCA claim.[8] Mr. Adler argues that, "[b]ecause the CBP Settlement did not extinguish [his] FCA claims, it could not be considered an 'alternate remedy.'" (Doc. 144 at 17.)

Interpreting the FCA's "alternate remedy" provision, the Second Circuit gave "effect to common meanings of 'alternate' and 'available,' and to the presence of other language implying choices between existing options, all introduced by the phrase '[n]otwithstanding subsection (b)' which deals with *qui tam* actions," and concluded "that § 3730(c)(5) was meant to allow the government to choose between (1) exercising subsection (b) rights accorded to it with respect to a *qui tam* action and (2) pursuing an alternate or substitute remedy." *United States v. L-3 Commc'ns. EOTech, Inc.*, 921 F.3d

---

[8] Defendants also contend that Mr. Adler "could not have pursued a share of the [CBP Settlement] unless that payment . . . constituted an alternate remedy under 31 U.S.C. § 3730(c)(5)." (Doc. 140 at 20.) Mr. Adler, however, seeks to recover a portion of the CBP's $172,845.00 settlement payment under 19 U.S.C. § 1619, which awards monetary relief to an individual who "furnishes . . . original information concerning . . . any fraud upon the customs revenue[] or . . . any violation of the customs laws[.]" 19 U.S.C. § 1619(a).

11, 27 (2d Cir. 2019). It recognized that the "word 'any' is all-encompassing, but the intended scope of the phrase as a whole, despite its apparently unbounded breadth, is not entirely clear." *Id.* In noting that the "means by which the government is authorized to combat frauds include criminal prosecutions[,]" *id.*, the Second Circuit opined that:

> it is hardly clear that "any alternate remedy" was meant to include a criminal prosecution, given that the second sentence of § 3730(c)(5) states that "[i]f any such alternate remedy is pursued in another proceeding, *the person* initiating the action"--*i.e.*, the *qui tam* relator--"shall *have the same rights in such proceeding* as such person would have had if the action had continued under this section" (emphases added). We would find it difficult to infer that Congress intended a private *qui tam* relator to be entitled to, for example, conduct discovery and cross-examine the witnesses in a criminal prosecution.

*Id.* at 28 (emphasis and alteration in original). It nonetheless found "it clear from other FCA provisions that that phrase was intended to include the government's authorization to bring a civil suit under § 3730(a)." *Id.*

Although the Second Circuit did not consider whether a settlement constitutes an "alternate remedy" under the FCA, other circuits have found government settlements are "alternate remedies" in certain circumstances. *See, e.g.*, *United States ex rel. Bledsoe v. Cmty. Health Sys., Inc.*, 342 F.3d 634, 649 (6th Cir. 2003) ("We therefore hold that a settlement pursued by the government in lieu of intervening in a *qui tam* action asserting the same FCA claims constitutes an 'alternate remedy' for purposes of 31 U.S.C. § 3730(c)(5)."). For example, in *Bledsoe*, the Sixth Circuit remanded to the district court for "an evidentiary hearing at which [the relator] may present evidence supporting his assertion that there exists overlap between the information he provided to the government and the FCA violations contemplated by the settlement agreement." *Id.* at 651; *see also United States ex rel. Birchall v. SpineFrontier, Inc.*, 2024 WL 4686985, at *5 (D. Mass. Nov. 4, 2024) (describing the "alternate remedy" inquiry as "whether there exists any overlap between [r]elator's allegations and the conduct discussed in the settlement agreement.") (internal quotation marks omitted) (citing *Bledsoe*, 342 F.3d at 651).

Similarly, the Ninth Circuit concluded that a settlement that arose from an administrative suspension and debarment proceeding initiated by the Air Force was an "alternate remedy" under the FCA even though "the Department of Defense and the Air Force have no power to prosecute FCA claims" and "the parties have a different kind of stake in a suspension or debarment proceeding than in an FCA action." *United States ex rel. Barajas v. United States*, 258 F.3d 1004, 1011 (9th Cir. 2001). The court explained that it did "not hold that a suspension or debarment proceeding is always an 'alternate remedy' within the meaning of the FCA. Indeed, [it] believe[d] that it rarely will be." *Id.* at 1012. The Ninth Circuit reasoned, however, that the settlement "substantially replicated the remedy [the government] could have obtained if it had intervened in [the relator's] . . . qui tam action." *Id.* at 1011; *see also id.* at 1012 ("[T]he government brought a suspension or debarment proceeding that allowed it to achieve essentially the same result it could have achieved by intervening in [the relator's *qui tam*] action."). "Under these circumstances, [it] h[e]ld that the remedy achieved by the government in the Air Force [settlement] is an alternate remedy within the meaning of the FCA." *Id.* at 1013. The Ninth Circuit thus focused on both the underlying conduct and the remedy obtained in evaluating whether the settlement was an "alternate remedy" under the FCA.

The D.C. Circuit, considering the plain text of the FCA, held that for a recovery of money by the federal government to be an "alternate remedy," it is not enough that "the underlying facts are similar to those in the earlier-filed *qui tam* lawsuit." *United States v. Novo A/S*, 5 F.4th 47, 49 (D.C. Cir. 2021). Instead, an "alternate remedy" "must redress the same type of falsity and fraud claims that otherwise could be pursued by a private relator's *qui tam* lawsuit under the [FCA]. That could include, for example, an administrative proceeding for the remediation of false or fraudulent money claims." *Id.* at 56 (citation omitted). The court emphasized § 3730(c)(5)'s use of the term "claim," observing that:

> [t]he statute does not, for example, say that the relator can recover if the government pursues any alternate cause of action. Instead, the remedy is tied to the single referenced "claim." 31 U.S.C. § 3730(c)(5). That claim is only the one that otherwise could be prosecuted through a *qui tam* suit

> under subsection 3730(b) of the [FCA]. It is for those specified claims of falsity or fraud that Congress felt a need to give express permission for the government to pursue alternative recourse "notwithstanding" a relator's initiation of a *qui tam* lawsuit under "subsection (b)." *Id.*

*Id.* at 55. Thus, according to the D.C. Circuit, "it is the nature of the legal claim—the fraudulent or false deprivation of a monetary or property interest—and not the commonality of facts that determines a relator's right to share in an alternative recovery." *Id.* at 57. Applying this interpretation, the D.C. Circuit concluded that a settlement arising from a misbranding claim under the Food, Drug, and Cosmetic Act, 21 U.S.C. § 352(y), was not an "alternate remedy" because "misbranding bears little resemblance to the types of fraudulent behavior that the [FCA] identifies and proscribes[,]" noting that, "[m]ost critically, a misbranding claim seeks to protect the *public* from being misled by the drug company's marketing tactics[]" while the FCA "seek[s] to recover damages for any use of falsity or fraud to deprive the *government* of its money or property[.]" *Id.* at 56 (emphasis in original).

In this case, the CBP Settlement appears to share common facts and legal theories with Mr. Adler's *qui tam* suit, as both arise from Defendants' alleged failure to mark jewelry imported from Canada to the United States with the country of origin. There is thus a plausible argument that the CBP Settlement "substantially replicated" and "effectively [took] the place of the FCA remedy." *Barajas*, 258 F.3d at 1011. The two proceedings, however, do not involve identical legal claims and time periods. Section 1304 regulates inscriptions indicating the country of origin and is intended "to enable the 'ultimate purchaser' of the goods to decide for himself [or herself] whether he [or she] would 'buy or refuse to buy them.'" *Globemaster, Inc. v. United States*, 340 F. Supp. 974, 976 (Cust. Ct. 1972).[9] Section 1592 concerns false or fraudulent statements in

[9] The purpose of § 1304 is like the misbranding purpose described in *Novo*, as it seeks to protect the public from being misled regarding purchased goods. It is not intended to protect the United States from import or export fraud.

customs documents,[10] which is information conveyed to the government. In that respect, a § 1592 claim resembles an FCA claim, as both seek to protect the government from falsity and fraud. Section 1592 does not, however, consider "whether the United States is or may be deprived of all or a portion of any lawful duty, tax, or fee thereby," 19 U.S.C. § 1592(a)(1), unlike an FCA claim, which seeks to remedy "the fraudulent or false deprivation of a monetary or property interest[.]" *Novo*, 5 F.4th at 57. Because § 1592 does not require the falsity or fraud to be used "to obtain money or property in which the United States has a legal interest[,]" it is not clear whether it is an "alternate remedy" under the FCA. *Id.* at 57.

The court has limited information regarding the facts and the nature of the proceedings that gave rise to the CBP Settlement. At this nascent phase of the case, it therefore cannot find as a matter of law that the CBP Settlement constitutes an "alternate remedy" under the FCA. The court thus DENIES Defendants' motion to dismiss on that basis. It does not, however, foreclose further argument on this issue.

### 3. Whether An "Alternate Remedy" Forecloses a Relator's *Qui Tam* Action.

Assuming *arguendo* that the CBP Settlement is an "alternate remedy," Defendants assert that it forecloses Mr. Adler's *qui tam* action "for the same conduct and period." (Doc. 140 at 21.) They claim that the "FCA permits the [g]overnment to pursue an alternate remedy as an *alternative* to intervening *or* to permitting the *qui tam* action to proceed under [a] [r]elator's oversight[,]" and argue that the "term 'alternate' would be meaningless had Congress not intended the [g]overnment's pursuit of an alternate remedy to replace and displace that portion of the *qui tam* action for which the [g]overnment sought an alternate remedy." *Id.* (emphasis in original).

[10] Section 1592 "provides monetary penalties for making false statements in customs documents, and limits the circumstances under which the government may seize or forfeit merchandise imported or introduced by means of such false statements." *United States v. Broadening-Info Enters., Inc.*, 578 F. App'x 10, 18 n.8 (2d Cir. 2014).

Dicta from the Sixth Circuit lends support to Defendants' position. In addressing a claim by a relator seeking a portion of a settlement between the DOJ and the defendant where the settlement "exclud[ed] [the relator's] claims from the agreement[,]" the Sixth Circuit held that "the government may not settle a relator's claims and seek to avoid paying a relator his or her statutory share to the settlement proceeds by excluding the relator's claims from the terms of the settlement agreement." *Bledsoe*, 342 F.3d at 649-50. The *Bledsoe* court opined that excluding the relator's claims from the settlement agreement "would lead to consequences unintended by the FCA[,]" reasoning that,

> [i]f indeed the government settled [r]elator's claims, either [d]efendants would assert an accord and satisfaction defense (which, if successful, would deny [r]elator part or all of his rightful share of the recovered funds), or [d]efendants would be forced to pay the civil penalties and double or treble damages associated with the very same claims for which they had already paid penalties and damages by way of the settlement. Under either result, adverse consequences (to either [r]elator or [d]efendants) would ensue that the FCA had not intended. *See* S. Rep. 99-345, at 27, 1986 U.S.C.C.A.N. at 5292 ("While the [g]overnment will have the opportunity to elect its remedy, it will not have an opportunity for dual recovery on the same claim or claims."); *id.* at 2, 23-24, 1986 U.S.C.C.A.N. at 5267, 5288-89 (emphasizing its intent to provide a financial incentive for relators bringing valid *qui tam* suits and its belief that the government and private citizens must work together to battle FCA violations).

*Id.*

*Bledsoe* is distinguishable in three respects. First, *Bledsoe* involved an action brought by a relator to recover proceeds obtained by the government. Here, Defendants seek to exclude a portion of Mr. Adler's claims and narrow the period governed by them. Section 3730(c)(5) provides that "the person initiating the [FCA] action shall have the same rights [to an alternate remedy] as such person would have had if the action had continued" under the FCA. It does nothing more. *See United States ex rel. LaCorte v. Wagner*, 185 F.3d 188, 191 (4th Cir. 1999) ("Section 3730(c)(5) simply preserves the rights of the original qui tam plaintiffs when the government resorts to an alternate remedy in place of the original action."). Second, the settlement agreement in *Bledsoe* was negotiated by the DOJ, which has the authority to release FCA claims and did so. In

this case, the CBP Settlement was negotiated by CBP, which has no authority to release FCA claims and did not do so. And third, the *qui tam* suit in *Bledsoe* was dismissed with prejudice after the relator failed to plead with particularity as required by Fed. R. Civ. P. 9(b). Mr. Adler's *qui tam* suit has not been dismissed, much less with prejudice. *See id.* at 192 ("Section 3730(c)(5) assumes that the original qui tam action did not continue."). Given these differences, at the pleading stage, the court cannot find as a matter of law that § 3730(c)(5) requires dismissal of Mr. Adler's claims with respect to the Settlement Period.[11]

The Third Circuit has held that an "alternate remedy" leaves a relator's "right to proceed with his [or her] *qui tam* action . . . unimpaired[,]" explaining that "[b]ecause the government never exercised its rights to intervene, the settlement between [the government] and [the defendant] does not negate [the relator's] ability, as the relator, to proceed independently with his [or her] *qui tam* action." *United States ex rel. Dunleavy v. Cnty. of Del.*, 123 F.3d 734, 739 (3rd Cir. 1997), *abrogated on other grounds by Graham Cnty. Soil & Water Conservation Dist. v. United States ex rel. Wilson*, 559 U.S. 280 (2010). The Third Circuit relied on the premise that a relator "has an interest in pursuing his [or her] claim independently of the government" because "the FCA also fills a

[11] Defendants rely on non-controlling precedent from the Ninth Circuit, which considered a settlement agreement arising from an administrative suspension or debarment proceeding initiated by the Air Force and held that, "in some circumstances, a suspension or debarment proceeding *can* be an alternate remedy." *United States ex rel. Barajas v. United States*, 258 F.3d 1004, 1012 (9th Cir. 2001) (emphasis in original). Like *Bledsoe* and unlike the instant case, however, *Barajas* was an action brought by a relator whose *qui tam* suit had been dismissed on the basis of claim preclusion. The decision does not address whether a relator may be precluded from pursuing a pending *qui tam* suit because the government has allegedly obtained an "alternate remedy." Rather, it observed that the settlement at issue "specifically provided that it could be used by [the FCA defendant] 'in any civil proceeding in which [the FCA defendant] attempts to obtain appropriate credit for funds paid or value received pursuant to [the] [a]greement[,]" and concluded that the "obvious 'civil proceeding' in which [the FCA defendant] would have been able to receive 'appropriate credit for funds paid or value received' was, of course, [the relator's] second *qui tam* action[.]" *Id.* at 1011.

remedial capacity in redressing injury to the individual relator." *Id.* (citing *United States ex rel. Neher v. NEC Corp.*, 11 F.3d 136, 137 (11th Cir. 1993)).

*Dunleavy*, however, preceded "the Supreme Court['s] determin[ation] that a relator's interest in a *qui tam* suit is one as the 'partial assignee' of the claims of the United States [and] that the injury[] and[,] therefore, the right to bring the claim belongs to the United States." *United States ex rel. Mergent Servs. v. Flaherty*, 540 F.3d 89, 93 (2d Cir. 2008) (citing *Vt. Agency of Nat. Res. v. United States ex rel. Stevens*, 529 U.S. 765, 774-75 (2000)); *see also United States ex rel. Polansky v. Exec. Health Res., Inc.*, 599 U.S. 419, 425 (2023) ("[T]he injury [relators] assert [in a *qui tam* suit] is exclusively to the [g]overnment.").

The Second Circuit has not addressed when an "alternate remedy" under § 3730(c)(5) precludes all or part of a relator's *qui tam* suit. It has found that § 3730(c)(5) "entitles a person who brought a *qui tam* action to share in the recovery gained by the government in a proceeding it has pursued as an alternative to the *qui tam* action, if the relator's *qui tam* action was pending when the government was choosing what course to pursue." *L-3 Commc'ns.*, 921 F.3d at 30. In reaching that conclusion, it noted that the third sentence of § 3730(c)(5), "that any final findings of fact in the alternate remedy proceeding 'shall be conclusive on all parties to an action under this section[,]'" *id.* at 29 (quoting § 3730(c)(5)), "refers to *qui tam* actions that were pending when the government considered its alternatives and that continued in existence . . . while an alternate to participation in the *qui tam* action was pursued." *Id.* at 29-30. This arguably supports an interpretation that a *qui tam* suit may proceed despite an "alternate remedy," as "the alternate remedy proceeding's findings and conclusions could have no such effect in an action that" was not pending and did not proceed. *Id.* at 29. Otherwise, the third sentence of § 3730(c)(5) would be meaningless. The Second Circuit also observed that "other FCA sections indicate that there is no impediment to the government's commencement of its own action under § 3730(a) after a *qui tam* action under subsection (b) has been brought[,]" *id.* at 28, which demonstrates that a *qui tam* suit is not mutually exclusive with the government pursuing its own claims under the FCA.

Because, at this stage, the court cannot find as a matter of law that an "alternate remedy" precludes a relator's *qui tam* suit for the same conduct and time period, the court DENIES Defendants' motion to dismiss. Nonetheless, it does not foreclose further argument on this issue.

## CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss is DENIED. (Doc. 140.)
SO ORDERED.

Dated at Burlington, in the District of Vermont, this 10th day of September, 2026.

Christina Reiss, ~~Chief Judge~~
United States District Court